IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § | Case No. 1:18-CV-637-RP |
| Plaintiffs, | § § § | |
| v. | § § | **Plaintiffs' Motion for a Preliminary Injunction** |
| GURBIR GREWAL, in his official capacity as New Jersey Attorney General; MICHAEL FEUER, in his official capacity as Los Angeles City Attorney; ANDREW CUOMO, in his official capacity as New York Governor; MATTHEW DENN, in his official capacity as Attorney General of the State of Delaware; JOSH SHAPIRO, in his official capacity as Attorney General of Pennsylvania; and THOMAS WOLF, in his official capacity as Pennsylvania Governor, | § § § § § § § § § § § § § | |
| Defendants. | § § | |

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ARGUMENT ........................................................................ 1

STATEMENT OF THE CASE............................................................................... 4

I.     Defense Distributed publishes digital firearms information. ............................. 4

     A.   Defense Distributed publishes digital firearms information via the internet............... 5

     B.   Defense Distributed publishes digital firearms information via the U.S. mail............ 7

     C.   Defense Distributed offers and advertises digital firearms information..................... 8

II.    New Jersey is censoring Defense Distributed with both civil and criminal law. .............. 9

     A.   New Jersey's civil actions erect an informal system of prior restraints. ..................... 9

     B.   New Jersey's new speech crime targets Defense Distributed. ................................. 10

ARGUMENT ................................................................................................... 13

I.     The Court should enjoin enforcement of the Section 3(*l*)(2) speech crime..................... 13

     A.     Plaintiffs will likely succeed on the merits of the First Amendment claim.......... 13

         1.     Content-based censorship makes Section 3(*l*)(2) unconstitutional. .......... 14

         2.     Overbreadth makes Section 3(*l*)(2) unconstitutional. ............................... 17

         3.     A missing scienter element makes Section 3(*l*)(2) unconstitutional......... 20

     B.     Plaintiffs will likely succeed on the merits of the Due Process Clause claim. ..... 20

     C.     Plaintiffs will likely succeed on the merits of the Commerce Clause claim. ....... 22

     D.     Plaintiffs will likely succeed on the merits of the Supremacy Clause claim. ....... 23

         1.     CDA Section 230 preempts Section 3(*l*)(2). ............................................. 23

         2.     The State Department's authority preempts Section 3(*l*)(2). .................... 24

     E.     Plaintiffs will suffer irreparable harm in the absence of immediate relief. .......... 25

     F.     The balance of equities favors the Plaintiffs and a preliminary injunction will serve the public interest. ................................................................................. 27

II.    The Court should enjoin New Jersey's civil enforcement efforts..................................... 27

CONCLUSION................................................................................................. 28

CERTIFICATE OF SERVICE ............................................................................. 30

Plaintiffs Defense Distributed and the Second Amendment Foundation, Inc. ("SAF") move for a preliminary injunction against Defendant Gurbir Grewal, the New Jersey Attorney General.

## SUMMARY OF THE ARGUMENT

In November 2018, the State of New Jersey enacted Senate Bill 2465, a new criminal law. Section 3(*l*)(2) criminalizes constitutionally protected speech that Defense Distributed has engaged in before and desires to engage in again soon. Defense Distributed now refrains from engaging in that speech for fear of prosecution by Defendant Gurbir Grewal, the New Jersey Attorney General.

Section 3(*l*)(2) does not address conduct. Rather, it addresses a specific kind of speech: *digital firearms information*. The new law criminalizes "digital instructions" that "may be used" to "produce a firearm" with a "three-dimensional printer." Section 3(*l*)(2) makes it a crime to "distribute" that speech "to a person in New Jersey" (except for manufacturers and wholesalers). The law provides a nearly limitless definition of "distribute": "to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute."

This law is unconstitutional. It is an extreme act of content-based censorship that has no hope of satisfying strict scrutiny because it is ineffective, overbroad, and underinclusive all at once. It punishes speakers worldwide not because the speech itself does any harm, but because of speculation that the speech may sometimes bear a contingent and indirect relationship to bad acts.

No medium escapes this new crime. Section 3(*l*)(2) outlaws speech delivered "by any means." It expressly criminalizes the sharing of information "via the Internet" and also expressly criminalizes sharing via standard postal "mail." The crime also extends to rudimentary in-person interactions such as "display[ing]," "present[ing]," and "giv[ing]" information. New Jersey's new speech ban sweeps in every way that people might possibly share these ideas with one another.

All kinds of digital firearms information are censored by this new speech crime.  The ban covers both "computer-aided design files" *and* "other code or instructions stored and displayed in electronic format as a digital model."  How the information is *actually* used is irrelevant.  The crime applies if information "*may be used*" by a third party in certain activities.  The speech's mere *potential* relationship to that conduct is adequate for a conviction.  It matters not how unlikely that potentiality may be, or whether the speaker had any specific knowledge or intent.  In addition, the new law makes it a crime to merely "offer" or  "advertise" or "make available" the information.

For years, Defense Distributed has done what Section 3(*l*)(2) now criminalizes: openly distribute digital firearms information to the public domain through both the internet and the mail.  In addition, Defense Distributed made offers and advertisements about both distribution methods.

New Jersey is targeting Defense Distributed with the new crime.  At the law's signing ceremony, the Attorney General singled out Defense Distributed founder Cody Wilson by name.  He said that this law must be enacted because of "a Texan named Cody Wilson" and "his supporters," who had "take[n] advantage of loopholes" in the past and are "still trying to release these codes."  Section 3(*l*)(2) was made "to stop them" and to "stop the next Cody Wilson."  With his new speech crime "tool" in hand, New Jersey's Attorney General threatened Defense Distributed and everyone else that shares digital firearms information: "we will come after you."

Irreparable harm of the highest constitutional order will occur if Section 3(*l*)(2) is enforced against Defense Distributed and/or SAF's members.  But the harm is not just prospective.  With each passing day, Section 3(*l*)(2) causes irreparable harm by chilling constitutionally protected speech and triggering self-censorship.  Plaintiffs are not the only ones so injured.  Every American who dares speak to a fellow citizen about modern firearm production under the First and Second Amendments suffers because of this law's effort to mute all digital firearms information.

In this action, Plaintiffs are likely to succeed in having Section 3(*l*)(2) held unconstitutional and its enforcement permanently enjoined. This is true both as to the First Amendment actions and as to those brought under the Due Process Clause, Commerce Clause, and Supremacy Clause. Until then, the Court should preserve the status quo and prevent irreparable harm by enjoining New Jersey's enforcement Section 3(*l*)(2) against the Plaintiffs.

In addition to its new *criminal* law, New Jersey's Attorney General has for months been acting to censor the Plaintiffs under the color of state *civil* laws. He sent cease-and-desist letters to Defense Distributed, sued Defense Distributed in state and federal court, and threatened Defense Distributed's service providers in an effort to shut down the speech indirectly. Through these civil legal actions, New Jersey's Attorney General has attempted to impose a prior restraint that is just as violative of the First Amendment as is Section 3(*l*)(2)'s new speech crime. The New Jersey Attorney General's civil actions are also bound to be held unconstitutional in this action. They too should be enjoined until the Court issues a final judgment stopping this censorship for good.

