## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DEFENSE DISTRIBUTED *et al.*,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, Attorney
General of the State of New Jersey,

    Defendant.

Hon. Michael A. Shipp, U.S.D.J.

Civil Action No. 3:21-cv-9867 (MAS)

---

### BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

---

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
Attorneys for Defendant
tim.sheehan@njoag.gov

Angela Cai
*Deputy Solicitor General*
Tim Sheehan (NJ Bar #179892016)
Samuel Rubinstein
Ashleigh B. Shelton
*Deputy Attorneys General*
  Of Counsel and On the Brief

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................1

PROCEDURAL HISTORY AND STATEMENT OF FACTS ...............................3

STANDARD OF REVIEW ....................................................................7

ARGUMENT

    I.    PLAINTIFF'S FIRST AMENDMENT CHALLENGE FAILS ...............7

        A. Subsection (*l*)(2) Survives Constitutional Scrutiny ............................8

           1.  Subsection (*l*)(2) Is Subject to Intermediate Scrutiny....................8

           2.  Subsection (*l*)(2) Satisfies Intermediate Scrutiny .........................13

        B. Plaintiffs' Remaining First Amendment Theories Fail......................17

    II.    PLAINTIFFS' SECOND AMENDMENT CHALLENGE FAILS .........19

    III.    PLAINTIFFS' DORMANT COMMERCE CHALLENGE FAILS........22

    IV.    PLAINTIFFS' SELECTIVE ENFORCEMENT CHALLENGE FAILS ....................................................................................26

    V.    PLAINTIFFS' DUE PROCESS CHALLEGE FAILS ...........................29

        A. Plaintiffs' Procedural Due Process Claim Lacks Merit .....................29

        B. New Jersey's Law Is Not Void For Vagueness .................................32

    VI.    PLAINTIFFS' PREEMPTION CLAIMS FAIL .......................................35

    VII.    PLAINTIFFS' TORTIOUS INTERFERENCE CLAIMS ARE BARRED BY SOVEREIGN IMMUNITY......................................38

i

CONCLUSION ...................................................................................................39

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ALA, Inc. v. CCAIR, Inc.,*
   29 F.3d 855 (3d Cir. 1994)............................................................................16

*Alexander v. United States,*
   509 U.S. 544 (1993)......................................................................................18

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.,*
   163 F.3d 780 (3d Cir. 1999).....................................................................23, 24

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..................................................................................7, 14

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)......................................................................................14

*Blatchford v. Native Vill. of Noatak & Circle Vill.,*
   501 U.S. 775 (1991)......................................................................................38

*Bruni v. City of Pittsburgh,*
   941 F.3d 73 (3d Cir. 2019).....................................................................8, 9, 13

*Buck Foston's New Brunswick LLC v. Cahill,*
   No. 11-3731, 2013 WL 5435289 (D.N.J. Sept. 27, 2013)...................................27

*CFTC v. Vartuli,*
   228 F.3d 94 (2d Cir. 2000).............................................................................8

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
   142 S. Ct. 1464 (2022)....................................................................................9

*Cook v. City of Price,*
   566 F.2d 699 (10th Cir. 1977) ...................................................................27, 28

*Defense Distributed v. Att'y Gen. of N.J.*,
  972 F.3d 193 (3d Cir. 2020)...................................................................6

*Defense Distributed v. Bonta*,
  No. 22-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ...............................21

*Defense Distributed v. Bruck*,
  30 F.4th 414 (5th Cir. 2022) .................................................................18

*Defense Distributed v. Grewal*,
  971 F.3d 485 (5th Cir. 2020) ........................................................5, 25, 29

*Defense Distributed v. Platkin*,
  617 F. Supp. 3d 213 (D.N.J. 2022).........................................................14, 15, 38

*Defense Distributed v. U.S. Dep't of State*,
  121 F. Supp. 3d 680 (W.D. Tex. 2015) ........................................................11, 14

*Defense Distributed v. U.S. Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) ..................................................................1, 3

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)....................................................................2, 19, 20, 21, 22

*Exxon Mobil Corp. v. Schneiderman*,
  316 F. Supp. 3d 679 (S.D.N.Y. 2018) .................................................................29

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ...............................................................38

*Folajtar v. Att'y Gen.*,
  980 F.3d 897 (3d Cir. 2020).....................................................................22

*FTC v. LeadClick Media, LLC*,
  838 F.3d 158 (2d Cir. 2016)...................................................................37

iv

*Hargrave v. Ramsey*,
    688 F. App'x 124 (3d Cir. 2017) ..........................................................................27

*Heffner v. Murphy*,
    745 F.3d 56 (3d Cir. 2014)............................................................................22, 25

*Hepp v. Facebook*,
    14 F.4th 204 (3d Cir. 2021) ...................................................................................37

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010)............................................................................................33, 35

*Huon v. Denton*,
    841 F.3d 733 (7th Cir. 2016) ...............................................................................37

*Green v. America Online (AOL)*,
    318 F.3d 465 (3d Cir. 2003)...................................................................................37

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)...................................................................................7

*Instructional Sys., Inc. v. Computer Curriculum Corp.*,
    35 F.3d 813 (3d Cir. 1994).....................................................................................23

*Jewish Home of E. Pa. v. CMS*,
    693 F.3d 359 (3d Cir. 2012).................................................................................26

*Karns v. Shanahan*,
    879 F.3d 504 (3d Cir. 2018)............................................................................27, 28

*King v. Christie*,
    981 F. Supp. 2d 296 (D.N.J. 2013) .......................................................................38

*Lacey v. Cessna Aircraft Co.*,
    862 F.2d 38 (3d Cir. 1988)......................................................................................14

*Lasche v. New Jersey*,
　No. 20-2325, 2022 WL 604025 (3d Cir. Mar. 1, 2022) ........................................27

*Lujan v. Defenders of Wildlife*,
　504 U.S. 555 (1992) ........................................................................................31, 32

*Lungu v. Antares Pharma Inc.*,
　2022 WL 212309 (3d Cir. Jan. 25, 2022) ............................................................16

*Madsen v. Women's Health Ctr., Inc.*,
　512 U.S. 753 (1994)............................................................................................9

*Maine v. Taylor*,
　477 U.S. 131 (1986)..........................................................................................25

*McCullen v. Coakley*,
　573 U.S. 464 (2014)..........................................................................................13

*MD Mall Assocs, LLC v. CSX Transp., Inc.*,
　715 F.3d 479 (3d Cir. 2013)..............................................................................36

*New York State Rifle & Pistol Ass'n v. Bruen*,
　142 S. Ct. 2111 (2022) ...............................................................................*passim*

*O'Bannon v. Town Court Nursing Ctr.*,
　447 U.S. 773 (1980)..........................................................................................31

*Oyler v. Boles*,
　368 U.S. 448 (1962)..........................................................................................28

*Pa. Fed'n of Sportsmen's Clubs v. Hess*,
　297 F.3d 310 (3d Cir. 2002)..............................................................................38

*Pennhurst State Sch. & Hosp. v. Halderman*,
　465 U.S. 89 (1984)............................................................................................38

*Perano v. Twp. of Tilden,*
  423 F. App'x 234 (3d Cir. 2011) ...........................................................26

*PG Pub. Co. v. Aichele,*
  705 F.3d 91 (3d Cir. 2013).....................................................................28

*Pharm. Research & Mfrs. of Am. v. Walsh,*
  538 U.S. 644 (2003)................................................................................24

*Philips v. Cty. of Allegheny,*
  515 F.3d 224 (3d Cir. 2008).....................................................................7

*Posters 'N' Things, Ltd. v. United States,*
  511 U.S. 513 (1994)...........................................................................32, 34

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015).................................................................................9

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999)...........................................................................26, 29

*Rigby v. Jennings,*
  __ F. Supp. 3d __, 2022 WL 4448220 (D. Del. Sept. 23, 2022) ..................*passim*

