## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DEFENSE DISTRIBUTED *et al.*,

     Plaintiffs,

v.

MATTHEW J. PLATKIN, Attorney
General of the State of New Jersey,

     Defendant.

Hon. Michael A. Shipp, U.S.D.J.

Civil Action No. 3:21-cv-9867 (MAS)

---

### REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

---

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
Attorneys for Defendant
tim.sheehan@njoag.gov

Angela Cai
*Deputy Solicitor General*
Tim Sheehan (NJ Bar #179892016)
Samuel Rubinstein
Ashleigh B. Shelton
*Deputy Attorneys General*
  Of Counsel and On the Brief

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................1

ARGUMENT ...............................................................................................2

   I.   Plaintiffs' Threshold Objections Lack Merit. ...............................2

   II.   Plaintiffs' First Amendment Challenge Fails As A Matter Of Law. ............3

   III.   Plaintiffs' Second Amendment Challenge Fails As A Matter Of Law. .....10

   IV.   Plaintiffs' Remaining Claims Fail. ............................................12

CONCLUSION .........................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*,
  163 F.3d 780 (3d Cir. 1999) ..................................................................13

*City of Austin v. Reagan National Advertising of Austin, LLC*,
  142 S. Ct. 1464 (2022) .............................................................. 1, 5, 6, 7

*Defense Distributed v. Platkin*,
  617 F. Supp. 3d 213 (D.N.J. 2022) ....................................................8, 14

*Defense Distributed v. U.S. Dep't of State*,
  121 F. Supp. 3d 680 (W.D. Tex. 2015) ...............................................5, 8

*Defense Distributed v. U.S. Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) ..............................................................14

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)............................................................................10

*Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*,
  545 F.3d 4 (D.C. Cir. 2008)...................................................................8

*Green v. U.S. Dep't of Justice*,
  54 F.4th 738 (D.C. Cir. 2022)............................................................5, 6

*Lapides v. Board of Regents of University System of Georgia*,
  535 U.S. 613 (2002)...........................................................................15

*Mazo v. N.J. Sec. of State*,
  54 F.4th 124 (3d Cir. 2022) .................................................................8

*Nat'l Institute of Family and Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018)..........................................................................6

*Nat'l Pork Producers Council v. Ross*,
  143 S. Ct. 1142 (2023)........................................................................13

*New York State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) .................................................................................... 7, 11

*Rigby v. Jennings*,
   __ F. Supp. 3d __, 2022 WL 4448220 (D. Del. 2022) ........................................ 3, 6

*TitleMax of Delaware, Inc. v. Weissmann*,
   24 F.4th 230 (3d Cir. 2022) .................................................................................... 14

*Tryko Holdings v. City of Harrisburg*,
   429 F. Supp. 3d 12 (M.D. Pa. 2019).................................................................... 14

*United States v. Chi Mak*,
   683 F.3d 1126 (9th Cir. 2012) ................................................................................ 5

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) ...................................................................................... 8

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ................................................................................ 4, 5

*Wag More Dogs Liab. Corp. v. Cozart*,
   680 F.3d 359 (4th Cir. 2012) .................................................................................. 8

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015).................................................................................................. 9

**Statutes**

26 U.S.C. § 5822 .......................................................................................................... 11

N.J. Stat. Ann. § 2C:39-9(k) ........................................................................................ 10

N.J. Stat. Ann. § 2C:39-9(*l*)(1) ...................................................................................... 9

N.J. Stat. Ann. § 2C:39-9(*l*)(2) ............................................................................. *passim*

## **PRELIMINARY STATEMENT**

Plaintiffs' submission only confirms that this case must be dismissed. Their First Amendment claim fails as a matter of law because Subsection (*l*)(2) is a valid, content neutral law. The statute restricts distribution of printable gun code based on its functional capability to produce 3D firearms, not because of any message it expresses. As federal courts have consistently explained, regulating code based on its function is content neutral—a conclusion bolstered by *City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464 (2022). And Plaintiffs offer little to rebut the conclusion that Subsection (*l*)(2) passes intermediate scrutiny, since the statute is tailored to preventing individuals who could not pass a legally required background check from gaining a tool to directly print untraceable firearms.

