**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

DEFENSE DISTRIBUTED *et al.*,

        Plaintiffs,

        v.

MATTHEW J. PLATKIN, Attorney General
of the State of New Jersey,

        Defendant.

---

Civil Action No. 21-9867 (MAS) (TJB)

**OPINION**

**SHIPP, District Judge**

    This matter comes before the Court upon Defendant Matthew J. Platkin, the Attorney General of New Jersey's ("Defendant" or "State") Motion to Dismiss Defense Distributed ("DD") and Second Amendment Foundation, Inc.'s ("SAF") (collectively "Plaintiffs") Third Amended Complaint ("TAC"). (ECF No. 181.) Plaintiffs opposed (ECF No. 184), and Defendant replied (ECF No. 185). After careful consideration of the parties' submissions, the Court decides Defendant's motion without oral argument pursuant to Local Civil Rule 78.1. For the reasons outlined below, Defendant's motion to dismiss is granted. Counts One through Seven are dismissed without prejudice, and Counts Eight and Nine are dismissed with prejudice.

I.     **BACKGROUND**[1]

    A.     **Factual Background**

        i.     *The Parties*

DD is a Texas corporation founded by Cody Wilson ("Wilson"). (TAC ¶¶ 4, 8, ECF No. 180.) Wilson currently serves as DD's director. (*Id.* ¶ 9.) DD "exists to promote the Second Amendment's individual right to keep and bear [a]rms." (*Id.* ¶ 30.) In service to this ideal, DD has published, is publishing, and intends to continue publishing digital firearms information to the American public. (*Id.*) SAF is a Washington-based non-profit membership organization. (*Id.* ¶ 10.) "SAF promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control." (*Id.* ¶ 11.) Some members of SAF seek out DD's digital firearms information, and some SAF members "seek to share their own computer files by utilizing [DD's] facilities." (*Id.*)

Defendant is the current New Jersey Attorney General ("NJAG"). (*Id.* ¶ 13.) In his capacity as NJAG, Defendant is responsible for all of New Jersey's civil and criminal enforcement efforts. (*Id.*)

        ii.     *Publishing of Digital Firearms Information*

"Digital firearms information," as Plaintiffs use the term, is information in the form of coded computer files that acts as an "information store."[2] (*Id.* ¶¶ 24, 25, 28.) This "digital firearms

---

[1] For the purpose of considering the instant motion, the Court accepts all factual allegations in the TAC as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[2] This digital firearms information exists in a wide variety of computer file formats, such as portable document format ("PDF"), Standard for the Exchange of Product Data ("STEP") files, and plain text files. (TAC ¶ 25.)

information" includes, in part, Computer Aided Design files ("CAD Files") and Computer Aided Manufacturing files ("CAM Files"). (*Id.* ¶¶ 26-27.) CAD Files are files primarily used for abstract design wherein a user can "construct and manipulate complex [two-dimensional ("2D") and three-dimensional ("3D")] digital models of physical objects." (*Id.* ¶ 26.) CAD Files are not ready for insertion into object-producing equipment such as a 3D printer. (*Id.*) CAM Files, on the other hand, can be used to construct and manipulate 2D and 3D models of physical objects. (*Id.* ¶ 27.) Unlike CAD Files, CAM Files are ready for insertion into object-producing equipment such as a 3D printer. (*Id.*)

From December 2012 to May 2013, DD published a substantial set of computer files with digital firearms information to its website, Defcad.com ("DEFCAD"). (*Id.* ¶ 41.) Any visitor to the website could download the published digital firearms information for free. (*Id.*) Some of the digital firearms information published via DEFCAD during this period included: (1) files concerning a single-shot firearm known as the "Liberator"; (2) files concerning a magazine for AR-15 rifles; and (3) diagrams of firearm components. (*Id.*) These computer files, in addition to other digital firearms information published by DD, were downloaded "millions of times" by site visitors. (*Id.* ¶ 42.)

In July 2018, DD again published a substantial set of computer files with digital firearms information to DEFCAD and let any site visitor download the information for free. (*Id.* ¶ 43.) This downloadable information included, in part: (1) files concerning an assembly of the AR-15 rifle and magazine; (2) SOLIDWORKS part (".sldprt") files about firearm components; and (3) plain text files about firearm assembly methods. (*Id.*) These files were downloaded "hundreds of thousands of times." (*Id.* ¶ 44.)

Later that year, between August and November 2018, DD again published a substantial set of computer files with digital firearms information. (*Id.* ¶ 46.) This time, however, DD made its computer files available for mailed shipment on physical storage devices like USBs and SD cards. (*Id.* ¶ 46.) To accomplish this mailed delivery, DD used an ecommerce platform on DEFCAD to facilitate all online orders, and then used the U.S. Postal Service ("USPS") to deliver the firearms information ordered by DD's website visitors. (*Id.*) It is unclear whether DD customers had to pay for the digital firearms information shipped in this physical form. (*See id.*)

On March 27, 2020, DD published a substantial set of computer files with digital firearms information via DEFCAD. (*Id.* ¶ 49.) This group of files is still published on DEFCAD to date. (*Id.* ¶ 55.) The files published during this period include: (1) original and legacy firearm models; (2) CAD Files; (3) CAM Files; and (4) blueprints and drawings (*Id.* ¶ 49.) Unlike DD's prior periods of publication, however, the current publication period does not let DEFCAD visitors download files freely. (*Id.* ¶ 50.) Instead, DEFCAD now utilizes secure end-to-end encryption, screens DEFCAD visitors that attempt to access files, deems some DEFCAD visitors ineligible for file distribution, prevents DEFCAD files from being made available outside the United States, and does not make any files available to New Jersey residents or persons who lack a federal firearms license. (*Id.* ¶¶ 49-54.)

While DD's March 2020 computer files continue to be available on DEFCAD, all computer files published by DD prior to March 2020, while no longer available on DEFCAD, continue to be available on the Internet more generally. (*See id.* ¶ 56.) This is because many recipients of DD information persistently republish DD files online via their own websites. (*Id.*) While DD ceased publishing new digital firearms information due to the current legal climate, DD intends to publish digital firearms information in the future when it is legal to do so. (*Id.* ¶ 57.) Specifically, DD seeks

to, in part, make all previously published digital firearms information, including the information published in 2012, 2013, 2018, and 2020, freely available to DEFCAD visitors. (*Id.*) DD also plans to publish additional CAD, CAM, and computer files with other digital firearms information in the future. (*Id.*)

### iii.    The NJAG's Alleged Censorship of DD's Speech

On July 26, 2018, the NJAG issued DD a formal cease-and-desist correspondence (the "Correspondence"). (*Id.* ¶ 120.) The Correspondence instructed DD to cease publishing digital firearms information "for use by New Jersey residents." (*Id.* ¶ 121.) The Correspondence stated that the publishing of digital firearms information was a violation of New Jersey's public nuisance and negligence laws. (*Id.*) The Correspondence concluded that legal action would be brought against DD by August 1, 2018 if DD's efforts to publish digital firearms information did not cease. (*Id.*)

That same day, the NJAG issued a press release informing the public that if DD failed to comply with the NJAG's demands, legal action would follow. (*Id.* ¶ 122.) The press release also took the position that posting digital firearms information online is "no different than driving to New Jersey and handing out hard-copy files on any street corner." (*Id.*)

On July 27, 2018, DD replied to the NJAG with a letter stating that all of DD's actions "are fully protected by the First Amendment" and that the NJAG's attempts to restrict DD's publications constitute an unconstitutional prior restraint in violation of the United States Constitution. (*Id.* ¶ 123.) Nevertheless, DD stated in its letter that it would attempt to restrict files made available on the Internet to prevent them from being downloaded within New Jersey. (*Id.*)

On July 30, 2018, the NJAG contacted one of DD's Internet security service providers, DreamHost. (*See id.* ¶¶ 124-26.) The NJAG informed DreamHost that DD planned to use

DEFCAD in a manner that violated DreamHost's Acceptable Use Policy. (*Id.* ¶ 127.) Moreover, the letter informed DreamHost that DD's publication of digital firearms information violates New Jersey law. (*Id.*) That same day, the NJAG sent Cloudflare, Inc. ("Cloudflare"), another of DD's Internet security service providers, a copy of the Correspondence. (*Id.* ¶ 128.)

On November 8, 2018, the New Jersey Legislature passed Senate Bill 2465, later codified at N.J. Stat. Ann. 2C:39-9(*l*)(2) (the "Challenged Statute"). (*Id.* ¶ 129; *see also* N.J. Stat. Ann. 2C:39-9(*l*)(2).) The law, in pertinent part, reads as follows:

> [I]t is a second[-]degree crime for:
>
> . . .
>
> (2) a person to distribute by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a manufacturer as provided in chapter 58 of Title 2C of the New Jersey Statutes, digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a [3D] printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.
>
> As used in this subsection: '[3D] printer' means a computer or computer-driven machine or device capable of producing a [3D] object from a digital model; and 'distribute' means to sell, or to manufacture, give, provide, lend, trade, mail, deliver, publish, circulate, disseminate, present, exhibit, display, share, advertise, offer, or make available via the Internet or by any other means, whether for pecuniary gain or not, and includes an agreement or attempt to distribute.

N.J. Stat. Ann. 2C:39-9(*l*).