"The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). Hence, a "law imposing criminal penalties on protected speech is a stark example of speech suppression." *Id.* at 244. The Constitution is no less offended by suppressive actions that take the form of "informal sanctions." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Both kinds of suppression are at issue here and both deserve to be halted immediately.

The New Jersey Attorney General's effort to abridge the First Amendment for the sake of muting the Second Amendment is unprecedented and unconstitutional. By the authority of 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), the Court should issue a preliminary injunction against the New Jersey Attorney General and stop his unlawful efforts to ban the free exchange of digital firearms information that belongs in the public domain.

## STATEMENT OF THE CASE

Plaintiffs' First Amended Complaint states the basic facts.  Doc. 23 (hereinafter "FAC"). Plaintiffs adopt that pleading here by reference.  *See* Fed. R. Civ. P. 10(c).[1]  Exhibits are submitted by Plaintiffs' Motion for a Preliminary Injunction Appendix in order, such that Exhibit 1 is the Appendix's Attachment #1, Exhibit 2 is the Appendix's Attachment #2, and so forth.

## I.    Defense Distributed publishes digital firearms information.

This action begins where the Court left off in *Defense Distributed v. United States Department of State*, No. 1:15-CV-372-RP (W.D. Tex.) (hereinafter *Defense Distributed I*).  That case concerned whether federal law lets the State Department halt Defense Distributed's online publication of certain digital firearms information. *See* FAC ¶¶ 27-39.

Plaintiffs and the State Department settled *Defense Distributed I* by entering into a Settlement Agreement, Ex. 14, which, among other things, obligates the State Department to alter certain regulations and grant the *Defense Distributed I* Plaintiffs—including Defense Distributed and SAF—a federal license to freely publish digital firearms information.  *See* FAC ¶¶ 42; Ex. 26 ¶ 16-17.  The State Department did so in July by modifying the regulations, Ex. 16, and issuing the license, Ex. 15.[2]

---

[1] This motion also sets forth facts occurring after the complaint's filing, which should be accounted for even if pleadings need to be amended later.  *See* 11A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2949 & nn. 5-6 (3d ed. West 2018); *see also* Fed. R. Civ. P. 15.  The Court should also employ Federal Rule of Evidence 201 to take judicial notice of facts such as other courts' dockets, *see* Exs. 4, 13, 17, 19, 20; *Orabi v. Att'y Gen. of the U.S.*, 738 F.3d 535, 537 & n.1 (3d Cir. 2014), and the contents of pertinent internet websites, *see* Exs. 6, 27, 29, 30-41, 49; *see United States v. Flores*, 730 F. App'x 216, 221 n.1 (5th Cir. 2018) (unpublished) (Haynes, J., concurring); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005); *Helen of Troy, L.P. v. Zotos Corp.*, 235 F.R.D. 634, 640 (W.D. Tex. 2006).

[2] The Department of Justice had long taken the position that such a censorship regime would be unconstitutional.  *See* U.S. Dep't of Justice Office of Legal Counsel ("OLC"), Mem. to Dr. Frank Press, Science Advisor to the President, on the Constitutionality Under the First Amendment of ITAR Restrictions on Public Cryptography (May 11, 1978) (Ex. 42); OLC, Mem. for the Office of Munitions Control, Department of State on the Constitutionality of the Proposed Revision of

The regulatory changes and license that resulted from *Defense Distributed I* may be *sufficient* to establish the Plaintiffs' right to share the digital firearms information at issue here. But as a matter of law, they are *not necessary*. The Constitution guarantees the Plaintiffs' right to engage in the speech at issue. The Plaintiffs can legally do so now *regardless* of whether the State Department acknowledges that right with a regulatory modification and/or license.[3]

A.      **Defense Distributed publishes digital firearms information via the internet.**

Defense Distributed has published digital firearms information to the internet's public domain for lengthy periods of time on multiple occasions. *See* FAC ¶¶ 1, 2, 10, 11, 31, 53-55. Indeed, doing so is Defense Distributed's core mission. *See* Ex. 26 ¶ 4; Ex. 23 ¶ 2. The nature of the digital firearms information that Defense Distributed has published is well-documented. *See* FAC ¶¶ 30-34; Ex. 26 ¶¶ 4-11, 19-20, 26-27; Ex. 23 ¶¶ 3, 8; Ex. 12; Ex. 6 at 1-2; Ex. 13 ¶¶ 25, 36, 44-45; Ex. 53[4]; Dkt. 57 at 2; *Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016) (Jones, J., dissenting).

---

the International Traffic in Arms Regulations (July 1, 1981) (Ex. 43); OLC, Mem. for the Director, Capital Goods Production Materials Division, Dep't of Commerce on the Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations (July 28, 1981) (Ex. 44); OLC, Mem. for Davis R. Robinson, Legal Advisor, Dep't of State, on Revised Proposed International Traffic in Arms Regulations (ITAR) (July 5, 1984) (Ex. 45); U.S. Dep't of Justice, Report on the Availability of Bombmaking Information (1997) (Ex. 46).

[3] In *State of Washington v. United States Department of State*, No. 2:18-cv-1115-RSL (W.D. Wash.), New Jersey and other states are suing the State Department to invalidate the regulatory modification and license issuance that occurred in July 2018. The case concerns whether the State Department complied with the Administrative Procedure Act in performing those actions. The case's preliminary injunction applies only to the State Department; it does not order Defense Distributed to do or not do anything. Ex. 20 at 25. Even if the states in that case ultimately prevail, the State Department will *not* be barred from complying with the Settlement Agreement. Success for the states in the Washington action means only that the State Department can simply re-perform the regulatory modification and license issuance in accordance with the APA. Indeed, the Settlement Agreement requires the government to perform its obligations thereunder in a manner "authorized by law (including the Administrative Procedure Act)." Ex. 14 ¶ 1(a).

[4] Plaintiffs' Exhibit 53 is the document filed in *Defense Distributed I* as docket entry number 37-5. In *Defense Distributed I*, the Court granted a motion to file docket entry number 37-5 under seal,

First, Defense Distributed published digital firearms information to the internet's public domain via its websites (known as "DEFCAD") in 2012, before *Defense Distributed I* began. *See* FAC ¶ 31; Ex. 26 ¶¶ 8-15; Ex. 23 ¶ 3; Ex. 4 at 15-16, ¶¶ 13-16. This publication period lasted from December 2012 to May 2013. *See id.*

Second, Defense Distributed published digital firearms information to the internet's domain via DEFCAD in 2018, after settling *Defense Distributed I*. *See* FAC ¶ 53-54; Ex. 26 ¶¶ 16-25. This publication period lasted from July 27, 2018, to July 31, 2018. *See id.*

The digital firearms information that Defense Distributed published on the internet—before and after *Defense Distributed I*—continues to be independently republished on the internet. *See* FAC ¶¶ 54-55. To this day, the files that Defense Distributed published on DEFCAD continue to be republished for free download by independent third parties on websites that can be located by a simple Google search. *See* Ex. 24 at 1-2; Ex. 8 at 1; Ex. 28 at 1; Ex. 27 at 10.