*Startzell v. City of Phila.,*
  533 F.3d 183 (3d Cir. 2008).....................................................................27

*TitleMax of Delaware, Inc. v. Weissmann,*
  24 F.4th 230 (3d Cir. 2022) ...............................................................23, 26

*United States v. Chi Mak,*
  683 F.3d 1126 (9th Cir. 2012) ............................................................11, 17

*United States v. Cox,*
  906 F.3d 1170 (9th Cir. 2018) ................................................................20

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010).....................................................................15

*United States v. Nat'l Dairy Prods. Corp.,*
  372 U.S. 29 (1963)..............................................................................33

*United States v. Stevens,*
  559 U.S. 460 (2010).............................................................................17

*United States v. Williams,*
  553 U.S. 285 (2008).........................................................................32, 35

*Universal City Studios, Inc. v. Corley,*
  273 F.3d 429 (2d Cir. 2001)........................................................10, 13, 16

*Universal Commc'n Sys., Inc. v. Lycos, Inc.,*
  478 F.3d 413 (1st Cir. 2007)..................................................................37

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982).............................................................................34

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989).........................................................................13, 33

*Washington v. U.S. Dep't of State,*
  315 F. Supp. 3d 1202 (W.D. Wash. 2018)...............................................30

*Washington v. U.S. Dep't of State,*
  420 F. Supp. 3d 1130 (W.D. Wash. 2019)...........................................30, 31

*Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands,*
  385 F.3d 801 (3d Cir. 2004)...................................................................27

## Statutes

11 Del. C. § 1463(c)(2) ...........................................................................12

22 U.S.C. § 2778 ...................................................................................11

47 U.S.C. § 230 ....................................................................................36

N.J. Stat. Ann. § 2C:2-2 .....................................................................34

N.J. Stat. Ann. § 2C:39-9(*l*)(2) .........................................................*passim*

## Regulations

22 C.F.R. § 120.10 ..............................................................................11

85 Fed. Reg. 3,819 (Jan. 23, 2020) ..............................................32, 35

85 Fed. Reg. 4,136 (Jan. 23, 2020) .........................................16, 32, 36

## Rules

Fed. R. Civ. P. 12(b)(6) ........................................................................7

## Other Authorities

FAQs for the Commerce Categories I-III (final rule)
   (Dep't of Commerce May 28, 2021) ...............................................16

## PRELIMINARY STATEMENT

This case involves Plaintiff Defense Distributed's effort to distribute computer files that "allow virtually anyone with access to a 3D printer"—even terrorists, felons, and domestic abusers—to print fully functional firearms. *Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 455 (5th Cir. 2016) ("*DD v. USDOS*"). In July 2018, Defense Distributed announced its plans to disseminate computer files that enable anyone to produce their own firearms, even if they are not licensed manufacturers and could not pass the legally required background check to possess a firearm. And because the printed firearms lack serial numbers, they would be untraceable by law enforcement even when later found at the scene of a crime. In other words, the files would give anyone with a 3D printer the ability to evade state and federal firearms background check requirements and to produce fully functional and untraceable firearms.

New Jersey responded to prevent the distribution of printable gun files within its borders. The New Jersey Attorney General (NJAG) first issued a letter to Defense Distributed demanding that it cease and desist distributing the files for use by New Jersey residents, which would violate New Jersey's public nuisance and negligence laws. Separately, the Legislature enacted legislation that prohibited distribution, to a person in New Jersey who is not a licensed manufacturer, of code that may be used to program a 3D printer to produce a firearm. As a result, printable guns are treated

no differently from any other firearm, meaning that a person must have a license before they can manufacture these weapons and cannot purchase or obtain such weapons without passing background checks.

Plaintiffs' allegations that these actions violate the First Amendment, Second Amendment, and a panoply of other constitutional provisions fail as a matter of law. As to the First Amendment, New Jersey regulates only the distribution of *functional* computer files that direct a 3D printer to produce a firearm. Because New Jersey restricts the distribution of this code based only on its functionality, rather than based on any message the code expresses, the challenged law would be at most subject to intermediate scrutiny. The challenged statute easily withstands that review given the overwhelming governmental interest in preventing the proliferation of untraceable firearms to dangerous individuals who could not pass a background check and the statute's careful tailoring to advance that interest.

Plaintiffs' remaining claims fare no better. The text of the Second Amendment extends only to bearable "Arms," which does not cover computer files. And because States can require background checks before obtaining a weapon—a point that both *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), explicitly endorse—States can equally prevent individuals from obtaining firearms in circumvention of those background checks. Further, Plaintiffs cannot prevail on their dormant Commerce Clause claim

where the challenged statute regulates only distribution of files "to a person in New Jersey," and where Defense Distributed can simply block access to its website to persons in New Jersey without restricting access in the rest of the country. And the plethora of other challenges—under the Equal Protection Clause, the Due Process Clause, preemption, and state tortious interference law—lack merit. This Court should dismiss the Third Amended Complaint in its entirety.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

Defense Distributed intends to disseminate files that "produce, among other things, [a] single-shot plastic pistol … and a fully functional plastic AR-15 lower receiver," as well as other "fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion." *DD v. USDOS*, 838 F.3d at 455; *see also id.* at 454 (noting Defense Distributed "is a nonprofit organization operated, in its own words, 'for the purpose of promoting popular access to arms guaranteed by the United States Constitution'"). Among other things, the company disseminates files online, and it does not require individuals who wish to access the code to first confirm that they are licensed manufacturers or that they have passed a background check. The weapons these files print are unserialized, which means that they cannot be traced by law enforcement if later used in a crime. *Id.* at 454-55.

In 2013, USDOS issued a directive to Defense Distributed to remove printable gun files from its website, as their distribution would violate the International Traffic

in Arms Regulations (ITAR). *See* Third Amended Complaint (TAC), No. 21-cv-9867, ECF 180 ¶¶ 58-65. The ITAR, which implements the Arms Export Control Act of 1976 (AECA), makes it unlawful to "export or attempt to export from the United States any defense article or technical data" without federal approval. TAC ¶ 63 (quoting 22 C.F.R. pt. 127.1). The U.S. Munitions List (USML) defines the covered defense articles.

In 2015, Defense Distributed sued USDOS in the Western District of Texas. 838 F.3d at 456. That court denied the company's motion for a preliminary injunction, and the Fifth Circuit affirmed. *Id.* at 461. In June 2018, however, the United States changed positions and entered into a Settlement Agreement with the company. *See* TAC ¶¶ 75-77. The Agreement stated that USDOS would issue Defense Distributed a license authorizing Defense Distributed to make printable gun files available "for 'unlimited distribution'" and exempting the release from ITAR by excluding Defense Distributed's files from the USML through a "Temporary Modification." *Id.* ¶¶ 77, 79. USDOS then issued that license on July 27, 2018, *id.*, and for several days, Defense Distributed posted printable gun files on its website, which any visitor could "download … for free." *Id.* ¶ 43.

A number of state and local officials took action. On July 26, 2018, the NJAG sent Defense Distributed a letter demanding that it "cease and desist from publishing printable-gun computer files for use by New Jersey residents." *Id.* ¶ 121; ECF 117-

8. The letter explained that these files "are a threat to public safety, and posting them violates New Jersey's public nuisance and negligence laws." ECF 117-8.[1] And in November 2018, the Legislature overwhelmingly voted to pass, and the Governor signed, N.J. Stat. Ann. § 2C:39-9(*l*)(2) ("Subsection (*l*)(2)"). That law prohibits distribution "to a person in New Jersey who is not registered or licensed as a manufacturer" of code "that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." *Id.*

As this Court has previously explained, the procedural history of the resultant lawsuits is complicated. In short, after the NJAG issued his letter, but before the New Jersey Legislature enacted Subsection (*l*)(2), Defense Distributed and the Second Amendment Foundation filed suit in the Western District of Texas against the NJAG and other state and local officials and sought declaratory and injunctive relief. *See* ECF 1. On January 30, 2019, the Western District of Texas dismissed the claims against the NJAG for lack of personal jurisdiction. Plaintiffs eventually obtained a reversal of that jurisdictional dismissal in *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020). Before that reversal, however, Plaintiffs filed a new lawsuit in this district, joined by additional plaintiffs, again seeking to enjoin the

---

[1] After Defense Distributed failed to comply, the NJAG filed suit in New Jersey state court, which was removed to this Court and later administratively terminated. *See Grewal v. Defense Distributed*, No. 18-13248 (D.N.J.).