Plaintiffs' remaining claims should likewise be dismissed. Plaintiffs nowhere grapple with a dispositive flaw in their Second Amendment theory: regulating code is not a restriction on bearable arms. Plaintiffs' digression into self-manufacture of firearms overlooks that point—and fails to rebut the pedigree of background check laws. As to equal protection and due process, they concede flaws in their pleading that require dismissal. The Commerce Clause claim ignores features in the statute's text and case law showing the law does not improperly burden interstate commerce. And Plaintiffs' remaining claims misunderstand the applicable federal statutes and doctrine. This Court should dismiss the Third Amended Complaint (TAC).

1

# ARGUMENT

## I.    Plaintiffs' Threshold Objections Lack Merit.

Plaintiffs' threshold objections—that their claims against the NJAG's 2018 cease-and-desist letter are "unchallenged," and that the NJAG misreads Subsection (*l*)(2), Opp. 2-4—cannot withstand scrutiny. As to the former, the NJAG responded to each of Plaintiffs' causes of action, none of which distinguish between their claims against civil or criminal enforcement, and which instead consistently group the two together. *See, e.g.*, TAC ¶¶ 176-93. Nor was this inadvertent: Plaintiffs themselves have repeatedly pressed that the "same constitutional analysis" must apply to their challenges to both civil enforcement and to Subsection (*l*)(2). Appellants' Br., No. 22-50669, 2022 WL 3701227, at *51 (5th Cir. Aug. 18, 2022) (contending "the same constitutional analysis that applies to the new speech crime applies to the AG's use of civil legal methods to achieve the same ends"). Even now, Plaintiffs' opposition does not say how they believe the claims differ with respect to the civil or criminal laws.[1] After all, if the Constitution allows this conduct to be criminally sanctioned under Subsection (*l*)(2), surely it allows civil sanctions too.

As to the latter, *see* Opp. 4, Plaintiffs' effort to read Subsection (*l*)(2) to apply to non-functional code misconstrues the statute altogether. The plain text limits the

---

[1] The only time Plaintiffs arguably distinguish between the two is in discussing their territorial reach, but the NJAG addressed this in his motion. *See* Def.'s Br. 24 n.6.

statute to code that performs the specific function of directing a 3D printer to produce a firearm. *See* N.J. Stat. Ann. § 2C:39-9(*l*)(2) (specifically citing CAD files and other such code displayed as a digital model). Contrary to Plaintiffs' position, *see* Opp. 4-5, a file incapable of that function—like "drawings" or "plain text" instructions, TAC ¶¶ 43, 49—cannot "be used to" directly print a 3D gun. *See Rigby v. Jennings*, __ F. Supp. 3d __, 2022 WL 4448220, at *10 (D. Del. 2022) (agreeing same language in Delaware statute "is narrowly focused on distributing functional code").

Nor is the NJAG's explanation of which code is covered by the statute in any way a "retreat" or a basis for a "settlement." Opp. 5-6. After all, Plaintiffs never dispute that their code *is* covered by the statute because of its function. Plaintiffs do not challenge the NJAG's explanation that the statute covers CAM and CAD files, and they nowhere dispute that such files are either already "in an executable code for the production of a firearm" or can be readily converted by "a software program" into executable code "with no or minimal additional information or manipulation from the operator(s)." Def.'s Br. 16 n.5. That conduct is clearly prohibited.

## II.  Plaintiffs' First Amendment Challenge Fails As A Matter Of Law.

Plaintiffs' attempts to revive their First Amendment theories come up short. First, Subsection (*l*)(2) is a content neutral regulation. Second, the statute withstands intermediate scrutiny. And third, it is not unconstitutionally overbroad.[2]

---

[2] Plaintiffs appear to abandon their argument regarding prior restraint.

1.      Plaintiffs' view that Subsection (*l*)(2) regulates based on the content of the message is wrong. Plaintiffs contend the statute forbids individuals to "speak" or "talk about" the "topic of 3D-printing firearms." Opp. 11. But Subsection (*l*)(2) does not apply to speech that expresses ideas advocating for printable firearms—whether plain text or a blog post extolling the benefits of 3D printing firearms—and instead restricts only distribution of code that itself directs a 3D printer to produce firearms. And it does not even impose that restriction across the board, but rather provides that such code may only be sent to licensed firearms manufacturers. That is because the State is concerned with the unregulated dissemination of the functional capability to produce unserialized firearms to those who could not pass a background check—not with any message or viewpoint that the code conveys.