DD alleges that the Challenged Statute was passed in order to "jail" DD, SAF, and anyone else that shares digital firearms information. (TAC ¶¶ 130, 135.) At the signing ceremony for the Challenged Statute, New Jersey Governor Phil Murphy referred to DD when he stated that the

NJAG "issued [the Correspondence] to the companies that deal in ghost guns,[3] saying explicitly that New Jersey is off limits to them." (*Id.* ¶ 136.) The NJAG then said, at the same signing ceremony, that the Challenged Statute was a "stronger tool" that the NJAG could use to stop DD founder Cody Wilson and his supporters from releasing digital firearms information online. (*Id.* ¶ 137.) The NJAG also stated that he hoped to "stop the next Cody Wilson" and that the NJAG will come after any "ghost gun company" that is "contemplating making a printable gun." (*Id.* ¶¶ 138-39.)

In light of the Challenged Statute's passage, DD ceased its activities in New Jersey because it feared that the NJAG would commence enforcement of the new law against DD at any moment. (*See id.* ¶¶ 141-42.) DD and SAF took legal action against the Challenged Statute shortly thereafter. *Def. Distrib., et al. v. Grewal*, No. 19-4753, ECF No. 1.

## B.     Procedural Background

This case has a long and contentious procedural history that is well-documented on the docket and need not be revisited in full. As such, the Court recites only the procedural history necessary to contextualize the instant motion.

### i.     *Relevant History from Previous Litigation Between the Parties*

Almost all cases in the United States addressing 3D-printed guns in the context of the First and Second Amendment stem from an initial action filed by Plaintiffs in the Western District of Texas in 2015. *See Def. Distrib. v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 701 (W.D. Tex. 2015). This first case (the "First Texas Case") was brought by Plaintiffs against the United States

---

[3] "Typically, 3D[-]printed firearms are made from plastic parts that may bypass security systems, and they are printed without serial numbers or other types of identification. As such, they are usually referred to as 'ghost guns.'" *Def. Distrib. v. Platkin*, 617 F. Supp. 3d 213, 221 n.2 (D.N.J. 2022) (citing *Gun Owners of Am., Inc. v. City of Philadelphia*, No. 21-2630, 2021 WL 4627556, at *1 (E.D. Pa. Oct. 7, 2021)).

Department of State (the "State Department"). *See generally id.* In that action, Plaintiffs sought an allowance to publish digital firearms information on DEFCAD despite the State Department's concerns that the practice violated the International Traffic in Arms Regulations ("ITAR") and jeopardized national security. *Id.* at 689-90.

Years later, on June 29, 2018, the State Department entered into a settlement agreement in the First Texas Case whereby the federal government agreed:

> [1] [to] publish a notice of proposed rulemaking and final rule revising the United States Munitions List [("USML")] to allow the distribution of [CAD] files for the automated production of [3D-printed] weapons[;] [2] to announce a temporary modification of the USML to allow such distribution[;] . . . and [3] to issue a letter to DD [and others] that the CAD files are approved for public release and unlimited distribution.

*Washington v. U.S. Dep't of State*, 315 F. Supp. 3d 1202, 1203 (W.D. Wa. 2018). Shortly thereafter, various Attorneys General, including the NJAG, sued the State Department (the "First Washington Case") for various administrative procedure violations and for allowing DD to publish digital firearms information containing code for use in a 3D printer. *See generally id.*

Not long after the filing of the First Washington Case, the instant matter was separately filed in the Western District of Texas against the NJAG and the State Department. (ECF No. 1.) Various procedural or administrative appeals stemming from the First Texas Case, the First Washington Case, and the instant matter comprise much of the jurisprudence regarding whether the distribution of digital firearms information is constitutionally protected speech. *See, e.g.*, *Def. Distrib. v. Bruck*, 30 F.4th 414, 421-23 (5th Cir. 2022); *Def. Distrib. v. Att'y Gen. of N.J.*, 972 F.3d 193, 195-97 (3d Cir. 2020); *Def. Distrib. v. U.S. Dep't of State*, 838 F.3d 451, 454-56 (5th Cir. 2016); *Defense Distrib.*, 617 F. Supp. 3d at 221-24; *Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130, 1135-39 (W.D. Wash. 2019); *Washington v. U.S. Dep't of State*, No.

8

C18-1115RSL, 2019 WL 1318704, at *1-2 (W.D. Wash. Mar. 22, 2019); *Washington v. U.S. Dep't of State*, No. C18-1115RSL, 2018 WL 5921011, at *1-2 (W.D. Wash. Nov. 13, 2018); *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1250-54 (W.D. Wash. 2018). This Court, for the first time, reaches the merits of DD's constitutional contentions separate and distinct from any breach of contract claims it brought against the State Department. *See Def. Distrib. & Second Amend. Found.*, No. 18-637, 2023 WL 2544334, at *7 (W.D. Tex. Mar. 15, 2023).

ii.     Recent Procedural History in this Matter

On April 26, 2023, the Court deconsolidated this matter from *Defense Distributed et al. v. Grewal*, Civ. No. 19-4753, after certain plaintiffs voluntarily dismissed their claims in that action. (*Def. Distrib., et al. v. Grewal*, No. 19-4753, ECF No. 60.) Plaintiffs then filed the TAC in this matter (ECF No. 180), which Defendant moved to dismiss (ECF No. 181). Plaintiffs opposed the motion (ECF No. 184), and Defendant replied (ECF No. 185). On June 14, 2023, this Court denied Plaintiffs' third and final attempt to transfer this matter to the Western District of Texas (ECF No. 187), concluding a years-long dispute over the proper forum for this case to be litigated. With the procedural tapestry woven, the Court now turns to the merits of Defendant's motion.

Plaintiffs' TAC alleges nine causes of action: (1) violation of the First Amendment's freedom of speech and of the press (Count One); (2) violation of the Second Amendment's right to keep and bear arms (Count Two); (3) violation of the Fourteenth Amendment's equal protection clause (Count Three); (4) violation of the Fourteenth Amendment's due process clause (Count Four); (5) violation of the dormant Commerce Clause (Count Five); (6) federal preemption through the Arms Export Contract Act ("AECA") (Count Six); (7) federal preemption through the Communications Decency Act ("CDA") (Count Seven); (8) tortious interference with a settlement agreement between DD and the State Department (Count Eight); and (9) tortious interference with

existing contracts (Count Nine). (TAC ¶¶ 175-246.) All of these claims arise from the passing of the Challenged Statute and Defendant's sending of the Correspondence to DD.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2)[4] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state that the defendant unlawfully harmed the plaintiff. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

---

[4] All references to "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

## III.   **DISCUSSION**

The manufacturing of "ghost guns" is a relatively recent phenomena, and legal jurisprudence stemming from the practice is therefore in its infancy. *See N.Y. State Rifle & Pistol Assoc. v. Bruen*, 142 S. Ct. 2111, 2180 (2022) (Breyer, J., dissenting) (anticipating, in light of current Second Amendment jurisprudence, challenges with how courts will assess the constitutionality of ghost guns). In fact, this case is one of the first in the country to assess both whether CAD and CAM Files are protected speech under the First Amendment and whether the Second Amendment allows an individual a constitutional right to manufacture firearms. *See, e.g.*, *Rigby v. Jennings*, 630 F. Supp. 3d 602, 615-16 (D. Del. 2022); *Fahr v. City of San Diego*, No. 21-1676, 2021 WL 4895974, at *4 (S.D. Ca. Oct. 20, 2021).

Ultimately, Plaintiffs bring nine causes of action against the Attorney General of New Jersey consisting of: (1) First Amendment Claims; (2) Second Amendment Claims; (3) Fourteenth Amendment Due Process Claims; (4) a dormant Commerce Clause claim; (5) federal preemption claims; and (6) state law tortious interference claims.[5] (TAC ¶¶ 175-246.) The Court will address each grouping of these claims in turn.[6]

---

[5] All of Plaintiffs' constitutional claims are brought pursuant to 42 U.S.C. § 1983. (TAC ¶¶ 175-246.)

[6] The Court notes Plaintiffs' contention that Defendant's motion should be denied because Defendant's motion to dismiss did not address Plaintiffs' allegations of "[c]ivil censorship (via [the Correspondence]) [but only] criminal censorship" via the passing of the Challenged Statute. (Pls.' Opp'n Br. 2, ECF No. 184.) The Court does not read Defendant's motion to dismiss as failing to address the constitutionality of the Correspondence. While Plaintiffs insist that Defendant must do two separate factual analyses, one addressing Defendant's alleged civil restrictions on Plaintiffs' speech, and one for criminal restrictions on Plaintiffs' speech, such contention is somewhat perplexing considering Plaintiffs makes no effort to separate their nine Counts in this manner. As such, Plaintiffs' contention that "[t]he [NJ]AG's failure to argue about civil censorship means that those claims survive no matter what" is unpersuasive. Moreover, Plaintiffs cite no case law to support their contentions on this issue.

A.     **First Amendment Claim (Count One)**

Plaintiffs allege three First Amendment violation theories: (1) unconstitutional speech restrictions; (2) prior restraint; and (3) overbreadth. (TAC ¶¶ 175-85.) Defendant moves to dismiss each theory. (*See generally* Def.'s Moving Br., ECF No. 181-1.) The Court addresses each in turn.

i.     *Unconstitutional Speech Restrictions*

The alleged speech at issue in this matter, as described by the Challenged Statute, is:

> [D]igital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a [3D] printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component.

N.J. Stat. Ann. 2C:39-9(*l*).[7] Before delving into a First Amendment analysis as to whether this alleged speech can be regulated, the Court must recognize the difficulty of the First Amendment question presented.[8] *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 451 (2d Cir. 2001) ("The[] realities of what code is and what its normal functions are require a First Amendment analysis that treats code as combining nonspeech and speech elements." (citing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386 (1969)).