Without question, Defense Distributed seriously desires to continue publishing digital firearms information on its website to the internet's public domain. *See* FAC ¶ 3; Ex. 26 ¶¶ 3-7, 20, 21, 23, 32; Ex. 27 at 3-5. But Defense Distributed refrains from doing so now for fear of being punished by states like New Jersey. *See* FAC ¶ 116; Ex. 26 ¶¶ 28-32.

The recipients of Defense Distributed's online publications include SAF's members, who refrain from receiving and republishing Defense Distributed's online digital firearms information for fear of being prosecuted by states like New Jersey. *See* FAC ¶¶ 1, 13; Ex. 21 ¶¶ 7-9; Ex. 22 ¶¶ 6-9. Once those threats cease, SAF's members intend to resume receiving information from Defense Distributed and republishing it. *See* FAC ¶¶ 13; Ex. 21 ¶¶ 7-9; Ex. 22 ¶¶ 6-8.

---

and it remains so sealed. The document should remain under seal now for the same reasons that it was placed under seal originally. In a separate filing in this case, Plaintiffs are moving to have the document filed under seal in this docket. Until that motion is ruled upon, Plaintiffs request that the Court take judicial notice of the document filed in *Defense Distributed I* as docket entry number 37-5 and treat it as this action's Exhibit 53. *See* Fed. R. Evid. 201.

**B.      Defense Distributed publishes digital firearms information via the U.S. mail.**

Apart from online publications, Defense Distributed has spent the last several months distributing digital firearms information by U.S. mail.  *See* FAC ¶ 1, 10-11.  In *State of Washington v. United States Department of State*, No. 2:18-cv-1115-RSL (W.D. Wash.), the State Department and the State of New Jersey expressly conceded that Defense Distributed has a right to do just that—to mail digital firearms information without violating any law.[5]

During the Washington action's preliminary injunction hearing, counsel for the State Department stated that "even if the Court were to grant [New Jersey and the other plaintiff states] every ounce of relief that they seek in this case, Defense Distributed could still mail every American citizen in the country the files that are at issue here."  Ex. 19 at 27:12-15. At that same hearing, counsel for New Jersey's Attorney General agreed that, apart from internet publication, Defense Distributed had a right to distribute digital firearms information via the mail or otherwise "hand them around domestically" without violating any law.  Ex. 19 at 23:5-9.

Thus, ever since both the State Department and New Jersey acknowledged Defense Distributed's right to do so legally, Defense Distributed has been distributing digital firearms information files by mailing them via the U.S. Postal Service.   *See* Ex. 26 ¶¶ 5-7, 26-27. Specifically, "Defense Distributed sold digital firearms information by using an ecommerce platform on DEFCAD to facilitate the transaction and using the U.S. Postal Service as its means of delivering the information."  *Id.* ¶ 26.  After "customers entered an order using DEFCAD's online ecommerce platform," Defense Distributed put the "information on a USB drive or SD card and mailed the drive or card to . . . customers via the U.S. Postal Service."  *Id.* ¶ 27.

---

[5] *Cf. Def. Distributed v. U.S. Dept. of State*, 121 F. Supp. 3d 680, 695 (W.D. Tex. 2015) ("As [the State Department] point[s] out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.").

For Defense Distributed, SAF, and anyone else interested in digital firearms information, the postal mail alternative to internet publication is not an "adequate substitute[]." *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994). Internet distribution is essential for many reasons. Most importantly, it is essential because it enables the collaborative development of digital firearms information in the public forum now known as the "Open Source Community."[6]

Defense Distributed refrains from continuing to distribute digital firearms information via the mail for fear of being punished by states like New Jersey. Once that threat ceases, Defense Distributed intends to continue engaging in this speech, *see* FAC ¶¶ 3, 116; Ex. 26 ¶¶ 4-7, 20, 23, 28-32, and SAF's members intend to continue receiving it, benefitting from it, and republishing it, Ex. 21 at ¶¶ 7-9; Ex. 22 ¶¶ 6-9.

### C. Defense Distributed offers and advertises digital firearms information.

In addition to its actual publications via the internet and mail, Defense Distributed also offers and advertises the distribution of digital firearms information to potential recipients. *See* FAC ¶ 1, 10; Ex. 26 ¶¶ 6, 26-27. These efforts include advertisements and offers on DEFCAD itself, participation in trade shows, e-mail advertisements, and media advertising efforts. Ex. 26 ¶¶ 6, 26, 32; Ex. 9 at 2.

---

[6] The "open-source community" is a "loosely organized, ad-hoc community of contributors from all over the world who share an interest in meeting a common need, ranging from minor projects to huge developments, which they carry out using a high-performance collaborative development environment, allowing the organizational scheme and processes to emerge over time." Javier Soriano, Genovea López & Rafael Fernández, *Collaborative Development Environments*, in Goran D. Putnik & Maria M. Cunha, I *Encyclopedia of Networked and Virtual Organizations* at 231 (2008) (Ex. 50). "The concept represents one of the most successful examples of high-performance collaboration and community-building on the Internet." *Id*; *see also* Georg von Krogh, *Open-Source Software Development*, 44 MIT-Sloan Mgmt. Rev. 3, 14 (2003) (Ex. 47); Eric S. Raymond, *The Cathedral and the Bazaar*, 3 First Monday 3 (1998), https://firstmonday.org/article/view/578/499 (Ex. 48).

Out of fear of prosecution by New Jersey, Defense Distributed refrains from continuing to offer and advertise its digital firearms information to persons in New Jersey.  Ex. 26 ¶ 32.  Once that threat ceases, Defense Distributed plans to resume offering and advertising its willingness to engage in the speech at issue.  *See* Ex. 26 ¶¶ 4-7, 29-32.

## II.     New Jersey is censoring Defense Distributed with both civil and criminal law.

New Jersey is engaged in a concerted and deliberate effort to stop Defense Distributed's expression of digital firearms information.  *See* FAC ¶¶ 75-87.  The censorship effort has taken three forms.  First, New Jersey is attempting to unsettle the resolution of *Defense Distributed I.* *See* FAC ¶¶ 56-63; Exs. 7-8.  Second and third, New Jersey is censoring Defense Distributed directly under the color of both state civil and criminal law.

### A.     New Jersey's civil actions erect an informal system of prior restraints.

Apart from and before the enactment of New Jersey's new criminal statute, the New Jersey Attorney General has spent months censoring Defense Distributed with a campaign of civil legal actions that amount to a prior restraint.  He inflicts this system of informal censorship upon both Defense Distributed itself and the third parties that service Defense Distributed's website.