5

NJAG and asserting near-identical constitutional claims. *See* No. 19-4753, ECF 1, 17 (D.N.J.). To avoid the problem of duplicative litigation, the District of New Jersey stayed Plaintiffs' second-filed suit pending resolution of the Texas action, which was still before the Fifth Circuit. *Id.*, ECF 26 (D.N.J. Mar. 7, 2019), *appeal dismissed sub. nom. Defense Distributed v. Att'y Gen. of N.J.*, 972 F.3d 193 (3d Cir. 2020).

After the Fifth Circuit ultimately reversed the dismissal of the Texas action, Plaintiffs filed a Second Amended Complaint. ECF 117. And in accordance with this Court's April 26, 2023 docket-cleaning order, Plaintiffs have filed a Third Amended Complaint—the operative pleading that is the subject of this motion—which removes the allegations against the State Department Defendants but is otherwise substantively identical to the Second Amended Complaint. *See* ECF 180. While the First Amended Complaint pled claims only relating to the NJAG's cease-and-desist letter pledging to enforce New Jersey's public nuisance law, TAC ¶ 121, the TAC brings claims against the enforcement of Subsection (*l*)(2) as well. *Id.* ¶¶ 129-49. Plaintiffs assert various claims under the First, Second, and Fourteenth Amendments, the dormant Commerce Clause, the Supremacy Clause, and state tortious interference law. *Id.* ¶¶ 175-246. They demand declaratory and injunctive relief and attorneys' fees and costs. *Id.* ¶¶ 247-57.

On April 19, 2021, the Western District of Texas severed and transferred the claims against the NJAG to this district. A procedural volley ensued, the details of

which are recounted in this Court's prior decisions. No. 19-4753, ECF 58 at 35; ECF

66 at 2-4. As relevant here, this Court denied motions to retransfer the case to Texas,

and further directed the parties "to proceed with the litigation without additional

delay, including in responding to Plaintiffs' Second Amended Complaint." ECF 66

at 12. The NJAG now moves to dismiss all claims.

## STANDARD OF REVIEW

A complaint must be dismissed under Rule 12(b)(6) when it fails to state a

claim upon which relief can be granted. Although courts must accept as true well-

pleaded factual allegations, *Philips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir.

2008), they do not "credit a complaint's 'bald assertions' or 'legal conclusions.'" *In

re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997). Instead,

a court looks to see whether the pleadings and legal conclusions "are supported by

factual allegations," and whether, if true, "plausibly give rise to an entitlement to

relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ARGUMENT

## I.   PLAINTIFFS' FIRST AMENDMENT CHALLENGE FAILS.

Plaintiffs' central First Amendment challenge fails as a matter of law because

Subsection (*l*)(2) survives intermediate scrutiny: the statute advances New Jersey's

interests in preventing the manufacture of weapons outside its regulatory regime—

where individuals do not go through a background check, and where their weapons

are untraceable by law enforcement—and does so in a tailored way. And the law at issue is neither overbroad nor a prior restraint on any speech.

## A.   Subsection (*l*)(2) Survives Constitutional Scrutiny.

It is doubtful that this statute's regulation of fully functional printable gun files implicates the First Amendment at all.[2] But even assuming Subsection (*l*)(2) impacts protected expression, its regulation of the computer files that directly manufacture 3D printed firearms is a content-neutral regulation and thus is subject to intermediate scrutiny. And because the provision advances New Jersey's public safety interests in a tailored way, it easily survives that scrutiny.

### 1.   Subsection (l)(2) Is Subject To Intermediate Scrutiny.

Subsection (*l*)(2) is a content-neutral statute subject to intermediate scrutiny. "The level of scrutiny a court applies to a restriction on speech depends on whether

---

[2] Indeed, when reviewing a challenge to a nearly identical Delaware statute, another court provided reason to be "skeptical" that a restriction on distribution of printable gun files "implicates the First Amendment" at all. *Rigby v. Jennings*, __ F. Supp. 3d ___, 2022 WL 4448220, *9 n.15 (D. Del. Sept. 23, 2022). After all, some computer code is purely functional—it instructs users or a computer to "follow the [code's] signals … without the intercession of the mind or the will of the recipient." *CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000). Restrictions on such code are not subject to First Amendment scrutiny; the fact that the relevant code "use[s] words as triggers and a human being as a conduit, rather than programming commands as triggers and semiconductors as a conduit," is "irrelevant." *Id.* That reasoning applies to this case: the "action to be induced, in this case the manufacturing of a firearm, is unrelated to the First Amendment." *Rigby*, 2022 WL 4448220, *9 n.15; *see also id.* (analogizing to other restrictions that would similarly not implicate the First Amendment). But just like the Delaware district court, this Court "need not decide this issue," because New Jersey prevails "even assuming [its law] burdens protected speech." *Id.*

it is content based or content neutral." *Bruni v. City of Pittsburgh*, 941 F.3d 73, 83 (3d Cir. 2019). If a law is content neutral, courts "apply intermediate scrutiny and ask whether it is 'narrowly tailored to serve a significant governmental interest.'" *Id.* at 83-84 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994)). If the law is content based, however, then strict scrutiny instead applies, and the law "may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Id.* at 83.

A statute is content based "if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Likewise, a law is content based if it "cannot be justified without reference to the content of the regulated speech" or was "adopted by the government because of disagreement with the message [the speech] conveys." *Reed*, 576 U.S. at 164. But the mere fact that a law requires some analysis of the speech to determine whether a violation has occurred does not mean that the law "discriminat[es] *based on*" the idea expressed. *City of Austin*, 142 S. Ct. at 1474 (emphasis added). Instead, "restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *Id.* at 1473; *see also id.* at 1471 (rejecting view that a law is content based merely because "it requires reading the sign at issue").

9

As numerous courts have explained, regulations of computer code are content neutral if they regulate code because of its *functional* capability. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001). *Corley* involved a constitutional challenge to the Digital Millennium Copyright Act, which not only "backed with legal sanctions the efforts of copyright owners to protect their works from piracy behind digital walls," but also allowed for sanctions against "anyone who would *traffic* in a technology primarily designed to circumvent" such digital walls. *Id.* at 435. In reviewing a First Amendment challenge to the restrictions on the distribution of decryption code, the Second Circuit held the statute content neutral. The court drew a line between laws that apply to code based upon any "functional capability [that] is not speech within the meaning of the First Amendment"—such as a law tied to the code's "*capacity to instruct a computer to decrypt*" digital software—and laws based on the code's "capacity … for *conveying information to a human being*." *Id.* at 454 (emphases added). If the "Government seeks to justify" a law for the former reason—that is, the restriction is imposed based on the function, not the expressive nature, of code—then "incidental regulation on speech" does not transform the law into a content-based regulation. *Id.*; *see also id.* (analogizing limits on distribution based on code's function to "a restriction on trafficking in skeleton keys identified because of their capacity to unlock jail cells, even though some of the keys happened to bear a slogan or other legend that qualified as a speech component").