Because Subsection (*l*)(2) is a restriction based on that *functional* capability, it is necessarily not based on expressive content, and Plaintiffs' attempt to rebut the relevant cases fails. *See* Opp. 13. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001), to take one example, confirms that the level of scrutiny turns on the basis of the restriction: where code is restricted "solely because of its capacity to instruct a computer," not because of any "capacity [the code] might have for conveying information to a human being," the statute is content neutral and subject only to intermediate scrutiny. *Id.* at 454. And *United States v. Chi Mak*, 683 F.3d

4

1126 (9th Cir. 2012), and *Defense Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 694-95 (W.D. Tex. 2015) ("*DD v. USDOS*"), make the same point.

Plaintiffs have no response to *Chi Mak* or *DD v. USDOS*, and their response to *Corley* fails on its face. As to *Corley*, Plaintiffs' claim that the Digital Millennium Copyright Act (DMCA) was actually content neutral because that statute did not turn on the kind of function the code had, *see* Opp. 13, is wrong: the DMCA did not target *all* decryption code, but only code that facilitated unauthorized access to copyrighted works in digital form. *See* 273 F.3d at 435 (noting the DMCA buttressed "efforts of copyright owners" to "protect their works from piracy behind digital walls"). That is precisely the situation here: neither Subsection (*l*)(2) nor the DMCA cover "*all* digital instructions that may be used to manufacture *anything*," Opp. 13, or that may be used to decrypt *anything*, but address a specific function—production of firearms or access to copyrighted works. *Corley* confirms such laws are content neutral.

The D.C. Circuit recently reaffirmed *Corley*'s conclusion that restricting code based on its functional capacity is content neutral, and emphasized that *City of Austin* (which rejected overly broad definitions of "content based") further compels this result. *See Green v. U.S. Dep't of Justice*, 54 F.4th 738, 745-46 (D.C. Cir. 2022) (calling *Austin* "virtually dispositive"). As *Green* explained, while the DMCA "requires reading computer code to determine what digital act the code carries out, it is nonetheless content neutral," because "it cares about the expressive message in

5

the code 'only to the extent that it informs' the code's function." *Id.* at 746 (quoting *City of Austin*, 142 S. Ct. at 1473);[3] *see id.* at 745 (DMCA "target[s] not the expressive content of computer code, but rather the act of circumvention and the provision of circumvention-enabling tools"). Subsection (*l*)(2) acts in precisely the same way—it requires reading the code exclusively to assess *the code's function*, namely, whether it is the "provision of" a tool that allows a person to directly print 3D firearms absent a background check. Plaintiffs' bald claims that Subsection (*l*)(2) "ban[s]" or "singl[es] out" speech about the printing of firearms are thus inconsistent with both *City of Austin* and the language of New Jersey law.[4]

Finally, Plaintiffs offer no answer to *Rigby*, in which the District of Delaware found that a nearly-identical restriction on distribution of printable gun code is a straightforward example of a content neutral law. *See* 2022 WL 4448220, at *10. As *Rigby* found, Delaware's printable guns statute—like the DMCA—turns on whether the code "could itself function to build a firearm," and "not whether the code expresses any particular idea." *Id.* Plaintiffs do not even try to distinguish *Rigby* (nor

---

[3] Indeed, regulation of code of the kind advanced by the DMCA is an "easier" case than *City of Austin*, because the sign ordinance in *City of Austin* "regulated speech as speech, whereas the DMCA looks only to the code's function, not its expressive content." *Id.* Simply, "[t]he code's 'substantive message itself is irrelevant.'" *Id.* (quoting *City of Austin*, 142 S. Ct. at 1472). The same applies to Subsection (*l*)(2).

[4] Plaintiffs' reliance on *Nat'l Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) is misplaced, *see* Opp. 12, because *NIFLA* did not involve code and thus did not and could not address this function/expression distinction.

could they), *see* Opp. 13 n.2, and *Rigby* provides further proof that Subsection (*l*)(2) is justified without reference to the expressive content of code. Plaintiffs simply say *Rigby* and the entire function/expression distinction must be rejected, but that would generate unprecedented consequences that lack legal support. *See City of Austin*, 142 S. Ct. at 1477 (Breyer, J., concurring) (explaining such a view makes vast swaths of well-accepted regulations—from securities disclosure to workplace safety rules— impermissibly content based). Plaintiffs cannot disprove content neutrality.[5]