---

[7] The Court notes that the Challenged Statute does not appear to stop DD from discussing the best way to 3D print a firearm or from distributing non-utilizable information, such as sheet instructions, to a resident in New Jersey. *See* N.J. Stat. Ann. 2C:39-9(*l*). Instead, the only "speech" that the Challenged Statute appears to regulate is digital instructions that can be "used to program" a 3D printer to construct a 3D-printed firearm. (*See* Def.'s Moving Br. 13 (stating that the Challenged Statute "does not restrict any components that express ideas advocating for printable firearms, such as instructional files[, instead] New Jersey law is specifically concerned with the unregulated distribution of the functional capability to make firearms, not the communicative content of code or its ability to convey a particular message").)

[8] *See also* Xiangnon Wang, *De-Coding Free Speech: A First Amendment Theory for the Digital Age*, 2021 Wis. L. Rev. 1373, 1406 (2021) (identifying two key reasons it is difficult to assess whether computer code is protected speech: (1) because "code challenges how [courts] perceive the boundary between 'speech' and 'conduct'"; and (2) "because code can be used in many ways" such as "calculating taxes, vacuuming floors, or for engaging in public discourse").

Whether computer code constitutes protected speech is a question of first impression in this District and this Circuit, and the question has not yet been addressed by the Supreme Court. In fact, only a handful of courts across the country have ruled on the issue at all. The courts that have taken on the issue have not yet taken a definitive stance on a critical question: whether all computer code is speech protected by the First Amendment, or whether some computer code, while speech generally, is functional or nonexpressive such that it is unprotected by the First Amendment.[9] *See e.g.*, *Rigby*, 630 F. Supp. 3d at 616 n.15 (denying a motion for preliminary injunction as to a First Amendment claim on nearly identical facts to this case while assuming 3D-printing computer code was protected First Amendment speech and noting "[t]he Court is skeptical that [the challenged statute] implicates the First Amendment" but stating that the Court need not decide the issue because the defendant prevailed on other grounds); *Karn v. U.S. Dep't of State*, 925 F. Supp. 1, 9 (D.D.C. 1996) ("As a threshold matter, for the purpose of addressing the dispositive issue whether [a] regulation is justified and permissible, the Court will assume that the protection of the First Amendment extends to [] source code.")

The Court does not find this avoidance constructive where, as here, the issue of whether computer code is protected by the First Amendment is directly at issue and it appears that the alleged "speech" may be serving to effectuate an entirely non-expressive function: printing a firearm with little human involvement. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) (rejecting "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea" let alone where a person intends

---

[9] *See also* Mark C. Bennett, *Was I Speaking to You? Purely Functional Source Code as Non-covered Speech*, 92 N.Y.U. L. REV. 1494, 1514 (2017) (identifying that when courts are considering this question they are often "inclined to assume the presence of speech [rather] than to decide the question definitively").

to create an object through use of a machine (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968))); *Spence v. State of Washington*, 418 U.S. 405, 410 (1974) (considering non-verbal speech and noting that for a court to determine if such speech is expressive and protected the court must combine "the nature of [plaintiffs'] activity . . . with the factual context and environment in which it was undertaken" before concluding whether the expression or speech is protected); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 159 (3d Cir. 2002) (noting that where speech "does not involve the use of words" that speech can only be protected if it is "expressive" as opposed to non-expressive. As such, the Court finds that it is necessary to reach this oft-avoided question on the facts of this case.

Courts generally agree that computer code constitutes a form of speech. *Corley*, 273 F.3d at 449-50 (collecting cases) (concluding "that computer code conveying information is 'speech'"); *see also Junger v. Daley*, 209 F.3d 481, 484-85 (6th Cir. 2000); *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435 (N.D. Cal. 1996) (noting that "the functionality of a language does not make it any less like speech"). There is, however, an open question as to whether computer code is always *protected* speech.[10] Specifically, many of the courts that have dealt with this issue

---

[10] An assortment of speech is unprotected by the First Amendment. For example, "[s]pecific criminal acts are not protected speech even if speech is the means for their commission." *United States v. Gonzalez*, 905 F.3d 165, 192 (3d Cir. 2018) (quoting *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017)). This is because "[s]peech intended to bring about a particular unlawful act has no social value," and is thus, in a sense, nonexpressive. *United States v. Hansen*, 143 S. Ct. 1932, 1947 (2023). Nonexpressive conduct, like sleeping on sidewalk, is also unprotected by the First Amendment. *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996). This is because certain conduct may not be "sufficiently imbued with elements of communication to fall within the scope of the First" Amendment. *Johnson*, 491 U.S. at 404 (citation omitted). With this in mind, the Court notes that just because computer code has elements of both conduct and speech does not mean that all computer code is *per se* protected by the First Amendment. Some greater analysis must occur, and while "[i]t is possible to find some kernel of expression in almost every activity a person undertakes" it is this Court's responsibility to ascertain whether "such a kernel is . . . sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

acknowledge a distinction between expressive computer code, which is constitutionally protected, and functional computer code, which may not be. *See Corley*, 273 F.3d at 449 (concluding source code is speech, but suggesting that where code operates "mechanically" and "without intercession of the mind or will of the recipient," it may not be speech, while crediting a previous Second Circuit decision that found that where a programmer communicates through code to the user of the program, such speech is protected, but where a programmer communicates through code with a machine or computer, such speech is "never protected"); *Junger*, 209 F.3d at 485 (finding on the facts of the case before the court that source code "is an expressive means for the exchange of information and ideas about computer programming" but not addressing the constitutional status of source code where the code only serves a functional use that does not serve to assist in the exchange of information or ideas about computer programming); *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 222 (S.D.N.Y. 2000) (assuming, in the context of a preliminary injunction, that "executable code is sufficiently expressive to merit some constitutional protection" but later noting that the computer code at issue in the case did not serve the goals of the First Amendment due to its functionality); *Karn*, 925 F. Supp. at 9 & n.19 (assuming that source code with expressive qualities like the source code in the case before the court, which contained comments embedded within the code serving an instructive purpose, is protected, but casting doubt that source code without such comments would be protected, stating that "[s]ource codes are merely a means of commanding a computer to perform a function."). This Court is inclined to follow the courts before it that have recognized a First Amendment distinction between expressive and non-expressive, functional computer code, as such distinction arises logically from, and is

consistent with, the First Amendment more generally.[11] *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("It is true that restrictions on protected expression [in the context of the First Amendment] are distinct from restrictions on economic activity or, more generally, [from] nonexpressive conduct.")

With this distinction in mind, the TAC lacks sufficient information regarding DD's computer code for the Court to analyze the sufficiency of Plaintiffs' allegations. The above outlined fact-intensive First Amendment standard necessarily requires detailed, technical allegations regarding the types of computer code at issue in this case (i.e., source code, origin code, other), how that code is used (i.e., precisely how the writer or user of the code might interact with the code), whom or what is communicating through the code (programmer-to-human communication, human-to-machine communication, or other), and for what purpose the computer code operates (i.e., to perform a function, to express an idea, or some combination thereof). While some of this information is contained in the TAC, the TAC does not engage in a sufficiently detailed account of DD's computer code for the Court to conduct the necessary analysis. (*See* TAC ¶¶ 24-29.) As such, Plaintiffs will be provided an opportunity to clarify their allegations, consistent with this Opinion, as to the type of code comprising the digital firearms information, how that code produces a firearm, and whether the programming communication that is being regulated is between a human and human, a machine and a human, or some hybrid of both.

---

[11] Were the Court to credit Plaintiffs' position that all computer code, including the alleged speech in this case, is protected as expressive under the First Amendment, then an AI-operated lawnmower which runs on code with no human involvement, an online recruiting service that develops software, or an automated household vacuum performing its core function of cleaning a home could all potentially constitute speech under the First Amendment. Xiangnon Wang, *De-Coding Free Speech*, 2021 Wɪs. L. Rᴇᴠ. at 1377 (providing several of these challenging examples in the context of viewing code as speech). No reasonable interpretation of First Amendment jurisprudence compels this Court to reach such a conclusion. *See Johnson*, 491 U.S. at 404; *Spence*, 418 U.S. at 410.

The Court notes separately that it is unclear what speech Plaintiffs perceive the Challenged Statute as regulating. As previously noted, the Challenged Statute explicitly regulates only computer code that "is used to program" a 3D printer. N.J. Stat. Ann. 2C:39-9(*l*). Plaintiffs, in the TAC, appear to suggest, for example, that the Challenged Statute regulates information that "conveys knowledge without advocating action" such as "plain text . . . files" containing "notes, instructions, and comments." (TAC ¶¶ 24-25.) Plaintiffs also allege, however, that the Challenged Statute regulates distribution of CAM Files, which are "ready for insertion into object-producing equipment." (*Id.* ¶¶ 25, 28.) These forms of computer code appear to be materially different for purposes of the Court's analysis. Should Plaintiffs wish to allege all computer code they offer on DEFCAD is protected speech, they will need to allege how each form of digital firearms information they offer constitutes protected speech based on the general distinction outlined above, and how the Challenged Statute regulates each form of code.

In light of the above findings, the Court does not reach any discussion of content-neutrality as the Court is not yet persuaded that the speech the Challenged Statute regulates is protected. As such, Plaintiffs' direct speech regulation theory of First Amendment violation is rejected at this time.

ii.    *Prior Restraint and Overbreadth*

As the Court has yet to establish whether DD's digital firearms information constitutes protected speech, the Court does not reach Plaintiffs' prior restraint or overbreadth theories.[12] Accordingly, Count One is dismissed without prejudice.