This campaign began on July 26, 2018, when the New Jersey Attorney General sent Defense Distributed a cease-and-desist letter.  Ex. 3.  That cease-and-desist letter claimed that publishing and republishing files on the internet violated New Jersey's "public nuisance and negligence laws."  *Id*. at 1.  Then it commanded Defense Distributed to stop publishing digital firearms information or else: "If you do not halt your efforts to proceed with publication, I will bring legal action against your company. . . ."  Ex. 3 at 1.

Four days later, the Attorney General sued Defense Distributed in a New Jersey state court and sought an *ex parte* temporary restraining order to prevent Defense Distributed's publication of digital firearms information.  *See* FAC ¶ 81; Ex. 4; *see also* Exs. 9-10; Dkt. 57 at 4 & n.2.  This

action, a quintessential prior restraint, was removed to federal court and administratively terminated. Ex. 51.

Additionally, New Jersey's Attorney General is waging an external campaign to silence Defense Distributed's speech by sending coercive legal letters to Defense Distributed's interactive computer service providers. *See* FAC ¶¶ 82-87. First, the Attorney General urged Dreamhost, an internet hosting provider, to terminate its service contract with Defense Distributed by deploying threats, coercion, and intimidation—all under the banner of "public nuisance law." Ex. 5 at 1. Second, the New Jersey Attorney General delivered a similarly threatening, coercive, and intimidating "Legal Request" to Cloudflare, an internet security provider. Ex. 5 at 3.

The New Jersey Attorney General's own press releases promote these activities as part of a unified and intentional campaign. The cease-and-desist letters, the intimidation of service providers, and the commencement of civil actions are all part of the New Jersey Attorney General's plan to stop Defense Distributed "from publicly releasing computer files." Ex. 6 at 1.

**B.    New Jersey's new speech crime targets Defense Distributed.**

Senate Bill 2465 amplified New Jersey's existing regime of unconstitutional civil actions by creating a new speech crime. The Governor signed Senate Bill 2465 at a public ceremony, flanked by the Attorney General and the bill's leading legislative sponsor. The statements delivered at this event prove that New Jersey's new speech crime was enacted for the purpose of censoring—and eventually, selectively prosecuting—Defense Distributed. [7]

---

[7] In addition to the event's transcript, Ex. 2, the government's version of the video is at https://www.youtube.com/watch?v=lJiQ6iFH5x4 and another copy of the same video is available at https://files.beckredden.com/dl/bKzFup6UmV.

First, the Governor called Senate Bill 2465 part of the very same "fight" and very same "efforts" as the cease-and-desist letter that the Attorney General sent to Defense Distributed:

> The Attorney General has been a national leader in this fight.  Last June he issued *a cease and desist letter to the companies that deal in ghost guns, saying explicitly that New Jersey is off limits to them*.  He joined likeminded attorneys general in successfully stopping in federal court the release of blueprints that would have allowed anyone with a computer and access to a 3D printer the ability to build their own, untraceable firearm.  *This law that we're going to sign today further backs up his efforts*, and I thank him for all that he has done.  Thank you, Gurbir.

Ex. 2 at 7:15-8:1 (emphasis added).  The Governor also praised the Attorney General's campaign of "naming and shaming" Defense Distributed and other companies that engage in constitutionally protected activity.  *Id.* at 9:7.

Next, Attorney General Grewal called out Defense Distributed founder Cody Wilson by name.  He said that he needed "stronger tools to stop them"  because "a Texan named Cody Wilson," Defense Distributed, and its supporters—i.e., the Second Amendment Foundation—were "not relenting" and "still trying to release these codes online."  *Id.* at 12:6-12:24.

Later in the ceremony, the Attorney General called out Defense Distributed founder by name *again*.  After tacitly admitting that prior law did not make Defense Distributed's expression illegal, he said that the new criminal law was being enacted "to stop the next Cody Wilson - to fight the ghost gun industry":

> **[B]***ad actors were trying to take advantage of loopholes because no law squarely addressed printable guns or ghost guns*.  So we had to rely on other laws, like our public nuisance law or our assault weapons law, to fight back. Now don't get me wrong:  Those laws are important and they're great tools, and they helped us stop the spread of these dangerous, untraceable weapons.  But a law right on point strengthens law enforcement's hand even more.
>
> And so today, there is no question that printable guns and ghost guns are deadly, and selling them in New Jersey is illegal.  And that's why I'm so proud to support Governor Murphy's efforts and the legislature's efforts to close those loopholes, *to stop the next Cody Wilson, to fight the ghost gun industry,* and to regulate the next dangerous gun models before they spread into our communities.

*Id.* at 14:8-25 (emphasis added).

Finally, Attorney General Grewal promised that New Jersey intends to "come after" "anyone who is contemplating making a printable gun" and "the next ghost gun company." *Id.* at 15:1-11. A press release further touted the enforcement threats. Ex. 52.

New Jersey's Governor signed Senate Bill 2465 into law at the end of that ceremony. Ex. 1, S. 2465, 218th Leg., Reg. Sess., 2018 NJ Sess. Law Serv. Ch. 138 (N.J. 2018) (hereinafter "SB 2465") (Ex. 1); *see* Dkt. 57 at 3. The law took effect immediately. SB 2465 § 4.

Section 3(*l*)(2) of SB 2465 criminalizes speech about firearms. Neighboring provisions criminalize conduct. But Section 3(*l*)(2) imposes a freestanding prohibition on speech; its operation does not depend on the previous criminal acts. Speech and speech alone is the sole ingredient of the Section 3(*l*)(2) crime:

> *l*. Manufacturing or facilitating the manufacture of a firearm using a three-dimensional printer. In addition to any other criminal penalties provided under law it is a third degree crime for:
> . . .
>> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.
>
> As used in this subsection: "three-dimensional printer" means a computer or computer-driven machine or device capable of producing a three-dimensional object from a digital model; and "distribute" means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute.

SB 2465 § 3(*l*)(2). A conviction entails at least three to five years of imprisonment, *see* N.J. Stat. 2C:43-6(a)(3); N.J. Stat. 2C:43-7(a)(4) (sometimes five to ten), and a fine of up to $15,000, *see* N.J. Stat. 2C:43-3(b)(1).

12

In this way, New Jersey has delivered a worldwide censorship edict by denying the Plaintiffs' right to share digital firearms information on the internet, via the mail, and via any other conceivable method.  The American public now has no right to access and share the digital information that is indispensable to any true engagement in the technical discussions, mechanical engineering, and other development activities that inhere in modern private firearms ownership.

## ARGUMENT

Plaintiffs move for a preliminary injunction against Defendant Gurbir Grewal in his official capacity as New Jersey Attorney General.  The Court should enjoin the New jersey Attorney General from (1) enforcing Section 3(*l*)(2) of Senate Bill 2465 against the Plaintiffs, and (2) using cease-and-desist letters and other civil legal actions to stop the Plaintiffs' publication of digital firearms information.  *See* 42 U.S.C. § 1983; *Ex parte Young*, 209 U.S. 123 (1908).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("[N]one of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus.").  With respect to both the criminal and civil censorship actions at issue here, the test for injunctive relief is met.