10

Nor does *Corley* stand alone. In *United States v. Chi Mak*, 683 F.3d 1126 (9th Cir. 2012), the Ninth Circuit confronted a First Amendment challenge to the AECA and ITAR, which "regulate[] the import and export of 'defense articles' and 'defense services'" and expressly encompass certain "'information … required for," *inter alia*, the "development, production, [and] manufacture'" of defense articles. *Id.* at 1130 (quoting 22 U.S.C. § 2778; 22 C.F.R. § 120.10(a)(1)). The central allegations involved computer files that contained information authored by the defendant, the subject of which was regulated by the AECA and ITAR. The Ninth Circuit rejected the defendant's position that because the AECA and ITAR only relate to information tied to defense articles, they had to be content-based. *See id.* at 1134-36. Instead, the "ITAR defines the technical data based on its *function* and not its viewpoint." *Id.* at 1135. Since "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," but on the files' function of producing weapons, "the AECA and its implementing regulations are content-neutral." *Id.*; *see also id.* (any contrary arguments "mistakenly focus on the nature of the content incidentally restricted, and not the nature of the statute"). And in *DD v. USDOS*, in which Defense Distributed itself challenged the AECA and ITAR, the Western District of Texas held the same. 121 F. Supp. 3d 680, 694 (W.D. Tex. 2015) (rejecting First Amendment challenge because "[t]he ITAR does not regulate disclosure of technical data based on the

message it is communicating," but rather on whether the files' function interferes with "a number of foreign policy and national defense goals").

Relying on these principles, the District of Delaware recently agreed that a nearly-identical restriction on distribution of printable gun files is content neutral. *See Rigby*, 2022 WL 4448220, at *9-10. Delaware's law—like Subsection (*l*)(2)—restricts the distribution of "functional" printable gun files "to a[ny] person who is not licensed as a manufacturer." *Id.* at *9 (quoting 11 Del. C. § 1463(c)(2)). As the court held, the mere fact that the statute "requires analysis of whether the code is functional and what the code's function is" does not make the statute content based. *Rigby*, 2022 WL 4448220, at *10. Just the opposite: the statute focuses on the code's *function*—namely, whether it enables a 3D printer to directly create a firearm and "not whether the code expresses any particular idea." *Id.* Indeed, the Delaware court explained, "the regulation does not prohibit discussing how to use a 3D-printer to build a firearm or conveying information that would aid someone in doing so," but only "prohibits distributing code that could itself function to build a firearm." *Id.* In short, the law "is not concerned with stifling expression of any idea. It is concerned with controlling the distribution of untraceable firearms." *Id.* It was therefore content neutral and subject to intermediate scrutiny.

The New Jersey statute at issue here operates in the same way as the Delaware law, and is content neutral for all the reasons the court held in *Rigby*. Subsection

(*l*)(2) only restricts code that performs the specific function of directing a 3D printer to produce firearms wholly outside of New Jersey's regulatory framework. *See* N.J. Stat. Ann. § 2C:39-9(*l*)(2) (addressing only the distribution of code that "may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component"). The statute applies based on the code's functionality, not any "capacity … for conveying information to a human being." *Corley*, 273 F.3d at 454. Regarding Defense Distributed's files in particular, Subsection (*l*)(2) does not restrict any components that express ideas advocating for printable firearms, such as instructional files. *See* TAC ¶¶ 43, 49. That is because New Jersey law is specifically concerned with the unregulated distribution of the functional capability to make firearms, not the communicative content of code or its ability to convey a particular message.

### 2.   *Subsection (l)(2) Satisfies Intermediate Scrutiny.*

Subsection (*l*)(2) survives intermediate scrutiny if it is "narrowly tailored to serve a significant governmental interest" and does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Bruni*, 941 F.3d at 88-89 (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). But a law "need not be the least restrictive or least intrusive means of serving the government's interest." *Id.* at 89 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). Subsection (*l*)(2) easily withstands that test.

There can be no doubt that New Jersey has a significant interest in preventing the dissemination of code that enables domestic terrorists, felons, and minors to produce untraceable and unregulated firearms. As this Court already stated in this lawsuit, "it is difficult to overstate New Jersey's interests in the constitutionality of a law enacted to prevent its citizens from manufacturing deadly weapons entirely outside of the state's regulatory regime." *Defense Distributed v. Platkin*, 617 F. Supp. 3d 213, 237 (D.N.J. 2022) (citing *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 48 (3d Cir. 1988) (agreeing that States maintain an "interest in deterring the manufacture of unsafe products within [their] borders")). Other courts have held the same. *See DD v. USDOS*, 121 F. Supp. 3d at 694-95 (reviewing AECA and ITAR).[3]

There are good reasons for these courts' conclusions. The TAC makes clear that Defense Distributed's plan is to permit "any site visitor" to "download" its printable gun files "directly," rather than limiting access to licensed manufacturers.

---

[3] The Delaware district court likewise held Delaware's law "advances a substantial government interest, as distributing a mechanism for automatically manufacturing untraceable firearms to non-licensed manufactures implicates public safety." 2022 WL 4448220, at *10. To be sure, *Rigby* made this point in rejecting an application for preliminary relief, while simultaneously allowing the case to survive a motion to dismiss. *See id.* at *11 ("Although Plaintiffs have not demonstrated a likelihood of success on the merits of their First Amendment claim, it is a well-pleaded claim and not fit for dismissal."). But that has no purchase here. The question here is not the sufficiency of Plaintiffs' specific allegations under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Iqbal*, 556 U.S. at 679; but rather whether New Jersey's statute survives First Amendment scrutiny as a matter of law. For all the reasons given in this brief, it does.

14

TAC ¶ 57; *see also id.* ¶¶ 41, 43, 46, 49-55 (same). Said another way, there is no factual dispute that the company would make printable gun files available to visitors regardless of whether they can pass a background check—even if they are terrorists, felons, or domestic abusers. States retain a powerful interest in ensuring that such individuals cannot produce their own weapons when "the state's regulatory regime" forbids their possession. *Platkin*, 617 F. Supp. 3d at 237; *see also Bruen*, 142 S. Ct. at 2138 n.9 (confirming that background checks are tied to a State's interest in "ensur[ing] only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'"). Moreover, "preserving the ability of law enforcement to conduct serial number tracing—effectuated by limiting the availability of untraceable firearms—constitutes a substantial or important interest." *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).[4]

Subsection (*l*)(2) covers no more conduct than necessary to achieve its interest in preventing New Jerseyans from accessing unserialized 3D firearms without going through a background check. Crucially, Subsection (*l*)(2) does not impose a blanket ban on distributing functional printable gun files to New Jersey, but instead requires that such files may only be sent to licensed firearms manufacturers. In other words, New Jersey takes no issue with the printable gun files, but only with their distribution

---

[4] *Marzzarella*'s application of means-end scrutiny is no longer applicable to Second Amendment claims in light of *Bruen*. But intermediate scrutiny, which *Marzzarella* was applying, remains the governing test for this First Amendment challenge.

in ways that circumvent lawful background checks and serialization requirements—which manufactures are required to follow. *Cf. Corley*, 273 F.3d at 454 (discussing code that instructs computers to take actions in circumvention of applicable laws). And Subsection (*l*)(2) allows for the distribution of code to anyone who is not in New Jersey, given its focus on public safety in the State.

Other features of Subsection (*l*)(2) likewise tailor it to the public-safety goal. Notably, the statute "prohibits only the distribution of functional code" but "leaves ample alternative channels to communicate about how to use a 3D-printer to manufacture" a firearm. *Rigby*, 2022 WL 4448220, at *10.[5] In other words,

---

[5] Plaintiffs' pleadings and incorporated materials confirm that the files underlying this challenge are functional. The TAC describes the relevant files as primarily Computer Aided Manufacturing (CAM) files and Computer Aided Design (CAD) files. *See* TAC ¶¶ 26-28, 32-34, 57. The TAC acknowledges "CAM files *are ready for insertion* into … 3D printers." *Id.* ¶ 27 (emphasis added). And while Plaintiffs say "CAD files are not ready for insertion into" 3D printers, citing and incorporating a U.S. Department of Commerce regulation as their sole support, *id.* ¶ 26 (citing 85 Fed. Reg. 4136 (Jan. 23, 2020)), the regulation says otherwise. The Commerce Guidance explains that its regulation applies to any file "ready for insertion" into a 3D printer "to produce the" firearm, and clarifies that "this includes any file, including any CAD file, that can be processed by a software program into an electronic format, such as a CAM file, *with no or minimal additional information or manipulation from the operator(s)*, and that the file once converted *will be in an executable code* for the production of a firearm frame or receiver or complete firearm." FAQs for the Commerce Categories I-III (final rule), at 18 (Dep't of Commerce May 28, 2021) (emphasis added), *available at* https://tinyurl.com/2ryyee92. This Court must consider that Guidance because it is incorporated directly into the TAC itself. *See Lungu v. Antares Pharma Inc.*, 2022 WL 212309, at *5 n.14 (3d Cir. Jan. 25, 2022) (citing *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994)).