2.      Plaintiffs' arguments that Subsection (*l*)(2) should be invalidated even under intermediate scrutiny have no merit.[6] As the NJAG's moving brief explained, Subsection (*l*)(2) is tailored to advancing overwhelming interests in preventing the distribution of code that allows terrorists, felons, and minors to produce untraceable firearms. *See* Def.'s Br. 13-15. (And for the reasons laid out above, this interest in limiting the provision of a tool that allows individuals to print unserialized weapons without a background check is not akin to an interest in "suppressing speech." Opp. 15-16.) Nor was that interest "wholly abrogated" by *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Opp. 17. *Bruen* abrogated the use of means-

---

[5] Plaintiffs' bare allegation that Subsection (*l*)(2) was enacted to target them has no bearing here, Opp. 14, because even assuming that the law was enacted as a response to a specific party's conduct, Plaintiffs offer nothing to disprove that the law resulted from the *functional capability* of what they planned to distribute.

[6] Plaintiffs stress the TAC's allegations that "the AG's wrongdoing violates intermediate scrutiny," Opp. 14, but these are legal conclusions entitled to no weight.

end scrutiny when considering Second Amendment claims, but intermediate scrutiny still governs Plaintiffs' leadoff *First* Amendment cause of action.

Plaintiffs then object that these public safety interests cannot be advanced at the motion-to-dismiss stage, Opp. 18-19, but that argument fares no better. Courts have already found that these exact interests justify laws like Subsection (*l*)(2). *See* Def.'s Br. 14-15 (citing *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010); *Defense Distributed v. Platkin*, 617 F. Supp. 3d 213, 237 (D.N.J. 2022); *DD v. USDOS*, 121 F. Supp. 3d at 694-95). Plaintiffs seem to think that courts may never dismiss a First Amendment claim on the basis that the challenged statute survives intermediate scrutiny, until there is a specific factual record laying out the government interests, but that is wrong. *See, e.g.*, *Mazo v. N.J. Sec. of State*, 54 F.4th 124, 153-54 (3d Cir. 2022) (affirming this Court's dismissal of challenge to ballot slogan law); *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 369 (4th Cir. 2012); *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 13 (D.C. Cir. 2008). And tellingly, Plaintiffs cannot identify what other proof they think would be needed to establish that Subsection (*l*)(2) advances these legitimate government aims.

Plaintiffs' smattering of arguments that Subsection (*l*)(2) is "underinclusive" likewise fails. Opp. 19. As a threshold matter, each argument ignores that the First Amendment has no "freestanding" under-inclusiveness test. *Williams-Yulee v. Fla.*

*Bar*, 575 U.S. 433, 449 (2015). But in any event, each alleged underinclusive feature fails. The reason Subsection (*l*)(2) does not apply to "manufacturers or wholesalers" merely *confirms* that the law is tailored to the State's interest: the State only prevents distribution of code where it would enable individuals to evade background checks, but manufacturers and wholesalers are subject to specific licensing and background check rules. The statute does not address the printing of "poison or bombs" because the Legislature is unaware of any code that enables a 3D printer to produce poison or a bomb; a State may pass a law to solve a real-world problem without addressing speculative fears. *See id.* And finally, although New Jersey law does also prohibit a recipient's use of the code to "produce an illegal firearm" if the user is not a licensed manufacturer, N.J. Stat. Ann. § 2C:39-9(*l*)(1), that alone cannot mitigate the risk of providing such a tool to terrorists, felons, and domestic abusers—among others who would fail a background check. Subsection (*l*)(2) survives scrutiny.

3.    Plaintiffs' overbreadth arguments rest on the same misunderstandings about Subsection (*l*)(2) refuted above—including that the law "criminalizes speech" and prohibits all distribution. *See* Opp. 20. In particular, Plaintiffs' analogy to laws that target incitement to violence is inapt, as Subsection (*l*)(2) restricts distribution of code solely based on its functional capability, not because of a capacity to "incite" human beings to imminent lawless action or to convey any expressive message. Opp. 20. Further, Plaintiffs misconstrue Subsection (*l*)(2)'s use of "firearm component,"

9

as uses of this term in the same statutory section confirm this refers to the parts that are housed by the frame or receiver—*e.g.*, "the hammer, bolt or breechblock, action, and firing mechanism." N.J. Stat. Ann. § 2C:39-9(k). And Plaintiffs overlook that "knowing" is the default mens rea for silent provisions within Title 2C, *see* Opp. 22, meaning the actor must have known that he distributed code that "may be used" to program a 3D printer to produce firearms. *See* Def.'s Br. 34 n.10.[7] Just as the statute is directly tailored to guard against individuals gaining access to weapons without a background check, it is not overbroad in protecting that interest.