**B.    Second Amendment Claim (Count Two)**

Plaintiffs allege that the Challenged Statute abridges the individual right to keep and bear Arms under the Second Amendment. (TAC ¶¶ 187.) More specifically, Plaintiffs allege that Defendant's conduct "infringes the individual right to make and acquire Arms, which is part and parcel of the right to keep and bear arms." (*Id.* ¶ 190.) Defendant moves to dismiss Plaintiffs' Second Amendment claim arguing: (1) that "a limitation on the distribution of printable gun files does not implicate the plain text of the Second Amendment" because computer code does not constitute an "Arm"; and (2) even if the Second Amendment is implicated, the Second Amendment only protects a "law-abiding citizen[']s right to armed self-defense," and by subverting background check laws by using computer code to print a gun, the manufacture of a 3D-printed gun is unlawful. (Def.'s Moving Br. 19-22.) Plaintiffs in opposition argue that the "right to self-manufacture firearms and to maintain them" is at issue in this case and that the right to self-manufacture firearms has been recognized since the colonial period. (Pls.' Opp'n Br. 23-30.)

---

[12] The Court notes that to the extent Plaintiffs seek to contend the Challenged Statute is an unconstitutional prior restraint, the Court need not reach that issue unless DD's digital firearms information is found to be protected speech. The Court does note, however, that it is skeptical that the Challenged Statute constitutes a prior restraint where it outlines a punishment for speech *after* such impermissible speech occurs. *Cf. Alexander v. United States*, 509 U.S. 544, 553 (1993). To the extent that Plaintiffs intend to contend that the Correspondence constitutes a prior restraint, Plaintiffs provide no case law as to whether a cease-and-desist correspondence can constitute a prior restraint. (*See generally* Pls.' Opp'n Br.) Should Plaintiffs file a fourth amended complaint and wish to reallege their prior restraint claim, they are advised to take note of this deficiency in their briefing.

While a 3D-printed gun itself may be an "Arm," the computer codes sent to someone else to manufacture such an "Arm" does not constitute an "Arm" under the Second Amendment. The term "Arms" in the Second Amendment was defined by the Supreme Court. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). Specifically, the Supreme Court held that "[t]he 18th-century meaning" of "Arms" is no different from the meaning today." *Id.* "Arms" are "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (citing to "Timothy Cunningham's important 1771 legal dictionary" defining "arms" (quoting 1 A NEW AND COMPLETE LAW DICTIONARY)). Computer code cannot be worn for defense, taken into ones hands, or used to cast down an enemy. Only the firearm or weapon it creates can perform such function.

Plaintiffs, however, do not appear to be alleging that computer code constitutes an "Arm" so much as they are alleging that the Second Amendment's "keep and bear" language protects a right to self-manufacture a firearm. (TAC ¶ 190.) Plaintiffs, therefore, allege that the Challenged Statute violates the Second Amendment's right to "keep and bear Arms" by criminalizing the manufacture of 3D-printed arms without a license. (*See id.* (alleging that the Challenged Statute infringes the individual right to make and acquire Arms, which is part and parcel of the *right to keep and bear* Arms).) As to this assertion, the Court is not satisfied that Plaintiffs have Article III standing to bring such a claim. *Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, No. 22-2030, 2023 WL 5539276, at *4 (3d Cir. Aug. 29, 2023) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (internal quotation marks and citation omitted)). While Defendant did not identify Article III standing as a cause for dismissal of Plaintiffs' Second Amendment claim, Article III standing implicates this Court's subject-matter jurisdiction. *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d

261, 269 (3d Cir. 2016) ("Article III standing is essential to federal subject[-]matter jurisdiction and is thus 'a threshold issue that must be addressed before considering issues of prudential standing.'" (citation omitted)). As such, the Court must be satisfied that standing exists before adjudicating Plaintiffs' Second Amendment claim. *N.J. Second Amend. Soc'y v. N.J. Press Assoc.*, No. 22-2938, 2023 WL 5740239, at *1 (3d Cir. Sept. 6, 2023) ("Standing is a jurisdictional requirement . . . so when its conditions are unmet, [courts] have no authority under Article III to consider the merits of the case." (citations omitted)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868))).

To establish Article III standing, a plaintiff must demonstrate: "(1) an injury-in-fact[;] (2) a sufficient causal connection between the injury and the conduct complained of[;] and (3) a likelihood that the injury will be redressed by a favorable decision." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (citations omitted). The "injury in fact" inquiry is often determinative of standing. *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir. 2021) (citations omitted). "A plaintiff seeking to establish [an] injury in fact 'must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). "To be 'concrete,' an injury must be 'real, or distinct and palpable, as opposed to merely abstract.'" *Finkelman*, 810 F.3d at 193 (quoting *N.J. Physicians, Inc. v. President of the United States*, 653 F.3d 234, 238 (3d Cir. 2011)). "To be sufficiently 'particularized,' an injury must 'affect the plaintiff in a personal and individual way.'" *Id.* (quoting

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 n.1 (1992)). Where a plaintiff is an association seeking to invoke associational standing, it may "bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citation omitted).

Here, the TAC does not appear to allege a concrete and particularized Second Amendment injury. (*See generally* TAC.) There is no allegation in the TAC that DD, SAF, or any member of either entity attempted to or was prevented from 3D printing a firearm but could not do so. (*Id.*) Instead, the TAC focuses exclusively on DD's reluctance to publish digital firearm information as a result of the Challenged Statute and the Correspondence. These allegations only invoke a First Amendment injury. With no allegations that either Plaintiff or any association member sought to manufacture a 3D-printed firearm and could not as a result of the Challenge Statute or the Correspondence, Plaintiffs have failed to allege a concrete and particularized Second Amendment injury. As such, Plaintiffs fail to allege an injury-in-fact capable of establishing Article III standing to challenge the Challenged Statute on Second Amendment grounds. The Court, therefore, is

unable to satisfy itself that it has subject-matter jurisdiction over Plaintiffs' Second Amendment claim, and dismisses Count Two without prejudice.[13]

### C.    Fourteenth Amendment Claims (Counts Three and Four)

Under the Fourteenth Amendment, Plaintiffs allege two violations: (1) violation of the equal protection clause through selective enforcement (Count Three); and (2) violation of the due process clause for lack of fair notice, overbreadth, and deprivation of property (Count Four). (TAC ¶¶ 194-211.)

### i.    *Count Three: Selective Enforcement*

Defendant contends that Count Three fails because the TAC identifies no parties who have violated the Challenged Statute, let alone any parties who violated the Challenged Statute and were not prosecuted. (Def.'s Moving Br. 27-28.) Accordingly, Defendant contends that Count Three is not ripe for adjudication as there has been no enforcement of the Challenged Statute. (*See id.*) Moreover, Defendant contends that Plaintiffs' conclusory allegation that the NJAG "disagrees with the content" of DD's speech and "dislikes the persons involved in the speech" is not evidence of improper motive or intent. (*Id.* at 29.) Plaintiffs argue in opposition that their allegation that Defendant "took action against [DD] but not similarly situated persons engaged in publication of

---

[13] Although Count Two is dismissed on standing grounds, the Court notes that should Plaintiffs be able to show that the plain text of the Second Amendment contains a right to self-manufacture a firearm, under *Bruen*, Defendant will have a burden to show how the Challenged Statute comports with this Nation's "historical tradition." *See Bruen*, 142 S. Ct. at 2126. Specifically, the Supreme Court established in *Bruen* that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Range v. Att'y Gen. of the U.S. of Am.*, 69 F.4th 96, 100 (3d Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2126). In such case, the government may regulate that conduct "[o]nly if a firearm regulation is consistent with this Nation's historical tradition." *Id.* Ultimately, it is the government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Here, Defendant did not provide any historical analysis justifying its regulation. Should Defendant wish to move to dismiss any renewed Count Two, Defendant will be expected to brief in accordance with *Bruen*.

[DD files] because [Defendant] disagrees with the content of [DD's] speech" is sufficient to survive the pleading stage. (Pls.' Opp'n Br. 30-31.)

The Fourteenth Amendment prohibits states from denying "any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. This clause protects individuals "against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)). To prevail on a selective enforcement claim under the equal protection clause, Plaintiffs must demonstrate: (1) that they were "treated differently from other similarly situated individuals; and (2) that this selective treatment was based on an 'unjustifiable standard . . . or to prevent the exercise of a fundamental right.'" *Dique v. N.J. State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010) (quoting *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)). To sustain their claim, Plaintiffs must provide evidence that a government decisionmaker took a particular course of action because it would have adverse effects on Plaintiffs. *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012); *see Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiffs' selective enforcement claim fails because they do not allege that the NJAG treated similarly situated parties differently in enforcing the Challenged Statute or sending the Correspondence. To the contrary, Plaintiffs allege that other 3D-printed gun manufacturers and information distributors were treated similarly. (*See* TAC ¶ 136 ("The Attorney General . . . issued a cease-and-desist letter to the *companies* that deal in ghost guns" (emphasis added)); ¶ 138 (quoting the Attorney General as saying "[e]arlier this year, we went after some of the biggest *players* in this industry" and directing his comments toward "*anyone* who is contemplating making

a printable gun" (emphasis added)).) As such, Plaintiffs fail to plausibly allege that the Challenged Statute itself was passed to selectively prevent Plaintiffs from acting. For these reasons, Plaintiffs' selective enforcement theory must fail. Accordingly, Defendant's motion to dismiss Count Three is granted, and Count Three is dismissed without prejudice.

ii.    *Count Four: Due Process Violations*

Defendant next contends that Plaintiffs' due process claim fails. (Def.'s Moving Br. 29-32.) Plaintiffs allege three theories of due process violation: (1) vagueness; (2) overbreadth; and (3) deprivation of property. (*See* TAC ¶¶ 206-08.) First, Plaintiffs do not expound upon their overbreadth theory, and the Court cannot discern any due process-related overbreadth theory separate and distinct from Plaintiffs' overbreadth theory mentioned in the context of the First Amendment. (*Id.* ¶ 206 ("The NJAG's conduct forbids a substantial amount of constitutionally protected speech; as such, it is an unconstitutional deprivation of liberty and property without due process of law."); *see generally* Pls.' Opp'n Br.) As such, the Court construes Plaintiffs' due process and First Amendment overbreadth theories as resting on the same factual allegations. Accordingly, for the reasons stated earlier in this Opinion, the Court does not reach this issue pending determination of whether the digital firearms information at issue in this litigation is protected speech. If Plaintiffs intend to bring this due process-overbreadth theory again, Plaintiffs are encouraged to better clarify their theory in the due process context if they intend to defeat any renewed motion to dismiss.