**I.     The Court should enjoin enforcement of the Section 3(*l*)(2) speech crime.**

**A.     Plaintiffs will likely succeed on the merits of the First Amendment claim.**

The complaint pleads that New Jersey has violated and is threatening to violate 42 U.S.C. § 1983 by acting, under color of state law, to abridge the Plaintiffs' First Amendment freedoms. *See* FAC ¶¶ 120-30.  With respect to the enforcement of Section 3(*l*)(2), Plaintiffs are likely to succeed on the merits of the First Amendment claim for at least three independent reasons.

Before addressing those arguments, the Court should hold that the Plaintiffs' distribution of the digital firearms information at issue qualifies as First Amendment speech.  In accordance with the complaint, *see* FAC ¶¶ 3, 10, 11, 30-34, proof shows that the digital firearms information at issue here qualifies as First Amendment speech under all of the applicable modern precedents.[8]

### 1.    Content-based censorship makes Section 3(*l*)(2) unconstitutional.

Section 3(*l*)(2) is a content-based speech restriction.  Facially, the law is content-based because it criminalizes "digital instructions" that "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component."  SB 2465 § 3(*l*)(2); *see Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015); *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2371 (2018).   The law's justification also makes it content-based because its enactors created the crime to punish the *idea* being conveyed—digital firearm information.  *See* Ex. 2; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Boos v. Barry*, 485 U.S. 312, 320-21 (1988).

---

[8] *Compare* Ex. 26 ¶¶ 5-10, 19-20, 26-27 (Defense Distributed's Director explaining the nature of exemplary digital firearms information), Ex. 53 (same), *and* Ex. 25 (industry expert explaining 3D printing processes), *with Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."), *Bartnicki v. Vopper*, 532 U.S. 514, 526-27 (2001) (similar), *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."), *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."), *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996) ("For the purposes of First Amendment analysis, this court finds that source code is speech."); *see also* Brief of Amicus Curiae Electronic Frontier Foundation in Support of Plaintiffs-Appellants, *Defense Distributed v. U.S. Dep't of State*, 2015 WL 9267338, at * 11, 838 F.3d 451 (5th Cir. 2016) ("The functional consequences of speech are considered not as a bar to protection, but to whether a regulation burdening the speech is appropriately tailored."); *Def. Distributed v. U.S. Dept. of State*, 121 F. Supp. 3d 680, 692 (W.D. Tex. 2015) ("Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as 'open source.' That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized. Thus, at least for the purpose of the preliminary injunction analysis, the Court will consider the files as subject to the protection of the First Amendment.").

As a content-based speech restriction, the Constitution renders Section 3(*l*)(2) presumptively invalid; it is enforceable only if New Jersey "prove[s] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231. New Jersey cannot meet that burden for at least four reasons.

First, Section 3(*l*)(2) does not survive strict scrutiny because it does not advance a compelling state interest. The holding of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), applies directly to this case: "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Id.* at 253. The government lacks a compelling state interest and "may not prohibit speech" if the speech merely "increases the chance an unlawful act will be committed 'at some indefinite future time.'" *Id.* A mere "remote connection" between speech and a third party's criminal conduct is not enough. *Id.* "Without a significantly stronger, more direct connection, the Government may not prohibit speech on the ground that it may encourage [third-parties] to engage in illegal conduct." *Id.* Under *Ashcroft*, New Jersey lacks a compelling state interest in banning Plaintiffs' expression of digital firearms information.

Second, Section 3(*l*)(2) does not meet strict scrutiny's narrow tailing requirement because of plausible, less restrictive alternatives. New Jersey could achieve its ends by banning only the harmful *conduct* at issue—not speech that is merely and only sometimes remotely associated with that conduct. *See Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."). Indeed, other provisions of SB 2465 do just that by criminalizing the *possession* of certain firearms.

Third, Section 3(*l*)(2) does not survive strict scrutiny because it is substantially underinclusive. While it criminalizes the "distribution" of digital firearms information, Section 3(*l*)(2) does nothing about the *possession* of that same information. While it criminalizes speech regarding "firearms," Section 3(*l*)(2) does nothing about speech regarding other dangerous

instrumentalities such as poison and bombs.  And while it criminalizes speech by normal people, Section 3(*l*)(2) does nothing about the speech of firearms manufacturers or wholesalers.  The statute ignores these and many other appreciable sources of the problem it supposedly targets. Therefore, Section 3(*l*)(2) is *not* narrowly tailored.  *See Reed*, 135 S. Ct. at 2231-32.

Fourth, Section 3(*l*)(2) does not survive strict scrutiny because New Jersey cannot prove that the law actually advances the state's aims.  In the First Amendment context, government justifications backed by mere "anecdote and supposition" will not suffice, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000), and neither will "ambiguous proof," *Brown v. Entm't Merchs. Ass'n.*, 564 U.S. 786, 800 (2011).  Compelling "empirical support" of efficacy must be supplied. *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 609 (1982). But there is none here—not in the text of the bill, not its legislative history, and not anywhere else. *Cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313-14 (2016) ("Determined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to adopt safe practices by a new overlay of regulations.").

In particular, New Jersey's effort to prove efficacy is bound to fail because the information they seek to censor is already freely available across the internet.  The digital firearms information that Defense Distributed already published was thereby committed to the internet's public domain, where independent republishers beyond Defense Distributed and New Jersey's control will make those files readily accessible on one website or another forever—regardless of whether New Jersey's Attorney General decides to exact vengeance on the publisher he most dislikes.

New Jersey has repeatedly admitted as much in its own court filings, which take the position that "posting these codes is a bell that can never be un-rung." Ex. 4 at 99; *see also* Ex. 6 at 1 ("Once [Defense Distributed] opens that Pandora's box, it can never be closed."). Proof of this reality is, indeed, overwhelming.[9] Because of this fact, New Jersey cannot possibly establish that post-hoc prosecution of Defense Distributed will effectuate its supposed interest in erasing already-released information from the public domain.

### 2. Overbreadth makes Section 3(*l*)(2) unconstitutional.

Plaintiffs are also likely to succeed on the merits of their First Amendment claim because Section 3(*l*)(2) is unconstitutionally overbroad. The overbreadth doctrine "prohibits the Government from banning unprotected speech" where, as is the case with Section 3(*l*)(2), "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft*, 535 U.S. at 255. Section 3(*l*)(2) violates this doctrine in no less than six separate ways.

First, Section 3(*l*)(2) is overbroad because it criminalizes speech regardless of its relationship to illegal conduct. Constitutionally, the "government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time'"; it may "suppress speech for advocating the use of force or a violation of law only if 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *Id.* at 253-54 (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam), and *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)). In other words, states can only prohibit speech to prevent illegal conduct when the speech is "*integral* to criminal conduct," *United States v. Stevens*, 559 U.S. 460, 468 (2010) (emphasis added). But speech cannot be "integral to criminal conduct" if it has only a "contingent and indirect" relationship to that conduct.