Subsection (*l*)(2) does not restrict Defense Distributed or any other entity from advocating in favor of 3D printing firearms. Subsection (*l*)(2) does not restrict Defense Distributed from disseminating text files or any other files that lack the functional capability to directly produce firearms. And Subsection (*l*)(2) "does not prohibit gunsmiths and hobbyists from exchanging information about how to use their 3D-printer to manufacture a firearm, or for instructing individuals on how to program their 3D-printer to make the firearm of their choice." *Id.* The statute restricts only those files that pose the most direct threat to public safety, and it sweeps no more broadly than necessary to protect that interest. It withstands scrutiny.

### B.    Plaintiffs' Remaining First Amendment Theories Fail.

Plaintiffs also challenge Subsection (*l*)(2) as overbroad and a prior restraint, TAC ¶¶ 179, 182, but cannot prevail on either theory. A statute is facially invalid as overbroad only where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). But as explained above, Subsection (*l*)(2) "is narrowly focused on distributing functional code" and does not sweep in legitimate speech—such as instructions on how to use the code or the discussion of ideas about printable guns. *Rigby*, 2022 WL 4448220, at *10 (rejecting similar overbreadth challenge); *see also Chi Mak*, 683 F.3d at 1136 (rejecting overbreadth challenge to federal arms control statute because federal law "delineate[s] narrowly the scope of information

subject to arms controls."). Instead, Subsection (*l*)(2) is not overbroad for the same reasons that it is appropriately tailored: it regulates only files that can be used, with little or no human intercession, to print an untraceable gun; only the distribution of those files to a person in New Jersey; and only distribution of those files to recipients *other than* licensed manufacturers, all of which are subject to background-check and serialization requirements for their production and sale of weapons.

Nor does Subsection (*l*)(2) impose a prior restraint—a First Amendment term of art. "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). This doctrine does not apply to statutes which impose "punishment for past criminal conduct" rather than censor communications before they are made. *Id.* at 553; N.J. Stat. Ann. § 2C:39-9(*l*)(2) (confirming "it is a second degree crime" to engage in the proscribed conduct). The Fifth Circuit's brief comment that the New Jersey laws at issue "appear to be flagrant prior restraints" is therefore simply inconsistent with the well-established line between prior restraints and subsequent criminal penalties, and that panel (tasked only with reviewing a transfer motion) did not grapple with these cases. *Defense Distributed v. Bruck*, 30 F.4th 414, 421 (5th Cir. 2022); *see also id.* at 421 n.2 (declining to reach the merits). The Delaware district court, by contrast, did reject a nearly-identical argument, and correctly held that a law which "operates

18

by imposing punishment after the purported speech has occurred" is by definition not a prior restraint. *Rigby*, 2022 WL 4448220, at *11.

## II.    PLAINTIFFS' SECOND AMENDMENT CHALLENGE FAILS.

Plaintiffs' Second Amendment claim in Count 2 lacks merit for two separate and independently sufficient reasons: the printable gun files are not "Arms" covered by the text of the Second Amendment, and *Heller* and *Bruen* confirm that statutes like Subsection (*l*)(2) permissibly ensure that guns are in fact only being possessed by "law-abiding citizens."

First, a limitation on the distribution of printable gun files does not implicate the plain text of the Second Amendment at all.  Under *Bruen*'s framework for Second Amendment challenges, courts must first assess whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. This threshold but dispositive inquiry is "focused on the 'normal and ordinary' meaning of the Second Amendment's language." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 576-77). If the text does not cover the conduct, "the analysis can stop there; the regulated activity is categorically unprotected." *Id.* at 2126. But if the text "guarantees" the right to engage in the conduct, a State must find support in "the Nation's historical tradition of firearm regulation"—by identifying an appropriate historical analogue—to "justify its regulation." *Id.* at 2126, 2130, 2135.

Plaintiffs' challenge fails at the threshold step, because the text of the Second Amendment plainly does not protect distribution of computer files that direct a 3D printer to produce a firearm. *Bruen* repeatedly recognizes that "Arms" in the Second Amendment's text means bearable arms that one can physically wear on their person to use in case of confrontation. The Court explained that "the Second Amendment's definition of 'arms' is fixed according to its historical understanding," *id.* at 2132, and that means "bearable arms." *Id.* (quoting *Heller*, 554 U.S. at 582). Other "textual elements" confirm that meaning, as the phrase "bear arms" refers to arms that one can "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 2134 (quoting *Heller*, 554 U.S. at 584). In other words, the plain constitutional text guarantees the right to possess and carry weapons "in case of confrontation." *Heller*, 554 U.S. at 592. And it protects the right to "keep" those arms; the text says nothing about *producing* those arms without a license. *See id.* at 582 (keep means "'[t]o retain; not to lose,' and '[t]o have in custody'").

In no way can the plain text of "arms" be understood to protect the distribution of computer code. Files on a computer are not "bearable" in any sense, nor can they themselves be used "for the purpose … of being armed and ready" for conflict with another. *Bruen*, 142 S. Ct. at 2134; *see also United States v. Cox*, 906 F.3d 1170, 1186 (9th Cir. 2018) (holding that, consistent with the "founding-era definition of

20

an 'Arm[],'" a "silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence') [and thus] can't be a 'bearable arm' protected by the Second Amendment"). And while the Second Amendment is not limited "only [to] those arms in existence in the 18th century," printable gun files are not a modern analogue for any instrument that "facilitate[s] armed self-defense." *Bruen*, 142 S. Ct. at 2132. It is immaterial that the files can program a 3D printer to produce items that may themselves be "arms," because the only relevant question under *Bruen* is whether the specific course of conduct the statute prohibits—here, distributing the computer code—is protected by the plain text. *See id.* at 2134; *see also Defense Distributed v. Bonta*, No. 22-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (rejecting Second Amendment challenge to California statute regulating the "sale of the tools and parts necessary to complete the self-manufacturing process" for a firearm on the basis that such activity is not covered by the plain text). Because Subsection (*l*)(2) only regulates conduct that lies wholly outside the scope of the Second Amendment right, the analysis "stop[s] there." *Bruen*, 142 S. Ct. at 2126.

Second, even if (contrary to the text) Defense Distributed's code was deemed a bearable "arm," Subsection (*l*)(2) is still consistent with the Second Amendment. As the Supreme Court has twice explained, the Second Amendment protects "a *law-abiding citizen's* right to armed self-defense." *Bruen*, 142 S. Ct. at 2133 (emphasis added); *see also Heller*, 554 U.S. at 635 (same); *Folajtar v. Att'y Gen.*, 980 F.3d 897,

908 (3d Cir. 2020) (describing the longstanding history of "limiting the right to bear arms to both law-abiding and 'peaceable' citizens"). Inextricably linked with the scope of that right is the States' power to require residents "to undergo a background check" to keep or carry their arms—as background checks are precisely "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see id.* at 2161-62 (Kavanaugh, J., concurring) (same). And that is exactly what Subsection (*l*)(2) does: the statute does not prevent individuals from accessing 3D printed weapons, but instead requires them to go through a licensed manufacturer, thus ensuring that individuals complete a background check. Any person can access the printed firearms Plaintiffs wish to make available—after the background check *Bruen* endorses.