## III.   Plaintiffs' Second Amendment Challenge Fails As A Matter Of Law.

Plaintiffs have no response to the fatal flaws in their Second Amendment theory. Plaintiffs offer no authority to show that computer code that programs a 3D printer to produce firearms is itself a bearable "Arm," and they altogether ignore the NJAG's authorities showing that it is not. *See* Def.'s Br. 20-21 (collecting authorities confirming that computer files are neither "arms" nor "bearable"). And they have no answer to the fact that *Bruen* specifically found that requiring background checks is permissible under the Second Amendment—as these checks "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *District of Columbia v. Heller*, 554 U.S.

---

[7] The actor need not have knowledge as to how the recipient intends to use the code, since the recipient's use of the code is not an element of the offense. And they need not know their act is illegal, as ignorance of the law is no excuse.

570, 635 (2008)). But that is all Subsection (*l*)(2) does—it prevents individuals from using 3D printing to evade the background checks that *Bruen* endorses.

Plaintiffs respond only with a supposed history of self-manufactured firearms, but that is irrelevant when their claims fall outside the Second Amendment entirely. *See Bruen*, 142 S. Ct. at 2126 (confirming that if the Second Amendment's text does not cover the challenged conduct, "the analysis can stop there; the regulated activity is categorically unprotected."). Plaintiffs' theory is radical: it would apparently mean that even Subsection (*l*)(1)'s prohibition on using this code to produce a firearm is unconstitutional. But regardless, that history gets Plaintiffs nowhere, given *Bruen*'s recognition that States can mandate background checks and safety training to ensure responsible use. *See* 142 S. Ct. at 2138 n.9. That is consistent with New Jersey law, which does not prohibit individuals from accessing 3D printed guns altogether, but instead simply requires them to obtain access through a licensed manufacturer, thus ensuring they pass a background check along the way.[8]

---

[8] Plaintiffs' challenge is further undercut by their prior admission that a federal statute can permissibly require prospective makers of firearms to obtain ATF's approval *before* manufacturing a firearm. *See* No. 19-4753, ECF 72 at 29 n.7 (discussing 26 U.S.C. § 5822). After all, if Plaintiffs accept it is constitutional for Congress to mandate that only authorized registrants may manufacture firearms, it cannot violate the Second Amendment for a State to similarly mandate that only authorized manufacturers may obtain the code that enables them to directly produce 3D printed firearms. While Plaintiffs deleted that footnote when they re-filed their opposition, the NJAG does not take their initial position to be in error or inauthentic, and thus Plaintiffs' prior admission is properly before the Court.

11

IV.     **Plaintiffs' Remaining Claims Fail.**

Plaintiffs make little effort to revive their remaining causes of action, and each

one fails as a matter of law. As to equal protection, the NJAG's argument is not that

Plaintiffs must offer "proof" of similarly situated parties, Opp. 30, but that they must

plausibly allege the existence of such parties and have failed to do so. Plaintiffs cite

paragraphs 56 and 198 of the TAC, but as the NJAG explained, these allegations do

not identify *any* of the "many recipients" of Defense Distributed's code or state that

any such recipient disseminated the functional code on a scale comparable to

Defense Distributed. *See* Def.'s Br. 27-28. And Plaintiffs have no response at all to

their failure to allege that any selectivity was based on an improper purpose, *see*

Def.'s Br. 28-29, an independently sufficient reason to reject this claim.

Plaintiffs get no traction on their due process theories. As to procedural due

process, their disappointment with the severance-and-transfer order does not change

the fact that no relief from this Court could result in nonparty U.S. State Department

officials issuing a license to Defense Distributed, Opp. 31-32, meaning Plaintiffs do

not meet Article III's traceability or redressability requirements. *See* Def.'s Br. 31-

32. And Plaintiffs do not dispute that they received notice and an opportunity to be

heard in the Western District of Washington lawsuit, which is sufficient on its own

to dismiss this claim, or cite any case suggesting they are entitled to specific process

before the State takes any action *as a litigant*. As to void-for-vagueness, Plaintiffs'

challenge is barred given that they agree with the NJAG that at least some of their conduct is "clearly covered" by Subsection (*l*)(2)'s terms. Opp. 32. And in any event, as explained above, *supra* at 2-3, Plaintiffs have fair notice of what code "may be used" to direct a 3D printer to produce firearms, particularly since they take no issue with the NJAG's position that their CAM and CAD files are covered.