Second, Plaintiffs' deprivation-of-property theory relies on the factual allegation that the NJAG "deprive[d] [DD] and SAF of a license issued by the Secretary of State pursuant to federal law . . . without supplying adequate pre-deprivation notice and an opportunity to be heard." (*Id.* ¶ 208.) The State Department is no longer a party to this matter, and Plaintiffs fail to plausibly

allege how this claim is sustainable in the absence of the State Department. (*Id.*) Moreover, as Defendant correctly notes, "no injunction could be granted against the NJAG that would result in [the State Department] restoring a license that the Western District of Washington has held violates the APA." (Def.'s Moving Br. 31-32; *see also Washington v. Dep't of State*, 420 F. Supp. 3d at 1135-39.) As such, even if Plaintiffs could state a claim for relief, Plaintiffs fail to allege how any deprivation-of-property theory by Plaintiffs is redressable under Article III. In light of the Western District of Washington's holding, therefore, Plaintiffs do not have Article III standing to bring a deprivation-of-property claim. *Finkelman*, 810 F.3d at 193 (finding that to establish Article III standing, a plaintiff must demonstrate . . . a likelihood that the injury will be redressed by a favorable decision.")

Finally, Plaintiffs aver that the Challenged Statute is void for vagueness. (TAC ¶ 206.) A statute is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)). A statute need not be "vague in all its application[s]" to be void for vagueness. *Johnson v. United States*, 576 U.S. 591, 597-98, 603 (2015).

Plaintiffs assert that "it is impossible for a speaker to know what counts as 'code . . . *that may be* used to' engage in" programming a 3D printer to produce a firearm because "what 'may be used' by one programmer can be totally useless to another." (Pls.' Opp'n Br. 32-33 (alteration in original).) Plaintiffs' contention that the code may be useless to some programmers does not render the language of the statute so vague that it fails to provide a person of ordinary intelligence fair notice of what is prohibited.

The Challenged Statute provides that it is a second-degree crime to facilitate the manufacturing of a firearm by distributing "digital instructions" that may be used to program a 3D printer to manufacture a firearm or firearm components. N.J. Stat. Ann. 2C:39-9(*l*)(2). The term "may," which Plaintiffs contend renders the Challenged Statute vague, in the context it is used, appears to refer to any digital instruction *with the capability* to program a 3D printer to produce a firearm. This does not appear to be a vague prohibition as a person of ordinary intelligence can conclude from this language that any digital instruction capable of programming a 3D printer to produce a firearm or firearm component is prohibited.[14] Instead, when read as a whole, the Challenged Statute's language clearly defines the type of digital files and the methods of distribution that qualify as prohibited conduct. *See* N.J. Stat. Ann. 2C:39-9(*l*)(2). In this way, the Challenged Statute alleviates the risk of arbitrary and discriminatory enforcement by setting forth a cognizable standard. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 503 (1982) (finding that where an ordinance was "sufficiently clear" the "speculative danger of arbitrary enforcement d[id] not render the ordinance void for vagueness" (citation omitted)). Therefore, because a person of ordinary intelligence is given fair notice of the types and files prohibited by the statute and what function those files cannot be used to perform, and because there is no risk of discriminatory enforcement of the statute, Plaintiffs' claim that the Challenged Statute is void for vagueness fails. Accordingly, Count Four is dismissed without prejudice.

---

[14] To the extent the parties disagree as to what type of digital instruction is capable of "programming" a 3D printer to produce a firearm, the Court does not reach such issue here where, as elaborated upon in the Court's First Amendment analysis, the Court does not yet have before it sufficient briefing to assess the nature and capability of the computer code at issue in this matter.

### D.      Dormant Commerce Clause Claim (Count Five)

Defendant next moves to dismiss Plaintiffs' dormant Commerce Clause claim. (Def.'s Moving Br. 22-26.) Plaintiffs allege that the Challenged Statute "directly regulates interstate commerce by projecting New Jersey law into other states" and "discriminate[s] against interstate commerce" without serving a compelling governmental interest. (TAC ¶¶ 212-21.) Moreover, Plaintiffs contend that the Challenged Statute "expressly projects New Jersey's law . . . throughout the entire Union," because regulating website publications creates "extraterritorial discrimination" violative of the dormant Commerce Clause. (Pls.' Opp'n Br. 34 (quoting *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D.N.Y. 1997).) Defendant, on the other hand, contends that the Challenged Statute is neutral, does not regulate conduct beyond the State of New Jersey, and creates no impermissible extraterritorial effects. (Def.'s Moving Br. 22-26.)

The Commerce Clause states that "Congress shall have [the] Power . . . [t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. "This affirmative grant of authority to Congress 'also encompasses an implicit or "dormant" limitation on the authority of the States to enact legislation affecting interstate commerce.'" *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 237-38 (3d Cir. 2022) (quoting *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 35 F.3d 813, 823 (3d Cir. 1994)). "When evaluating whether a statute violates the Commerce Clause, [courts] examine the statute's effect on interstate commerce." *Id.* at 238 (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)). "[W]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [courts] generally str[ike] down the statute without further inquiry." *Instructional Sys.*, 35 F.3d at 824 (quoting *Brown-Forman*, 476 U.S. at 579). "When, however, a statute only has indirect effects on interstate commerce and

27

regulates evenhandedly, [courts] examine[] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman*, 476 U.S. at 579 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Just this year, in *National Pork*, the Supreme Court clarified its dormant Commerce Clause jurisprudence. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374-80 (2023). In *National Pork*, a California law, Proposition 12, was challenged under the dormant Commerce Clause. *Id.* at 365. The law banned "the in-state sale of certain pork products derived from breeding pigs confined in stalls so small they cannot lie down, stand up, or turn around." *Id.* at 364. Two groups of out-of-state pork producers challenged the law and argued that it "unconstitutionally interferes with their preferred way of doing business in violation of" the dormant Commerce Clause. *Id.* at 363-64.

The Supreme Court in *National Pork* set forth a comprehensive history of dormant Commerce Clause jurisprudence. *Id.* at 368-71. The Supreme Court identified, in part, "that state laws offend the Commerce Clause when they seek to "'build up . . . domestic commerce' through 'burdens upon the industry and business of other States,' regardless of whether Congress has spoken." *Id.* at 369 (quoting *Guy v. City of Baltimore*, 100 U.S. 434, 443 (1880)). This behavior, i.e., building up one state's economy to the detriment of other states' economies, is the type of behavior that constitutes "discriminatory" conduct violative of the dormant Commerce Clause. *See id.* at 369-70 (confirming this definition of "discriminatory" in modern cases and finding that "the Commerce Clause prohibits the enforcement of state laws 'driven by . . . "economic protectionism– that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."'" (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008)). Importantly, however, the Supreme Court noted that, "absent discrimination, 'a State may exclude

from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to' the interest of its citizens." *Id.* at 369 (quoting *Guy*, 100 U.S. at 443).

Here, Plaintiffs expressly bring a "discrimination-based claim" against Defendant. (Pls.' Opp'n Br. 34.) From Plaintiffs' briefing, it appears that they raise a "discrimination-based" claim in an effort to try and distance their dormant Commerce Clause claim from *National Pork* by noting that the plaintiffs in *National Pork* "disavow[ed] any discrimination-based claim." (*Id.* (quoting *Nat'l Pork*, 598 U.S. at 370).) While this assertion is true, it does not make the Supreme Court's interpretation of dormant Commerce Clause jurisprudence concerning discriminatory and non-discriminatory challenges any less relevant to Plaintiffs' "discrimination-based claim." As such, the Court rejects Plaintiffs' attempts to subvert *National Pork.*

As mentioned above, the Supreme Court in *National Pork* identified that, "state laws offend the Commerce Clause when they seek to 'build up . . . domestic commerce' through 'burdens upon the industry and business of other States,'" regardless of whether Congress has spoken. *Nat'l Pork*, 598 U.S. at 369 (quoting *Guy*, 100 U.S. at 443)). This antidiscrimination principle is at the heart of most dormant Commerce Clause challenges, and it follows from this principle that "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors" is prohibited under the dormant Commerce Clause. *Id.* ("[A]ntidiscrimination principles lie[] at the 'very core' of our dormant Commerce Clause jurisprudence." (quoting *Dep't of Revenue of Ky.*, 553 U.S. at 337-38)). Here, the Challenged Statute clearly does not discriminate against out-of-state corporations.