---

[9] *See* Ex. 8 at 1; Ex. 12 at 3; Ex. 23 ¶ 4; Ex. 24; Ex. 27 at 10; Ex. 28 at 1; Ex. 29; Ex. 30; Ex. 32 at 1, 3; Ex. 33; Ex. 37; Ex. 38; Ex. 39; Ex. 40; Ex. 41; Ex. 49; *see also* Ex. 30; Ex. 31.

*Ashcroft*, 535 U.S. at 250. It is not enough for the state to allege, as New Jersey does here, that there is "some unquantified potential for subsequent criminal acts." *Id.* Indeed, the Supreme Court has recognized that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law abiding third party." *Bartnicki*, 532 U.S. at 529-30.

Virtually all of the speech covered by Section 3(*l*)(2) falls squarely on the protected side of *Brandenburg* and *Ashcroft*'s line, either because the expression's recipient commits no illegal act at all or because, if they did, the causal link is merely contingent and indirect. *Cf. Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country."). Yet Section 3(*l*)(2) still criminalizes every instance of "distribut[ion]" no matter what. That alone constitutes classic overbreadth.

Second, Section 3(*l*)(2) is overbroad because it also criminalizes the low-tech, in-person "offer" and "advertise[ment]" of instructions—squarely protected speech—even if no actual distribution of the information occurs. In the case of an unconsummated offer or advertisement, the state lacks a sufficiently compelling interest in applying its content-based speech ban.

Third, Section 3(*l*)(2) is overbroad because it criminalizes an "agreement or attempt to distribute." New Jersey lacks a compelling interest to criminalize an "agreement or attempt to distribute" instructions if the distribution never comes to fruition. The same overbreadth logic applies to the statute's criminalization of instructions that "may be used" toward a prohibited purpose but are not in fact.

Fourth, Section 3(*l*)(2) is overbroad because it also criminalizes sharing information about any "firearm component." This covers a wide array of generic items—such as fasteners, nuts, bolts, and screws—that have unlimited potential uses and are not unique to firearms. Even if New

18

Jersey could criminalize certain speech concerning a completed "firearm," it could not possibly criminalize speech about mundane parts available in any hardware store.

Fifth, Section 3(*l*)(2) is overbroad because it fails to distinguish between information that has, and has not, been committed to the public domain.  Digital firearms information is already freely circulating in the public domain because of publications that took place before this law was enacted. *See supra* at pp. 16-17 nn. 5-6.  "[T]he Government may not . . . restrict individuals from disclosing information that lawfully comes into their hands in the absence of a 'state interest of the highest order.'"  *United States v. Aguilar*, 515 U.S. 593, 605 (1995).  However, this statute draws no distinction between truly novel "instructions" and those that anyone has been able to obtain with simple Google searches for months.  Therefore, the statute's coverage of these readily-available files renders it overbroad.

Finally, the state cannot salvage its statute by proffering a narrow reading.  The statute covers all of these problematic situations too clearly to allow for any such attempt at narrowing (which would not necessarily bind future criminal prosecutions anyhow).  *See Dana's R.R. Supply v. Att'y Gen., Florida*, 807 F.3d 1235, 1242 (11th Cir. 2015) ("We will not, however, contort, disfigure, or vitiate a law's plain meaning and readily discerned purpose merely for the sake of statutory preservation.").  Because Section 3(*l*)(2)'s ordinary meaning is so overly broad, it creates an unconstitutional "chilling effect on free speech" for countless Americans, regardless of any atextual saving construction the state's lawyers might conjure.  *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 807 (2011).  The overbreadth doctrine does not permit such legerdemain in the First Amendment context.  *See Stevens*, 559 U.S. at 481.

### 3.  A missing scienter element makes Section 3(*l*)(2) unconstitutional.

The Plaintiffs' First Amendment claim is also likely to succeed because Section 3(*l*)(2) lacks a necessary scienter element.  States cannot create speech crimes without including a stringent requirement of scienter—that is, knowledge of the fact that truly distinguishes innocent acts from guilty ones.  *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010); *New York v. Ferber*, 458 U.S. 747, 765 (1982); *Smith v. California*, 361 U.S. 147, 153-54 (1960). Section 3(*l*)(2) lacks the needed scienter element because it does not even require the speaker to know that instructions will "be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component"—let alone know that the recipient would use the information to engage in *illegal* production of a firearm.[10]  Hence, the requisite scienter requirement is missing.  *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 247-48 (4th Cir. 1997); *see also Boos*, 485 U.S. at 320-21.

### B.  Plaintiffs will likely succeed on the merits of the Due Process Clause claim.

Plaintiffs are also likely to succeed on the merits of their claim that Section 3(*l*)(2) is void for vagueness under the Due Process Clause.  *See* FAC ¶¶ 147-56.[11]  "A law may be vague in violation of the Due Process Clause for either of two reasons: 'First, it may fail to provide the kind

---

[10] Federal laws permit the manufacture of a firearm for personal use.  *See Does an Individual Need a License to Make a Firearm for Personal Use?*, Bureau of Alcohol, Tobacco, Firearms and Explosives (Nov. 6, 2017), https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use ("[A] license is not required to make a firearm solely for personal use."); William J. Krouse, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IN10957.pdf ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also, e.g.*, 18 U.S.C. § 922(a)(1)(a).

[11] Pre-enforcement facial vagueness challenges are allowed to address the Due Process Clause's concern for "arbitrary and discriminatory enforcement," *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. D.C.*, 846 F.3d 391, 410 (D.C. Cir. 2017), and also to the extent that they seek to halt the chilling of protected speech, *Dana's*, 807 F.3d at 1241.  Plaintiffs' claim implicates both concerns.

of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.'"  *Act Now*, 846 F.3d at 409 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).   Section 3(*l*)(2) is unconstitutionally vague in both respects.

A key Section 3(*l*)(2) vagueness problem is that it criminalizes the "publication" of "code or instructions stored and displayed in electronic format as a digital model *that may be* used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component."  Yet it is impossible for sophisticated parties, let alone ordinary people, to understand what counts as "code . . . *that may be* used to" engage in the proscribed programming.

In the same way that "(w)hat is contemptuous to one man may be a work of art to another," *Smith v. Goguen*, 415 U.S. 566, 575 (1974), what "may be used" by one programmer can be totally useless to another.  Speakers like Defense Distributed cannot tell in advance on which side of the line their speech will fall.  Indeed, like the residual clause at issue in *Johnson v. United States*, 135 S. Ct. 2551 (2015), Section 3(*l*)(2) ties the crime's meaning not to "real-world facts or statutory elements," but to a "judicially imagined" notion of what information "may be used" by hypothetical persons.  *Id.* at 2557.