## III.   PLAINTIFFS' DORMANT COMMERCE CHALLENGE FAILS.

Plaintiffs' allegation in Count 5 that Subsection (*l*)(2) and the NJAG's 2018 cease-and-desist letter violate the dormant Commerce Clause is inconsistent with precedent. Because the challenged law is neutral—it does not discriminate between in-state and out-of-state actors seeking to distribute printable gun files, *see Heffner v. Murphy*, 745 F.3d 56, 72 (3d Cir. 2014) (discussing facial neutrality)—Plaintiffs' entire claim is that the challenged law impermissibly regulates conduct beyond New

Jersey's borders. TAC ¶ 216. But New Jersey is regulating only conduct involving the State, to the degree the Constitution plainly permits.

Most importantly, New Jersey is not controlling "commerce wholly outside its borders," but is instead regulating conduct that involves its territory. *See TitleMax of Delaware, Inc. v. Weissmann*, 24 F.4th 230, 238 (3d Cir. 2022) (acknowledging a law "that directly controls commerce wholly outside its borders violates the dormant Commerce Clause"). A law does not control commerce wholly outside its borders if it "regulates its 'half' of [a] transaction" between an in-state and out-of-state party. *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999); *see also id.* (explaining that a contract between an in-state seller of securities and an out-of-state buyer "does not occur 'wholly outside'" the state, because "elements of the transaction occur in each state"). Indeed, when a law regulates conduct involving an in-state recipient, it is "inevitable" that it "will have extraterritorial effects," but the "Supreme Court has never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3d Cir. 1994). That holds true in the e-commerce context, even if the out-of-state distributor lacks an in-state brick-and-mortar presence. *See, e.g.*, *TitleMax*, 24 F.4th at 239 (rejecting extraterritoriality challenge to Pennsylvania usury laws even when applied to an out-of-state lender,

23

because that lender's transactions with any in-state borrowers "do not occur 'wholly outside' of Pennsylvania," even if the lender has no in-state physical presence).

Plaintiffs' allegation of extraterritorial effects is misplaced. Subsection (*l*)(2) is cabined to the distribution of printable gun files "to a person in New Jersey," N.J. Stat. Ann. § 2C:39-9(*l*)(2), and regulates only the delivery of those files to a person present in the State. *See A.S. Goldmen*, 163 F.3d at 787 (a securities contract is not "wholly outside" New Jersey if one of the contracting parties is present in the state). Nor does it have the "inevitable effect" of regulating transactions "wholly outside" New Jersey's borders. *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003). The TAC itself admits the opposite is true: Defense Distributed continues to make files available for download all across the country, except "to residents of and persons in the State of New Jersey who lack a federal firearms license." TAC ¶¶ 49-53; *see also Defense Distributed v. U.S. Dep't of State*, No. 18-637, ECF 152-1 ¶ 9(c) (W.D. Tex. May 5, 2021) (company confirming it continues to distribute files in other States but screens site visitors to ensure they are not in New Jersey). In short, Plaintiffs can and do distribute their files in other States without running afoul of Subsection (*l*)(2); this law only comes into play where Plaintiffs' distribution is to an in-state recipient without a license.[6]

---

[6] The same is true for the NJAG's 2018 cease-and-desist letter, which only demands that Defense Distributed cease posting "printable-gun computer files for use by New Jersey residents." TAC ¶ 121. While the Fifth Circuit previously identified a factual

That proves fatal to Plaintiffs' dormant Commerce Clause theory. Because the laws at issue neither discriminate against interstate commerce nor regulate wholly out-of-state commerce, they are constitutional so long as the burden on interstate commerce does not "clearly outweigh" the local benefits. *Heffner*, 745 F.3d at 77. That makes this an easy case. The local benefits of these laws have been described in detail: they protect public safety by ensuring that dangerous individuals (such as felons, domestic abusers, and terrorists) cannot print untraceable weapons without going through background checks. *See supra* at 13-15. And public safety is a classic valid interest—a far cry from the economic protectionism the dormant Commerce Clause exists to limit. *See Maine v. Taylor*, 477 U.S. 131, 151 (1986).

On the other side of the ledger, there are *no* burdens on interstate commerce at all. For one, "the only burdens to be considered in the balancing test are those that 'discriminate against interstate commerce,'" and there are no such burdens because the text of the challenged law puts out-of-state distributors like Defense Distributed

---

dispute over whether the 2018 letter threatened enforcement for distribution wholly outside of New Jersey, *see Defense Distributed v. Grewal*, 971 F.3d 485, 492 & n.6 (5th Cir. 2020), much has changed since. For one, the pleading that *Grewal* reviewed was not the operative TAC, but an earlier complaint filed months before Subsection (*l*)(2)'s enactment. *See* No. 18-637, ECF 23 (W.D. Tex.). The added allegations involving Subsection (*l*)(2) clarify that New Jersey is regulating the distribution of printable gun files only to persons in New Jersey. For another, the Fifth Circuit's ruling predates—and thus did not consider—the TAC's admission that the company has continued to distribute printable gun files beyond New Jersey without running afoul of New Jersey's restrictions. *See supra* at 24. Together, there is no room for doubt about the territorial reach of New Jersey's laws.

"in no different position than an in-state" distributor of the same code. *TitleMax*, 24 F.4th at 240. For another, Plaintiffs' allegations confirm that Defense Distributed can simply block access to its website to persons in New Jersey without limiting its ability to disseminate its code to recipients in other States. *See supra* at 24. *No* case suggests a State violates the dormant Commerce Clause when it bans distribution of a product within its borders without affecting its distribution in *any other State*, and certainly not where the local public safety benefits of the in-state limitations are so overwhelming. Plaintiffs have no dormant Commerce Clause claim.

## IV.   PLAINTIFFS' SELECTIVE ENFORCEMENT CHALLENGE FAILS.

To prevail on the claim of selective enforcement in Count 3, Plaintiffs bear a "particularly demanding" burden: they must offer "'clear evidence' displacing the presumption that a prosecutor has acted lawfully." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999). A plaintiff must ultimately prove both that "it was treated differently from another, similarly situated [entity]," and that "this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, … or to prevent the exercise of a fundamental right." *Jewish Home of E. Pa. v. CMS*, 693 F.3d 359, 363 (3d Cir. 2012); *see also, e.g.*, *Perano v. Twp. of Tilden*, 423 F. App'x 234, 238-39 (3d Cir. 2011). But Plaintiffs have not included sufficient allegations to raise a plausible inference of selective enforcement.

First, the TAC identifies no other parties who violated the relevant New Jersey law and are "alike 'in all relevant aspects.'" *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008). This element requires offering not only some "factual detail as to the identities" of those other parties, *Karns v. Shanahan*, 879 F.3d 504, 521 n.10 (3d Cir. 2018), but similarity with respect to "the most relevant comparators"—not merely "commonality at a very general level." *Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025, at *6 (3d Cir. Mar. 1, 2022); *see also Hargrave v. Ramsey*, 688 F. App'x 124, 127 (3d Cir. 2017). The bare "assertion that other entities are of the same general category as plaintiff … and engaged in the one similar incidence of conduct giving rise to plaintiff's cause of action (e.g. applying for a permit, canceling a lease)" is insufficient. *Buck Foston's New Brunswick LLC v. Cahill*, No. 11-3731, 2013 WL 5435289, at *26 (D.N.J. Sept. 27, 2013). Even if the statute was regularly violated, a plaintiff cannot prevail where "[n]one of the other" violations were of a similar magnitude. *Cook v. City of Price*, 566 F.2d 699, 701-02 (10th Cir. 1977).