As to the dormant Commerce Clause, Plaintiffs' theory that Subsection (*l*)(2) amounts to "extraterritorial discrimination" cannot be squared with undisputed facts or the law. Opp. 34. Plaintiffs ignore that the text is cabined to distribution of code "to a person in New Jersey," N.J. Stat. Ann. § 2C:39-9(*l*)(2), and that Defense Distributed continues to distribute its code across the country while screening visitors to ensure they are not in New Jersey, *see* Def.'s Br. 24, confirming this law does not control what code can be sent to individuals in other States. And Plaintiffs have no response to precedent holding that where, as here, a transaction involves an in-state recipient, it "does not occur 'wholly outside' the state." *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999). The law's territorial reach is the same where an "offer" or "advertisement" is concerned, and thus would not apply if the code is provided to, *e.g.*, a Texan at a trade show in Texas. Opp. 34.

Next, recognizing that even their conception of the claim (which, as described above, is incorrect) is foreclosed by *National Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023), Plaintiffs baldly claim the presence of "extraterritorial

discrimination." Opp. 34. But what they describe—the existence of some impact "outside of New Jersey"—invokes precisely the *per se* extraterritoriality rule that the *NPPC* Court unanimously rejected. *See* 143 S. Ct. at 1154.

Finally, with respect to *Pike* balancing, Plaintiffs are wrong to say their claim is not susceptible to dismissal without a full record. As a general matter, courts regularly grant motions to dismiss dormant Commerce Clause theories where the complaint is devoid of facts showing the burdens imposed on interstate commerce are "clearly excessive" in relation to the benefits. *See, e.g.*, *Tryko Holdings v. City of Harrisburg*, 429 F. Supp. 3d 12, 20-21 (M.D. Pa. 2019). That is especially so here, as Plaintiffs did not even try to plead facts showing a burden on interstate commerce, and offer only threadbare recitals of the elements of a Commerce Clause claim. *See* Opp. 35; TAC ¶¶ 212-21. Indeed, without discrimination, "'inquiry as to the burden on interstate commerce should end' and further analysis of the local benefits is unnecessary." *TitleMax of Delaware, Inc. v. Weissmann*, 24 F.4th 230, 241 (3d Cir. 2022). Regardless, it is hard to imagine a case with more obvious local interests than this one, given the State's interest in preventing individuals "from manufacturing deadly weapons entirely outside of the state's regulatory regime." *Platkin*, 617 F. Supp. 3d at 237; *see also Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016).

As to preemption under the Arms Control Export Act, Plaintiffs' premise that the U.S. State Department has "expressly authorized" Defense Distributed's code for dissemination is refuted by their own pleadings. Opp. 36. The State Department instead "disavowed" the license it previously issued to the company, TAC ¶¶ 98-114, and no longer licenses dissemination of this type of code at all. *See* Def.'s Br. 32 n.9. As to the Communications Decency Act (CDA), nothing in Subsection (*l*)(2) treats a website operator as the publisher of content posted by others. And the CDA is irrelevant, because Defense Distributed does not host code posted by others. It wishes to distribute code directly, which is precisely why the CAD does not apply.

Last, Plaintiffs' argument that the NJAG "waived" sovereign immunity relies on *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 616 (2002), which held that a State waives its sovereign immunity by removing a state court lawsuit to federal court. *Lapides* is inapposite, as the NJAG did not remove the *Washington* litigation from state court, and in any event, that lawsuit against the U.S. State Department was separate from this one. And sovereign immunity is appropriately raised on a motion to dismiss, even before an answer is filed pleading affirmative defenses. Plaintiffs' state law tortious interference claims are thus barred.

## **CONCLUSION**

This Court should dismiss the Third Amended Complaint in its entirety.

15

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    /s/ Tim Sheehan
       Tim Sheehan
       Deputy Attorney General

16

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on June 13, 2023, I electronically filed the foregoing Reply in Support of Defendant's Motion to Dismiss with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.


Dated:  June 13, 2023                                    /s/ Tim Sheehan
                                                                     Tim Sheehan