The Challenged Statute provides that any "person" in New Jersey is prohibited from manufacturing a firearm without a proper manufacturer's license or registration, and any distribution of digital firearms information to a person in New Jersey "who is not registered or

licensed as a manufacturer" is a crime. N.J. Stat. Ann. 2C:39-9(*l*). While it is certainly true that Plaintiffs, out-of-state corporations dealing in a now criminalized activity in New Jersey, are economically restricted by the Challenged Statute, such restriction is not a *per se* violation of the dormant Commerce Clause. *See Nat'l Pork*, 598 U.S. at 371-76 (rejecting plaintiffs' argument that the dormant Commerce Clause suggests an "almost *per se*" rule "forbidding enforcement of state laws that have the "'practical effect of controlling commerce outside the state,' even when those laws do not purposely discriminate against out-of-state economic interests"). This is because the Challenged Statute treats in-state and out-of-state distributors of digital firearms information equally: whether a company is a New Jersey or Texas-based digital firearms information distributor, it is illegal for that company to distribute such information into New Jersey. For these reasons, Plaintiffs' "discrimination-based claim" under the dormant Commerce Clause fails as alleged.

The Court's analysis does not end there, however. There are at least two ways to show a state statute facially violates the dormant Commerce Clause: (1) facial discrimination; or (2) direct regulation. *Instructional Sys.*, 35 F.3d at 824 ("When a state statute *directly regulates or discriminates* against interstate commerce . . . [courts] generally [strike] down the statute without further inquiry.") (emphasis added) (quoting *Brown-Forman*, 476 U.S. at 579). Plaintiffs, while claiming to only bring a "discrimination-based claim," also clearly allege and argue that the Challenged Statute directly regulates interstate commerce where Plaintiffs invoke the phrase "extraterritorial discrimination." (TAC ¶ 216 ("The NJAG's conduct violates the dormant Commerce Clause doctrine regarding laws that directly regulate interstate commerce."); Pls.' Opp'n Br. 34 (referring to the Challenged Statute's regulation as "extraterritorial discrimination," a phrase that conflates legal terms related to direct regulation and direct discrimination); *TitleMax*,

24 F.4th at 238 (finding that "[o]ne way a challenged statute can 'directly regulate' interstate commerce is if the statute has 'extraterritorial effects' that adversely affect economic production (and hence interstate commerce) in other states" (quoting *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261-62 (3d Cir. 2006))).)[15] As such, the Court briefly assesses whether the Challenged Statute violates the dormant Commerce Clause by directly regulating interstate commerce.

Plaintiffs appear to argue that the Challenged Statute creates extraterritorial effects by regulating what information can be published on the Internet, i.e., by prohibiting the distribution of digital instructions capable of producing a 3D-firearm on the Internet. (Pls.' Opp'n Br. 34; N.J. Stat. Ann. 2C:39-9(*l*).) The regulation of information published on the Internet, such as digital firearms information that is free to download, can be particularly challenging in this context. This is because, as the Second Circuit in *Dean* noted in 2003, "the [I]nternet does not recognize geographic boundaries, [and as such,] it is difficult, if not impossible, for a state to regulate [I]nternet activities without 'projecting its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 334 (1989)). Nevertheless, *National Pork* again offers useful insight into why a State's regulation of Internet behavior within that State does not directly regulate interstate commerce. Specifically, the Supreme Court in *National Pork* sets forth the following persuasive analysis:

> In our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior. State income tax laws lead some individuals and

---

[15] Facial discrimination is a separate dormant Commerce Clause violation theory from direct regulation and extraterritorial effects. *See Instructional Sys.*, 35 F.3d at 824. "Extraterritorial discrimination," stated conjunctively, is Plaintiffs' creation, as this Court could find no case law using this phrase and Plaintiffs provide no case law using this phrase. (*See generally* Pls.' Opp'n Br.) As such, the Court assumes that Plaintiffs allege both theories of dormant Commerce Clause violation separately and addresses both.

companies to relocate to other jurisdictions. Environmental laws often prove decisive when businesses choose where to manufacture their goods. Add to the extraterritorial-effects list all manner of libel laws, securities requirements, charitable registration requirements, franchise laws, tort laws, and plenty else besides. Nor, as we have seen, is this a recent development. Since the founding, States have enacted an immense mass of [i]nspection laws, quarantine laws, [and] health laws of every description that have a considerable influence on commerce outside their borders. [An] "almost *per se*" rule against laws that have the "practical effect" of "controlling" extraterritorial commerce would cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers. It would provide neither courts nor litigants with meaningful guidance in how to resolve disputes over them. Instead, it would invite endless litigation and inconsistent results.

*Nat'l Pork*, 598 U.S. at 374-75 (internal quotation marks and citations omitted). Moreover, as directly applicable to this matter, the Supreme Court in *Strassheim* noted that the dormant Commerce Clause does not, for example, prohibit one state from prosecuting citizens of another state for "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it." *Strassheim v. Daily*, 221 U.S. 280, 285 (1911). The Supreme Court then reaffirmed this notion in *National Pork*, emphasizing that, "absent discrimination," the dormant Commerce Clause does not forbid states from prohibiting "the sale therein of articles which, in its judgment . . . are prejudicial to' the interests of its citizens." *Nat'l Pork*, 598 U.S. at 369 (quoting *Guy*, 100 U.S. at 443).

Here, Plaintiffs contend that because the Challenged Statute regulates the Internet by criminalizing the transmittal of information via the Internet to New Jersey residents, it violates the dormant Commerce Clause. First, the Supreme Court stated in *National Pork* that the dormant Commerce Clause does not prevent a state from criminalizing behavior originating in another state that might produce detrimental effects within the state. *Id.* That is precisely what is happening here. DD, a Texas corporation, published information on the Internet that New Jersey determined

produced detrimental effects in the State of New Jersey. As such, New Jersey criminalized the behavior in the Challenged Statute *but only in New Jersey*. This action does not violate the dormant Commerce Clause even if it produces some modicum of extraterritorial effects.

Second, Plaintiffs' suggestion that any regulation of the Internet is effectively a regulation "throughout the entire Union" is not tenable. (Pls.' Opp'n Br. 34.) Web-content providers, for example, frequently control content flows from state to state and can do so by conditioning access to certain content on the presentation of payment information or by geographical filtering.[16] As such, just because a state regulates certain behavior on the Internet within its borders does not necessarily establish that the state directly regulates interstate commerce by creating extraterritorial effects. For these reasons, any contention by Plaintiffs that the Challenged Statute directly regulates interstate commerce is also rejected. Accordingly, the Court finds that the Challenged Statute does not directly regulate interstate commerce and does not discriminate against out-of-state interests.

Finally, the Court briefly mentions the *Pike* balancing test. *See Brown-Forman*, 476 U.S. at 579 (finding that "[w]hen . . . a statute only has indirect effects on interstate commerce and regulates evenhandedly," courts then conduct a *Pike* balancing test (citing *Pike*, 397 U.S. at 142)). "Under that test, '[w]here [a state] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Yerger v. Mass. Turnpike Auth.*, 395 F. App'x 878, 883 (3d Cir. 2010) (citing *Pike*, 397 U.S. at 142). Other than baldly asserting that "[t]he NJAG's conduct imposes burdens on interstate

---

[16] Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 YALE L.J. 785, 809-10 (2001).

commerce that are clearly excessive in relation to putative local benefits," Plaintiffs' TAC provides no further allegations as to what burden is placed on interstate commerce and how that burden outweighs New Jersey's interest in "preventing individuals 'from manufacturing deadly weapons entirely outside of the state's regulatory regime.'" (Def.'s Reply Br. 14, ECF No. 185; *see generally* TAC.) As such, the Court cannot conduct the *Pike* balancing test, and Plaintiffs' dormant Commerce Clause claim, Count Five, is dismissed without prejudice.[17]

### E.      Federal Preemption Claims (Counts Six and Seven)

Defendant next argues that the Challenged Statute is not preempted by either the AECA or CDA. (Def.'s Moving. Br. 35.) "The doctrine of preemption is derived from the Supremacy Clause of Article IV of the Constitution, which provides that 'the Laws of the United States . . . shall be the supreme Law of the Land.'" *Lupian v. Joseph Cory Holdings*, 905 F.3d 127, 131 (3d Cir. 2018) (citing U.S. CONST. art. VI). "There are three types of federal preemption: field preemption, implied conflict preemption, and . . . express preemption." *Id.* (citation omitted). "Express preemption occurs when a federal law contains express language providing for the preemption of any conflicting state law." *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 395 (3d Cir. 2010) (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)). "Implied conflict preemption occurs

---

[17] Moreover, the Court cautions Plaintiffs that if they wish to amend their dormant Commerce Clause allegations, the Supreme Court in *National Pork* clarified that "'no clear line' separates the *Pike* line of cases from [the Supreme Court's] core antidiscrimination precedents." *Nat'l Pork*, 598 U.S. at 377. To be clear, the Supreme Court held that *Pike* is only intended to be utilized where a state law does not discriminate on its face to assess whether there is nevertheless, in effect, a "discriminatory character [to] the state regulation[.]" *Id.* at 377-78. As noted by the Court above, the Challenged Statute does not discriminate either facially or implicitly against interstate commerce on the facts alleged because there is no allegation that out-of-state distributors of firearms information like DD are treated less favorably than New Jersey distributors of the same information. (*See generally* TAC.) To this end, if Plaintiffs seek to amend their dormant Commerce Clause claim, such amended claim must account for the Supreme Court's *Pike* interpretation outlined in *National Pork*.

when it is either impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). Finally, field preemption "arises when a state law or regulation intrudes upon a 'field reserved for federal regulation.'" *Id.* at 396 (quoting *United States v. Locke*, 529 U.S. 89, 111 (2000)).