Because of indeterminacies like this, the statute both chills speech nationwide and encourages arbitrary and discriminatory enforcement, *see Smith*, 415 U.S. at 575 ("Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections.").  Indeed, this case proves the latter point especially: the statements made during Section 3(*l*)(2)'s signing ceremony show that New Jersey's Attorney General wishes to prosecute Defense Distributed not because it poses some sort of unique threat, but because Defense Distributed and its founder espouse views that New Jersey's politicians dislike.  *See* Ex. 2.

**C.       Plaintiffs will likely succeed on the merits of the Commerce Clause claim.**

Plaintiffs are also likely to succeed with the claim that New Jersey has subjected and is subjecting the Plaintiffs to an unconstitutional deprivation of the right to be free of commercial restraints that violate the dormant Commerce Clause.  *See* FAC ¶¶ 157-66.  Two modes of judicial review occur in dormant Commerce Clause cases.  Apart from the default balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), strict scrutiny applies to any law that discriminates against out-of-state economic interests on its face, in its purpose, or in its practical effect.  *E.g.*, *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013).

Section 3(*l*)(2) triggers strict scrutiny because it discriminates against out-of-state economic interests by "regulat[ing] conduct that takes place exclusively outside the state." *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *11 (D.N.J. Aug. 20, 2013).  Specifically, discrimination occurs with respect to website publication: even though speakers like Defense Distributed operate their websites in a passive fashion from outside of New Jersey, Section 3(*l*)(2) expressly projects New Jersey's law about what can and cannot be said on the internet throughout the entire Union.  *See Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997).

Discrimination also occurs with respect to the statute's "offer" and "advertisement" bans. That conduct will often occur entirely outside of New Jersey—such as at the trade shows that Defense Distributed attends—and still qualify as a crime under Section 3(*l*)(2).

Because these applications are direct and substantial parts of the statute, Section 3(*l*)(2) is unconstitutional per se, "regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *see Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *Pataki*, 969 F. Supp. at 182.  The Court should so hold.

**D.      Plaintiffs will likely succeed on the merits of the Supremacy Clause claim.**

Plaintiffs' complaint pleads that New Jersey is violating 42 U.S.C. § 1983 by censoring speech with state laws that Congress chose to preempt and immunize the citizenry from.  FAC ¶¶ 167-73.  Plaintiffs are likely to succeed on the merits of this claim for multiple reasons.

**1.      CDA Section 230 preempts Section 3(*l*)(2).**

First, Congress immunized the Plaintiffs from prosecution under Section 3(*l*)(2) with the Communications Decency Act of 1996 ("CDA"), "Congress's grant of 'broad immunity' to internet service providers 'for all claims stemming from their publication of information created by third parties.'"  *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).  CDA Section 230(c)(1) provides that, for interactive computer services such as a website, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).[12]  Section 230(e)(3), in turn, preempts state laws that are "inconsistent with" subsection (c)(1).  47 U.S.C. § 230(e)(3).

The Plaintiffs' case directly implicates CDA Section 230.  Much of the digital firearms information that Defense Distributed published in the past, and desires to publish in the future, is "information provided by another information content provider."  47 U.S.C. § 230(c)(1).

The digital firearms information that Defense Distributed published in July 2018 is a perfect example.  "With the exception of the Liberator CAD files, which were previously posted by Defense Distributed before receiving the State Department's letter, the other CAD files posted at this time were created by persons other than Defense Distributed and had been posted on the internet by persons other than Defense Distributed before Defense Distributed republished them

---

[12] "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  § 230(f)(3).

on DEFCAD."  Ex. 26 ¶ 19.  Thus, while this action certainly concerns the Plaintiffs' right to publish *new* digital firearms information, for purposes of the CDA, this case also implicates Plaintiffs' right to *republish* digital firearms information that was provided by other people engaged in the open source development process.[13]

Section 3(*l*)(2) criminalizes the distribution of information regardless of whether information was *re*published—i.e., "provided by another information content provider."  As such, Section 3(*l*)(2) is facially "inconsistent with" Section 230(c)(1) and preempted.  This fault makes Section 3(*l*)(2) facially invalid, for "there can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and therefore is preempted by the Supremacy Clause." *United States v. Arizona*, 641 F.3d 339, 346 (9th Cir. 2011).

This conclusion is not novel.  Courts have consistently invalidated similar state criminal laws because they were preempted by CDA Section 230.  *See Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *1 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 823 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1271 (W.D. Wash. 2012).  The Court should follow those decisions here.

**2.      The State Department's authority preempts Section 3(*l*)(2).**

Additionally, New Jersey's use of Section 3(*l*)(2) to stop Defense Distributed's publication of digital firearms information is preempted by the federal government's exclusive authority over foreign affairs. Specifically, Congress charged the executive branch with administering and enforcing pertinent provisions of the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. ch. 39, and the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130.  *See* 28

---

[13] A judgment based solely on the CDA would not provide *complete* relief to Plaintiffs, as Defendants could rely on other provisions of state law—such as "public nuisance and negligence laws"—to prohibit the distribution of *new* digital firearm information. *See infra* Part II.

U.S.C. §§ 516, 519; *see also* 22 U.S.C. § 2778(a)(1); 22 U.S.C. § 2778(g)(6); 22 U.S.C. § (e)(2)(A);  22 C.F.R. § 126.7(a).

By seeking to criminalize Plaintiffs' publication of matters that the State Department has expressly authorized for publication, New Jersey seeks to have its legislature take over the President's job of "control[ling] the import and the export of defense articles." § 2778(a)(1). Indeed, Attorney General Grewal declared, "[t]he federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."  Ex. 6 at 1.  States cannot regulate this aspect of foreign policy.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 738-742 (N.D. Ill. 2007).  The Supremacy Clause forbids this usurpation of federal power. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

### E.  Plaintiffs will suffer irreparable harm in the absence of immediate relief.

New Jersey's enforcement of Section 3(*l*)(2) causes irreparable harm currently, and unless enjoined, will do so to an even greater extent in the near future.  Plaintiffs have engaged—and desire to engage in the future—in at least three distinct courses of conduct that New Jersey's speech crime unconstitutionally outlaws.  For fear of being prosecuted under New Jersey's new speech crime, Plaintiffs have stopped engaging in these constitutionally protected courses of conduct.  In each respect, Plaintiffs' speech lies squarely within Section 3(*l*)(2)'s proscriptions.  And because the law is unconstitutional, the looming threat of its enforcement against Plaintiffs causes irreparable harm.

First, Section 3(*l*)(2) causes irreparable harm because Plaintiffs have published digital firearms information on the internet and intend to do so in the future.  *See supra* pp. 5-6.  Section 3(*l*)(2) clearly covers this conduct by making it a crime to distribute the banned "digital instructions" "by any means, including the Internet."

Second, Section 3(*l*)(2) causes irreparable harm because Defense Distributed has published digital firearms information via the mail and intends to do so in the future. *See supra* at pp. 7-8. Section 3(*l*)(2) clearly covers this conduct by making it a crime to "distribute" the banned "digital instructions" and defining "distribute" to mean "mail."