Plaintiffs fail to allege the bare minimum: that the NJAG was aware of some other party violating the same law, and to the same degree, but refused to prosecute.[7]

---

[7] The NJAG has never enforced Subsection (*l*)(2) against Defense Distributed or any other Plaintiff, and thus a selective enforcement claim premised on Subsection (*l*)(2) is not ripe. *See Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 807-08 (3d Cir. 2004). In any event, the reasons Plaintiffs fail to state a claim are the same whether directed at Subsection (*l*)(2) or the NJAG's 2018 cease-and-desist letter, and so the entire claim can and should be disposed of on its merits.

27

The TAC alleges only that there exist "many recipients" of the company's code who "republished those same files online via their own websites," TAC ¶¶ 56, 198, but does not allege that their actions are remotely of the magnitude of Defense Distributed's dissemination. Indeed, a re-poster could hardly be similarly situated if its re-posting attracted only a small fraction of the number of downloads that Defense Distributed's widely-publicized site generated. *See* TAC ¶ 44 (alleging company's files "were downloaded hundreds of thousands of times" in a five-day period in July 2018). And the allegations are especially wanting where the TAC itself admits that Defense Distributed was the progenitor of the files. *See* TAC ¶ 56.

Second, Plaintiffs cannot establish that any differential treatment was based on improper motivation. The "conscious exercise of some selectivity in enforcement [of a law] is not in itself a federal constitutional violation." *PG Pub. Co. v. Aichele*, 705 F.3d 91, 115 (3d Cir. 2013) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). After all, there are myriad legitimate reasons an enforcement official may decline to prosecute other offenders that do not reflect a discriminatory intent, such as that "a test case is needed to clarify a doubtful law," or that "officials seek to prosecute a particularly egregious violation and thereby deter other violators." *Cook*, 566 F.2d at 701 (internal citations omitted). "[M]ere unequal treatment or adverse effect" is not enough. *Karns*, 879 F.3d at 521; *see also Aichele*, 705 F.3d at 116. But Plaintiffs allege no facts relating to "evidence of discriminatory purpose." *Karns*, 879 F.3d at

521. Plaintiffs' conclusory allegation that the NJAG "disagrees with the content of Defense Distributed's constitutionally protected speech" and "dislikes the persons involved in the speech," TAC ¶ 198, is not itself evidence of intent. *See, e.g.*, *Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 708 (S.D.N.Y. 2018) (similarly speculative allegations of Attorney General's improper motive failed the plausibility standard). The TAC alleges no facts to plausibly undermine the NJAG's legitimate motive, and thus falls short of the necessary fact allegations needed to overcome the presumption that the NJAG "acted lawfully." *Reno*, 525 U.S. at 489.[8]

## V.    PLAINTIFFS' DUE PROCESS CHALLENGE FAILS.

Plaintiffs' two due process-based theories in Count 4 both fail as a matter of law. First, the NJAG did not "deprive[] Defense Distributed and SAF of a license issued by the Secretary of State pursuant to federal law" without due process of law. TAC ¶ 208. Second, the challenged state laws are not void for vagueness.

### A.    Plaintiffs' Procedural Due Process Claim Lacks Merit.

Plaintiffs raise an unprecedented procedural due process theory: that the State owed "adequate pre-deprivation notice and an opportunity to be heard" before filing

---

[8] The Fifth Circuit's statement in *Grewal* that the NJAG "has not targeted the many similarly-situated persons who publish Defense Distributed's files on the internet" is entirely beside the point. 971 F.3d at 493. *Grewal* did not review the merits of any of these claims, did not address whether the allegations support a finding that the parties are similarly situated, and did not address whether the NJAG in fact harbored a discriminatory purpose. In short, the opinion did not speak to this issue at all.

a lawsuit with eight other state Attorneys General against the USDOS challenging, *inter alia*, USDOS's decision to grant a license to Defense Distributed. But no court has ever held that a state Attorney General owes notice before filing a lawsuit against the Federal Government just because a third party could be impacted.

This procedural due process theory makes no sense. In cases in which the State acts as a *plaintiff* challenging a decision by the United States, rather than as the regulator, the State is not directly depriving the third party of any right whatsoever. Instead, should the State prevail in its suit, what actually "deprives" the third party of any alleged right is the separate court judgment. And before that judgment issues, the third party gets notice and an opportunity to be heard in that judicial forum—as happened here. After USDOS issued Defense Distributed a license to publish its files on July 27, 2018 and granted a Temporary Modification to the USML, a group of Attorneys General filed an APA challenge to the USDOS's actions in the Western District of Washington. TAC ¶ 83. That district court issued a temporary restraining order enjoining both the July 27, 2018 license and the Temporary Modification, *Washington v. U.S. Dep't of State*, 315 F. Supp. 3d 1202 (W.D. Wash. 2018), and subsequently entered a final order vacating both actions, *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130, 1148 (W.D. Wash. 2019). According to the operative Complaint, after the TRO issued, USDOS "disavowed" and "refused to supply" the license. TAC ¶¶ 98-114; *see* ECF 117-4.

But as the allegations also lay out, Plaintiffs had notice and an opportunity to be heard in that court. Defense Distributed was a nominal defendant and was able to file pleadings and briefs. *See Washington v. Dep't of State*, No. 18-1115, ECF 8, 11, 81, 114 (W.D. Wash). And it did so: it fought aggressively against an injunction in that court. *See id.* ECF 63 (opposing preliminary injunction, arguing that "[t]he State Department's decision to settle the federal litigation in Texas was correct" and that "[i]t was justified in issuing the license and making the temporary modification"). Having lost that argument, *see Washington*, 420 F. Supp. 3d at 1148, the company cannot now seek a do-over in another court. And the company likewise cannot claim an entitlement to some sort of hearing from New Jersey before the NJAG can make *litigation decisions* as a party to that separate case—or, presumably, hearings from all eight States that participated as plaintiffs in that same lawsuit—when it had every chance to respond to the position of those Attorneys General in court.

Plaintiffs' claim is also barred by multiple jurisdictional doctrines. Because USDOS disavowed the licensed in response to a judicial order, any injury Plaintiffs suffered was "the result of the independent action of some third party not before the court" and is not "fairly traceable" to the NJAG. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). That the NJAG lawfully sought relief "does not turn" that judicial act "into a governmental decision [by the NJAG] to impose" it. *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789 (1980). Further, no injunction could

31

be granted against the NJAG that would result in USDOS restoring a license that the Western District of Washington has held violates the APA—meaning that Plaintiffs' injury would not be "redressed by a favorable decision" in this case. *Lujan*, 54 U.S. at 561. In other words, Plaintiffs have no standing in this Court to collaterally attack the prior proceedings in the Western District of Washington. Plaintiffs had a forum in which to make these very arguments—the Western District of Washington, where they raised and failed to prevail on a panoply of the same contentions.[9]

**B.    New Jersey's Law Is Not Void For Vagueness.**

Plaintiffs' void-for-vagueness claim also fails as a matter of law. A law is only void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). A law thus need only provide "relatively clear guidelines as to prohibited conduct," *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 525 (1994); it may "not [be] automatically invalidated as vague simply because difficulty is found in determining

---

[9] There is another problem with this argument: revival of any license is impossible given the change in the federal regulatory landscape. In January 2020, new federal rules removed printable gun files from USDOS's jurisdiction and transferred them to the Commerce Department's jurisdiction. *See* ITAR: USML Cat. I, II, and III, 85 Fed. Reg. 3,819, 3,820 (Jan. 23, 2020); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the USML, 85 Fed. Reg. 4136 (Jan. 23, 2020). Any inability to engage in "unlimited distribution" of printable gun files is now the result of Commerce regulations rather than the Western District of Washington's vacatur of USDOS's prior actions.

whether certain marginal offenses fall within [its] language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963); *see also, e.g.*, *Ward*, 491 U.S. at 794 (agreeing that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity").