### i.  *AECA Preemption Analysis (Count Six)*

Defendant moves to dismiss Plaintiffs' claim that the AECA and the related ITAR preempt the Challenged Statute. (*See* Def.'s Moving Br. at 35-38.) Defendant contends that the Challenged Statute does not forbid anything that federal law authorizes and that it is possible to comply both with the federal regulations applicable to Plaintiffs' digital firearms data and the Challenged Statute, which prohibits distribution in New Jersey. (*See id.*) Defendant specifically highlights that relevant agency rulemakings indicate that such federal administrative rules do not purport to displace existing federal or state law. (*See id.* at 36.) In opposition, Plaintiffs contend that "[b]y seeking to criminalize Plaintiffs' publication of matters that the State Department has expressly authorized for publication, New Jersey seeks to have its legislature take over the President's job of 'control[ling] the import and export of defense articles.'" (Pls.' Opp'n Br. at 36 (citing 22 U.S.C. § 2778(a)(1)).) Plaintiffs further dispute that it is possible to comply with both federal and state law where "the federal law goes far beyond not forbidding conduct and *affirmatively licenses it*." (*Id.* at 37 (emphasis in original).)

"The AECA regulates the export of arms, ammunition, and other military and defense technology." *Washington v. U.S. Dep't of State*, 443 F. Supp. 3d 1245, 1250 (W.D. Wa. 2020) (citing 22 U.S.C. § 2778(a)(1)), *vacated on other grounds by* 996 F.3d 552 (9th Cir. 2021). Under

the AECA, "the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). The same section of the AECA authorizes the President to "promulgate regulations for the . . . export of such articles and services." *Id.* The President delegated the authority to promulgate implementing regulations to the Secretary of State. *Washington*, 443 F. Supp. 3d at 1250. Those regulations, the ITAR, are administered by the Directorate of Defense Trade Controls (the "DDTC"). 22 C.F.R. § 120.1(a); *see Stagg, P.C. v. U.S. Dep't of State*, 983 F.3d 589, 595 (2d Cir. 2020). A "list of items designated as 'defense articles and defense services' is identified as the" USML and appears within the ITAR. *Stagg*, 983 F.3d at 595 (citing 22 C.F.R. § 121.1).

"Under the AECA, any person 'who engages in the business of manufacturing, exporting, or importing any' of the items on the USML must register" with DDTC and obtain a license from the State Department. *Id.* (citing 22 U.S.C. § 2778(b)(1)(A)(i)). "The ITAR specify that 'engaging in such a business requires only one occasion of manufacturing or exporting or temporarily importing a defense article or furnishing a defense service.'" *Id.* (citing 22 C.F.R. § 122.1(a)). "Each of the 21 categories designated as 'defense articles or defense services' in the USML is defined to include 'technical data' either 'relating' or 'directly related' to the listed articles." *Id.* (citing 22 C.F.R. § 121.1). "[T]he term 'technical data' is defined to include '[i]nformation . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance[,] or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions[,] or documentation.'" *Id.* (quoting 22 C.F.R. § 120.10(a)(1)). "Computer software for the production of a Category I firearm or its components using a 3[D] printer ("3D gun files"), such as [CAD] files, is 'technical data' subject

to the AECA and ITAR." *Washington*, 433 F. Supp. 3d at 1251. And "[s]ince about 2013, it had been the government's position that posting [3D] gun files on the [I]nternet was an 'export' subject to the AECA and ITAR." *Id.*

Relevant here, on January 23, 2020, the State Department and Commerce Department published two separate but related final rules affecting regulation of the technical data at issue in this action under the AECA. First, the State Department published a final rule revising the USML. *See* 85 Fed. Reg. 3819 (Jan. 23, 2020) ("State Rule"). The State Rule, among other things, removed all non-automatic firearms up to .50 caliber and related technical data from Category I of the USML. *See id.* at 3823. Second, a companion final rule published by the Commerce Department confirmed that such technical data would still be controlled on the Commerce Control List ("CCL") of the Export Administration Regulations ("EAR"). *See* 85 Fed. Reg. 4136 (Jan. 23, 2020) ("Commerce Rule"). Pursuant to the EAR, notwithstanding the Commerce Department's jurisdictional exemption for "published" technology or software, it retains jurisdiction over:

> '[S]oftware' or 'technology' for the production of a firearm, or firearm frame or receiver, . . . that is made available by posting on the [I]nternet in an electronic format . . . and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the 'software' or 'technology' to produce the firearm frame or receiver or complete firearm.

15 C.F.R. § 734.7(c).

Against this federal regulatory framework, Plaintiffs claim that Defendant's use of the Challenged Statute to stop Plaintiffs' publication of digital firearms data "is preempted by the federal government's exclusive authority over foreign affairs." (Pls.' Opp'n Br. at 35; *see* TAC ¶¶ 224-26.) Plaintiffs also emphasize that, prior to the State Rule and the Commerce Rule, the State Department issued Plaintiffs a license to publish the firearms data at issue. (*See* TAC

¶¶ 75-82, 224.) Aside from such broad and conclusory assertions, however, nothing in the TAC or opposition to Defendant's Motion demonstrates federal preemption of the Challenged Statute.

First, the Challenged Statute is not expressly preempted by the relevant federal statutory provisions and regulations as the regulations do not "contain[] express language providing for the preemption of any conflicting state law." *Kurns*, 620 F.3d at 395. Nor do Plaintiffs argue as much.

Second, the Challenged Statute and the federal framework regulate distinct conduct, and thus there is no basis to find the Challenged Statute invalid under a field preemption theory. While Plaintiffs' basic contention that the federal government retains exclusive authority over foreign affairs is correct, it hardly follows that states are therefore unable to regulate goods, services, or data available within their borders via the Internet. Field preemption "exists if 'federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.'" *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 263, 269 (3d Cir. 2004) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).

Here, the State Rule explicitly contemplates supplementary regulation of domestic distribution of defense articles, including technical data related to firearms. Specifically, the State Rule provides that "[n]either the AECA nor ITAR expressly provide the Department with authority to regulate the distribution of technical data in the United States to U.S. persons." 85 Fed. Reg. 3819, 3822. The State Rule further states that "the AECA does not provide the Department with the authority to . . . regulate the domestic distribution among U.S. persons of any defense article," and that "[d]omestic activities that do not involve release to foreign persons are generally left to other federal agencies—and the states—to regulate." 85 Fed. Reg. 3819, 3822-23. Similarly, the Commerce Rule states that "the domestic transfer of commodities is outside" the Commerce Department's jurisdiction and that "nothing in this final rule affects existing federal or state laws

that pertain to the manufacture, possession, use, or commercial sale of firearms." 85 Fed. Reg. 4136, 4141. Because the Challenged Statute merely supplements the federal regulatory framework, New Jersey's prohibition of Plaintiffs' technical data within its borders absent proper licensing does not intrude upon the federal government's authority over the import and export of defense articles, including via the Internet, under the AECA.[18] Indeed, as the federal government acknowledges, there is ample room in the legislative field for state regulation.

Third, the Challenged Statute does not prevent Plaintiffs' compliance with the relevant federal law. Conflict preemption exists "where it is impossible for a private party to comply with both state and federal law" or "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *Id.* (quoting *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006)).

---

[18] The Commerce Rule notes that "[t]he release of controlled technology in the United States would only be regulated to the extent it would constitute a deemed export (i.e., release to a foreign person)." 85 Fed. Reg. 4136, 4141. The Commerce Rule further explains that, in general, the Commerce Department maintains "controls over the 3D printing of firearms when such software and technology is posted on the [I]nternet." 85 Fed. Reg. 4136, 4142. The fact of federal controls in this area, however, does not prevent supplementary state regulation providing for further restriction applicable only to distribution within state borders. Mere regulatory overlap does not imply field preemption. *See Farina v. Nokia Inc.*, 625 F.3d 97, 116 (3d Cir. 2010) (explaining that the "presumption against pre-emption" "applies with particular force in fields within the police power of the state," including "the field of public health and welfare" and that "the presence of federal regulation, however longstanding, does not by itself defeat the application of the presumption" (citing *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009))).

Here, Plaintiffs are obligated to comply with the licensing requirements of ITAR and EAR with respect to the export of technical data and the Challenged Statute, which applies only to distribution within New Jersey's borders. *See* N.J. Ann. Stat. § 2(C):39-9(*l*)(2). Plaintiffs' only particularized argument as to any conflict between these federal and state regimes is that they were allegedly previously granted a license for "unlimited distribution" of technical firearm data by the State Department as part of a settlement agreement related to a separate litigation and that the Challenged Statute forbids conduct that was approved by the license. (*See* TAC ¶¶ 77-79, 224-26.) But the existence of such a license is refuted by Plaintiffs' own allegations. (*See id.* ¶¶ 83-119.) In fact, Plaintiffs allege that the State Department ultimately "disavowed" and "refused to supply" such a license. (*See id.* ¶¶ 98-106.) Moreover, as described above and as Defendant highlights, the State Department is no longer responsible for the licensing procedures that apply to the technical data, or the majority of technical data, at issue in this matter. (*See* Def.'s Moving Br. at 32 n.9.) Notably, rather than establishing the Challenged Statute as an obstacle to the federal scheme, Plaintiffs' own allegations appear to demonstrate that dual compliance proves no issue, as Plaintiffs admit that their publications of technical data from March 2020 to present were not made available to persons outside the United States and were similarly made unavailable to persons in New Jersey who lack a firearms license. (*See* TAC ¶¶ 52-53.) Plaintiffs' TAC, therefore, fails to set forth any convincing basis for conflict preemption.