Third, Section 3(*l*)(2) causes irreparable harm because Defense Distributed has offered and advertised digital firearms information and intends to do so in the future. *See supra* at 8-9. Section 3(*l*)(2) clearly covers this conduct by making it a crime to "distribute" the banned "digital instructions" and defining "distribute" to mean "offer" and "advertise."

In each of these respects, New Jersey's enforcement of Section 3(*l*)(2) would cause irreparable harm by subjecting the Plaintiffs to unconstitutional punishment. Moreover, the looming threat of such unconstitutional enforcement causes a nationwide chilling effect that stops Plaintiffs and other law-abiding people from engaging in speech that the Constitution entitles them to express freely. *See supra* at pp. 5-9; *Dana's*, 807 F.3d at 1241 ("Litigants who are being 'chilled from engaging in constitutional activity,' . . . suffer a discrete harm independent of enforcement."). Both of these harms—the actual enforcement of New Jersey's unconstitutional criminal law and the chilling effect caused by the specter of its enforcement—are irreparable. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").[14]

---

[14]The irreparable injury requirement is met notwithstanding the United States District Court for the District of Washington's entry of a preliminary injunction against the State Department. *See supra* note 3. Additionally, New Jersey bears a "formidable" burden to demonstrate that it is no longer threatening the Plaintiffs. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 92 (2013). Specifically, under the "voluntary cessation" doctrine, the Defendant must "show that the challenged behavior cannot reasonably be expected to recur." *Id.* New Jersey cannot meet that burden here because the state continued its suppression efforts against the Plaintiffs well *after* the preliminary injunction's entry—both by enacting the Section 3(*l*)(2) speech crime and by continuing its civil legal actions against Plaintiffs. *See* Exs. 9-10.

**F.      The balance of equities favors the Plaintiffs and a preliminary injunction will serve the public interest.**

The balance of equities favors an injunction.  The Plaintiffs have approached this litigation in a fair manner, having both exhausted all possible avenues for relief in *Defense Distributed I* and sought a Temporary Restraining Order shortly after New Jersey enacted its new speech crime.  The risk of erroneously denying the injunction entails the "potential for extraordinary harm and a serious chill upon protected speech."  *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 671 (2004).  "The harm done from letting [an] injunction stand pending a trial on the merits, in contrast, will not be extensive," especially where, as here, "[n]o prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands."  *Id.*  The state's interest in enforcing under their new law will be just as feasible a few weeks from now as it is at present.

Finally, it is always in the public interest to prevent the violation of a party's constitutional rights.  *See, e.g.*, *O'Donnell v. Goodhart*, 900 F.3d 220, 232 (5th Cir. 2018).  And with respect to preemption, in particular, the "[f]rustration of federal statutes and prerogatives are not in the public interest."  *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

**II.     The Court should enjoin New Jersey's civil enforcement efforts.**

The Court should also issue a preliminary injunction against the New Jersey Attorney General's use of civil legal actions to censor Defense Distributed.  In every key respect, the same constitutional analysis that applies to the new speech crime applies to the New Jersey Attorney General's use of civil legal methods to achieve the same censorship ends.  Indeed, the application of "public nuisance and negligence laws" to speech on the internet is orders-of-magnitude more overbroad, underinclusive, and vague than Section 3(*l*)(2).  Additionally, the Plaintiffs are likely to succeed on the merits of their Section 1983 action's First Amendment claim because New Jersey's conduct violates the doctrine regarding unconstitutional prior restraints.  *See* FAC ¶ 124.

New Jersey's delivery of a cease-and-desist letter to Defense Distributed constitutes a prior restraint because it demands—in advance, and upon pain of legal punishment—that Defense Distributed *never* publish "printable-gun computer files for use by New Jersey residents."  Ex. 3 at 1.  So do civil actions like the New Jersey Attorney General's effort to obtain an *ex parte* temporary restraining order against Defense Distributed.  *See* Ex. 4.

As prior restraints, the state's civil censorship efforts bear a heavy presumption of unconstitutionality.  *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71-72 (1963); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 579 (5th Cir. 2005).  But New Jersey cannot overcome this burden.  The same reasoning that prevents Section 3(*l*)(2) from surviving strict scrutiny also spells defeat for the civil censorship effort as a prior restraint. *See Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) (en banc), aff'd, 452 U.S. 89 (1981).

Importantly, this constitutional violation encompasses both the action taken directly against Defense Distributed and New Jersey's associated efforts to threaten, coerce, and intimidate Defense Distributed's service providers.  *See Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015); *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003); *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991).  *Backpage.com, LLC* is on all fours, and supports every major element of Defense Distributed's request for this additional category of injunctive relief.

## CONCLUSION

The motion for a preliminary injunction should be granted.  The Court should enjoin Defendant Gurbir Grewal, in his official capacity as New Jersey Attorney General, from enforcing Section 3(*l*)(2) of Senate Bill 2465 against the Plaintiffs.  The Court should also enjoin the New Jersey Attorney General's use of cease-and-desist letters and other civil legal actions to stop the Plaintiffs' publication of digital firearms information.

Date: December 4, 2018.                    Respectfully submitted,

                                           BECK REDDEN LLP
                                           By /s/ Chad Flores
                                           Chad Flores*
                                           cflores@beckredden.com
                                           State Bar No. 24059759
                                           1221 McKinney St., Suite 4500
                                           Houston, TX 77010
                                           (713) 951-3700 | (713) 952-3720 (fax)

                                           FARHANG & MEDCOFF
                                           Matthew Goldstein*
                                           mgoldstein@fmlaw.law
                                           D.C. Bar No. 975000
                                           4801 E. Broadway Blvd., Suite 311
                                           Tucson, AZ 85711
                                           (202) 550-0040 | (520) 790-5433 (fax)

                                           Josh Blackman
                                           joshblackman@gmail.com
                                           Virginia Bar No. 78292
                                           1303 San Jacinto Street
                                           Houston, TX 77002
                                           (202) 294-9003 | (713) 646-1766 (fax)

                                           *Admitted *pro hac vice*

                                           Attorneys for Plaintiffs Defense Distributed
                                           and Second Amendment Foundation, Inc.

29

**CERTIFICATE OF SERVICE**

On December 4, 2018, I served this filing on the following persons via CM/ECF:

    Counsel for Defendants Gurbir S. Grewal and Matthew Denn
    Kenneth W. Taber
    Ronald Casey Low

    Counsel for Defendant Michael Feuer
    Connie K. Chan
    James P. Clark
    Michael M. Walsh
    Jason P. Steed

    Counsel for Defendants Josh Shapiro and Thomas Wolf
    J. David Cabello
    John D. Kimball

    Counsel for Defendant Andrew Cuomo
    Pete Marketos
    Tyler Bexley

    Counsel for Plaintiffs
    Chad Flores
    Matthew A. Goldstein
    Joshua Michael Blackman


/s/ *Chad Flores*
Chad Flores