While Plaintiffs allege that Subsection (*l*)(2) does not provide notice of the conduct prohibited, TAC ¶ 206, they run into an immediate problem: any challenger "whose speech is clearly proscribed cannot raise a successful vagueness claim" tied to their "lack of notice." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010). Here, Plaintiffs freely admit that at least some of their intended conduct is prohibited by Subsection (*l*)(2)'s plain terms. *See* TAC ¶¶ 130, 133. After all, Subsection (*l*)(2) applies only to the distribution of such code "that may be used to program a three-dimensional printer to manufacture or produce a firearm." Plaintiffs acknowledge their intent to disseminate code that does exactly that—including CAM files, which Plaintiffs allege "are ready for insertion into object-producing equipment" like "3D printers," and other code that directs a printer to make "a single-shot firearm known as the 'Liberator,'" "AR-15 rifle and magazine," and/or "AKM rifle and magazine." *Id.* ¶¶ 27, 33, 43; *see also supra* at 16 n.5. Plaintiffs even specifically allege in the TAC that Subsection (*l*)(2) "outlaws constitutionally protected speech that Plaintiffs would engage in but for [the NJAG's] enforcement threats." *Id.* ¶ 130. Persons of

ordinary intelligence are clearly put on notice by the language of Subsection (*l*)(2)
that it proscribes Plaintiffs' intended distributions.

Further, Subsection (*l*)(2) offers sufficiently "clear guidelines as to prohibited
conduct." *Posters 'N' Things*, 511 U.S. at 525. The law makes clear that it is only
concerned with "the distribution of functional code," *Rigby*, 2022 WL 4448220, at
*10 (construing Delaware's near-identical statute)—that is, specifically the printable
gun files that enable someone to use a 3D printer to manufacture their own weapons
outside the State's regulatory regime. Indeed, it even provides a clear and illustrative
example of the types of files it addresses—"computer-aided design files" and other
code "displayed in electronic format as a digital model." N.J. Stat. Ann. § 2C:39-
9(*l*)(2). The law thus draws a distinction (just as *Rigby* noted) between "functional
code" and "information about how to use their 3D-printer to manufacture a firearm,
or for instructing individuals on how to program their 3D-printer to make the firearm
of their choice." 2022 WL 4448220, at *10.[10] And even assuming cases will arise
where it is not obvious if a given code is "functional," that does not make the statute
vague. After all, "[c]lose cases can be imagined under virtually any statute"; "[w]hat
renders a statute vague is not the possibility that it will sometimes be difficult to

---

[10] And the law prohibits only "knowing" distribution of the code, *see* N.J. Stat. Ann.
§ 2C:2-2(c)(3) (criminal laws that do not specify a mens rea default to a "knowing"
requirement), which "mitigate[s] a law's vagueness, especially … the adequacy of
notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates
v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306.

Subsection (*l*)(2) does not "tie[] criminal culpability" to conduct that requires "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Holder*, 561 U.S. at 20. Plaintiffs' challenge fails.

## VI.    PLAINTIFFS' PREEMPTION CLAIMS FAIL.

Subsection (*l*)(2) is not preempted by either the AECA or the Communications Decency Act (CDA). *See* TAC ¶¶ 222-35 (Counts 6 and 7). As to the former, Plaintiffs wrongly contend that Subsection (*l*)(2) "regulate[s] conduct that the federal government has expressly authorized pursuant to its authority under the AECA and ITAR." *Id.* ¶ 225. But the state and federal laws regulate distinct conduct. N.J. Stat. Ann. § 2C:39-9(*l*)(2) regulates only distribution of code "to a person in New Jersey." The AECA and ITAR, by contrast, limit the *international* export of defense articles and do not apply to domestic distribution. *See* 85 Fed. Reg. 3,822 (USDOS agreeing that neither "regulate the domestic distribution among U.S. persons of any defense article, including firearms" and that "[d]omestic activities that do not involve release to foreign persons are generally left to other federal agencies—and the states—to regulate"). State law does not forbid anything that federal law authorizes here.

Nor is there any conflict or obstacle preemption. Particularly "when the state law involves the exercise of traditional police power," such as the power to protect

public safety, this Court may only find preemption where "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *MD Mall Assocs, LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013). But nothing in the ITAR or operative Commerce Department regulations preempts state public safety laws like Subsection (*l*)(2). It is possible to comply with both federal and state law—preventing distribution internationally, while preventing distribution to New Jersey at the same time. The Commerce Department itself could hardly have been clearer about the consistency between these regimes: it emphasized both that the agency "shares the concerns raised over the possibility of widespread and unchecked availability" of 3D printing technology, and that "nothing in this final rule affects existing federal or state laws that pertain to the manufacture, possession, use, or commercial sale of firearms." 85 Fed. Reg. 4141. The United States has the plenary authority to decide what arms can cross the Nation's border, and New Jersey could not adopt a contrary rule. But New Jersey has authority to protect its citizens from the in-state danger posed by untraceable, 3D printed firearms.

Plaintiffs' CDA preemption theory fares no better. Plaintiffs rely on 47 U.S.C. § 230(c)(1), which establishes that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." But Section 230 of the CDA only applies if "the relevant content originated not from [the website operator] but from 'another

information content provider.'" *Green v. America Online (AOL)*, 318 F.3d 465, 470

(3d Cir. 2003). "Thus, an interactive computer service provider remains liable for its

own speech." *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st

Cir. 2007); *see also Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016) (holding the

CDA does not insulate a company when "creating and posting" its own content "in

a forum that company maintains"). Said another way, the CDA only "bar[s] attempts

to treat websites as publishers or speakers of content posted by others," *Hepp v.*

*Facebook*, 14 F.4th 204, 209 (3d Cir. 2021), and does not apply where the defendant

"is being held accountable for its *own* deceptive acts or practices," *FTC v. LeadClick*

*Media, LLC*, 838 F.3d 158, 176 (2d Cir. 2016).

      That proves fatal to Plaintiffs' preemption theory. After all, the plain text of

Subsection (*l*)(2) applies to the actor's *own* distribution of printable gun files, and it

is silent regarding holding a website accountable for the posts of another. *See* N.J.

Stat. Ann. § 2C:39-9(*l*)(2). The allegations of the TAC detail at length that Defense

Distributed itself distributes the printable gun files on its website. *See* TAC ¶¶ 40,

41, 43, 49-50, 55, 57, 69. And even where the TAC does allege that the "recipients

of Defense Distributed's" code "republished" the files, the TAC confirms they did

so "via their own websites," not on Defense Distributed's website. *Id.* ¶ 56. Defense

Distributed is therefore anything but "a passive transmitter of information provided

by others," and the CDA is inapposite. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008).

## VII.   PLAINTIFFS' TORTIOUS INTERFERENCE CLAIMS ARE BARRED BY SOVEREIGN IMMUNITY.

Finally, Counts 8 and 9 alleging state-law tortious interference are barred by sovereign immunity and must be dismissed. A State is not "subject to suit in federal court unless it has consented to suit." *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 779 (1991). Although litigants may seek injunctive relief in federal court to prevent ongoing violations of *federal* law by state officials, *Pa. Fed'n of Sportsmen's Clubs v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002), no such exception exists for claims under *state* law. Instead, a plaintiff in federal court "may not bring state law claims—including state constitutional claims—against the State regardless [of] the type of relief it seeks." *King v. Christie*, 981 F. Supp. 2d 296, 310 n.12 (D.N.J. 2013) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-06 (1984)); *Platkin*, 617 F. Supp. 3d at 239 (same, at transfer stage).

## **CONCLUSION**

This Court should dismiss the Third Amended Complaint in its entirety.

                                 Respectfully submitted,

                                 MATTHEW J. PLATKIN
                                 ATTORNEY GENERAL OF NEW JERSEY

                By:    /s/ Tim Sheehan
                      Tim Sheehan
                      Deputy Attorney General

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 19, 2023, I electronically filed the foregoing with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

Dated:  May 19, 2023           /s/ Tim Sheehan
                                             Tim Sheehan