In sum, Plaintiffs' AECA preemption claim is less an argument about preemption than it is an apparent grievance with the State Department's supposed repudiation of a previous settlement agreement. In opposing Defendant's Motion, Plaintiffs offer no reasoning or authority supporting the conclusion that the federal regulatory scheme invalidates New Jersey's efforts to preclude illicit

distribution of technical firearms data within its borders. As such, Defendant's Motion is granted as to Count Six, and Plaintiffs' AECA preemption claim is dismissed without prejudice.

      *ii.*    *CDA Preemption Analysis (Count Seven)*

Plaintiffs also allege that § 230(c)(1) of the CDA expressly preempts the Challenged Statute. (*See* Pls.' Opp'n Br. 37-38 (citing 47 U.S.C. § 230(e)(3)).) Defendant moves to dismiss arguing that § 230(c)(1) only applies if the relevant content at issue did not originate from the website operator itself, i.e., did not originate from DD. (Def.'s Moving Br. 36-37.) Defendant then argues that the plain text of the Challenged Statute "applies to the actor's *own* distribution of printable gun files, and is silent regarding" a website's accountability for the posts of another. (*Id.* at 37.) In opposition, Plaintiffs argue that the Challenged Statute is preempted because it does in fact criminalize the republishing of digital firearms information provided by another information content provider. (Pls.' Opp'n Br. 38.)

The CDA provides, in relevant part, that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Essentially, this provision "bars attempts to treat websites as publishers or speakers of content posted by others." *Hepp v. Facebook*, 14 F.4th 204, 209 (3d Cir. 2021); *see also Backpage.com, LLC v. Hoffman*, No. 13-03952, 2013 WL 4502097, at *6 (D.N.J. Aug. 20, 2013) ("[W]hat matters is not the name of the cause of action . . . [but] whether [it] inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009))). "The CDA reflects Congress's decision not to treat websites and other providers of interactive computer services like . . . information providers, such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing

defamatory material written by others." *Obado v. Magedson*, 612 F. App'x 90, 93 (3d Cir. 2015) (citing *Green v. Am. Online (AOL)*, 318 F.3d, 465, 471 (3d Cir. 2003)). The CDA expressly preempts any state or local law that is inconsistent with any provision of the CDA. *See* 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

The question here is whether enforcing the Challenged Statute against DD for publication of digital firearms information to its own website, DEFCAD, would "treat" DD as the "publisher or speaker" of that content. *See Backpage.com*, 2013 WL 4502097, at *6 (citation omitted). The parties do not dispute that DD is an interactive computer service as defined in 47 U.S.C. § 230(f).[19] The TAC alleges that DD is a provider of an "interactive computer service," as defined in § 230(f), because it is a provider and user of an interactive online service at DEFCAD. (TAC ¶ 230.) Critically, however, "[b]y its terms, § 230 provides immunity [only] to [a party] as a publisher or speaker of information *originating from another information content provider*." *Green*, 318 F.3d at 471 (emphasis added).[20] In other words, § 230 only grants immunity to a computer service provider from liability "that would hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content" originating from an entity other than itself. *Id.* (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

---

[19] Section 230(f)(2) defines "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f).

[20] An "information content provider" is defined under § 230(f)(3) to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f).

Here, the Court finds that § 230(c)(1) does not apply to the instant case. As plead in the TAC, the content at issue in this case is the digital firearms information that DD published, from 2012 through 2020, to its own website, DEFCAD. (TAC ¶¶ 41, 43, 46, 49, 50, 55, 56.) Indeed, the basis for DD's liability under the Challenged Statute is DD's own posting of information onto its own website, not any "actions quintessentially related to a publisher's role" that would implicate protection under § 230. *Green*, 318 F.3d at 471. Thus, because the Challenged Statutes does not seek to treat DD as the publisher of a third party's statements, CDA protection under § 230 does not apply.[21] Accordingly, the Court grants Defendant's Motion to Dismiss with respect to Plaintiffs' CDA preemption claim and dismisses Count Seven without prejudice.

## F.      Tortious Interference Claims (Counts Eight and Nine)

Finally, Plaintiffs bring two state-law tortious interference claims. (TAC ¶¶ 236-46.) Sovereign immunity, however, protects Defendant from both Counts.

The Eleventh Amendment "grants a state immunity" from being sued by private parties in federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002) (citation

---

[21] In their opposition brief, Plaintiffs focus their arguments on "Plaintiffs' right to *republish* digital firearms information that was provided by other people engaged in the open-source development process." (Pls.' Opp'n Br. 38 (emphasis in original).) Specifically, they allege that the Challenged Statute criminalizes the distribution of information regardless of whether information was republished. (*Id.*) For instance, the Challenged Statute could penalize DD if it were to republish digital firearms information from a third party. This argument is unavailing, however, given the TAC fails to contain any allegations of republishing. The only allegation with respect to republishing is that "many recipients of [DD]'s digital firearms information have persistently republished those same files online *via their own websites*," not on DD's own website. (TAC ¶ 56 (emphasis added).) The TAC does not allege any facts as to whether DD even allows for other information content providers, besides itself, to post or host content onto its website. Nor does the TAC allege any specific incidents in which DD republished a third party's digital firearms information or even that such republishing would be subject to penalty under the Challenged Statute. As such, Plaintiffs' alleged increased risk of future liability under the Challenged Statute based on republishing is a hypothetical and speculative harm that is insufficient to sustain their CDA preemption claim. *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (stating that "allegations of 'possible future injury' are not sufficient to satisfy Article III" standing).

omitted); *see also MCI Telecomms. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 503 (3d Cir. 2001) (collecting cases). "This immunity extends to state agencies and departments." *MCI Telecomms.*, 271 F.3d at 503. "[A] suit against a state official in his or her official capacity is not a suit against the official[,] but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). A state, however, "may waive its Eleventh Amendment immunity" by either voluntarily invoking federal jurisdiction when bringing a suit or by making a clear declaration that it intends to submit itself to federal jurisdiction. *Allen v. N.J. State Police*, 974 F.3d 497, 505 (3d Cir. 2020) (citing *MCI Telecomms.*, 271 F.3d at 504). "Waiver of Eleventh Amendment immunity will be found 'only where the state's consent is stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Id.* (citing *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 345 (3d Cir. 2003)).

Here, Plaintiffs are private actors bringing this federal lawsuit against the NJAG for actions taken in his official capacity. Plaintiffs seek only declaratory and injunctive relief, in addition to attorney's fees. (TAC ¶¶ 246, 250.) Typically, where Plaintiffs seek injunctive relief against state officials to end ongoing violations of federal law, such claims are not barred by the Eleventh Amendment. *MCI Telecomms.*, 271 F.3d at 513-14 (citations omitted). Importantly, however, this Eleventh Amendment exception does not apply where, as here, a plaintiff brings state law claims against a state actor. *King v. Christie*, 981 F. Supp. 2d 296, 310 n.12 (D.N.J. 2013) (finding a plaintiff "may not bring state law claims . . . against the State regardless [of] the type of relief it seeks" (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-06 (1984))). As such, in order for Plaintiffs' state law claims to proceed at all, Plaintiffs must show that Defendant waived sovereign immunity.

Plaintiffs first contend that Defendant waived immunity by "voluntarily proceeding in federal court against the Plaintiffs" in the First Washington Case. (Pls.' Opp'n Br. 39 (citing *Lapides*, 535 U.S. at 619).) In *Lapides*, the Supreme Court held in the context of a defendant's removal of a matter to federal court from state court that "a State's voluntary appearance in federal court amount[s] to a waiver of its Eleventh Amendment immunity." 535 U.S. at 619 (citing *Clark v. Barnard*, 108 U.S. 436, 447 (1883)). Critically, Defendant neither filed this action nor voluntarily appeared in federal court by removing this action from state court like the defendant in *Lapides*. Plaintiffs were the only party that decided to litigate this matter voluntarily in a federal court where they chose to file their claims against the NJAG in a Texas federal court. (Compl., ECF No. 1.) Further, the Court is unpersuaded that *Lapides* stands for the proposition that Defendant's filing of the First Washington Case in a separate, but factually adjacent, matter constitutes a waiver of sovereign immunity in a Texas/New Jersey matter that Defendant did not voluntarily file or remove to federal court. *See Lombardo v. Pa. Dep't of Pub. Welfare*, 540 F.3d 190, 198 (3d Cir. 2008) (holding that in light of *Lapides*, a "State's ability to raise sovereign immunity when it is involuntarily brought into federal court[]" is not affected). Plaintiffs certainly cite no case law that leads this Court to make such a conclusion. (*See* Pls.' Opp'n Br. 39.) As such, Plaintiffs fail to plausibly allege that Defendant waived sovereign immunity and therefore Plaintiffs' state law claims cannot succeed against Defendant. Accordingly, Counts Eight and Nine are dismissed with prejudice.

## IV.   **CONCLUSION**

For the reasons discussed in this Opinion, Defendant's motion to dismiss is granted. Counts One through Seven are dismissed without prejudice. Counts Eight and Nine are dismissed with prejudice. The Court will issue an Order consistent with this Opinion.

s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE
